**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for Tarragon Corporation, *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>TARRAGON CORPORATION, *et al.*,<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NOS. 09-<br><br>Chapter 11<br>(Joint Administration Pending)<br><br>**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER: (A) AUTHORIZING THE DEBTORS TO CONTINUE USING THEIR EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS; (B) AUTHORIZING CONTINUED INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES; AND (C) WAIVING THE DEBTORS' COMPLIANCE WITH INVESTMENT GUIDELINES UNDER 11 U.S.C. § 345(b)**<br><br>**HEARING DATE AND TIME:**<br>January __, 2009, at __:__ __.m.<br><br>**ORAL ARGUMENT REQUESTED** |

TO:   Honorable Judge of the
        United States Bankruptcy Court

The Verified Application of Tarragon Corporation, *et al*., the within debtors and debtors-in-possession (collectively, the "Debtors")[1], by and through their proposed counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., respectfully states as follows:

## I.    INTRODUCTION AND JURISDICTION

1. This Verified Application is submitted in support of the Debtors' motion for an Order: (a) authorizing the Debtors to continue using their existing cash management system, bank accounts and business forms; (b) authorizing continued intercompany arrangements and historical practices; and (c) waiving compliance with investment guidelines under 11 U.S.C. § 345(b) (the "Motion").  As set forth below, granting the Debtors the relief requested in the Motion is crucial to the Debtors' ability to operate their businesses during these Chapter 11 proceedings without interruption.

2. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## II.    BACKGROUND

4. On January 12, 2009 (the "Filing Date"), each of the Debtors filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing Date, the Debtors have remained in possession of their assets and

---

[1] The Debtors are Tarragon Corporation ("Tarragon Corp."), Tarragon Development Corporation, Tarragon South Development Corp., Tarragon Development Company LLC, Tarragon Management, Inc., Bermuda Island Tarragon LLC, Orion Towers Tarragon, LLP, Orlando Central Park Tarragon L.L.C., Fenwick Plantation Tarragon LLC, One Las Olas, Ltd., The Park Development West LLC, 800 Madison Street Urban Renewal, LLC, 900 Monroe Development LLC, Block 88 Development, LLC, Central Square Tarragon LLC, Charleston Tarragon Manager, LLC, Omni Equities Corporation, Tarragon Edgewater Associates, LLC, The Park Development East LLC, and Vista Lakes Tarragon, LLC.

2

continued management of their businesses as debtors-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

5. A detailed description of the Debtors' businesses and facts precipitating the filing of the Debtors' Chapter 11 proceedings is set forth in the Affidavit of William S. Friedman (the "Friedman Affidavit") submitted in support of the Debtors' various "First Day Motions." Those facts are incorporated herein by reference.

6. As set forth in the Friedman Affidavit, Tarragon Corp. and its direct and indirect, debtor and non-debtor affiliates (collectively, "Tarragon") are real estate developers, owners and managers. Tarragon operates two (2) business divisions, a real estate development division (the "Development Division") and an investment division (the "Investment Division"). The Development Division focuses on developing, renovating, building and marketing homes in high-density, urban locations and in master-planned communities. The Investment Division owns and operates a portfolio of stabilized rental apartment communities.

7. Tarragon uses an integrated, centralized cash management system in its ordinary course of business. Generally, under this system (the "Cash Management System"), funds collected by project entities are wired directly or transferred daily to a master concentration account maintained by Tarragon Corp. and disbursed through controlled disbursement accounts in the name of the project entities to pay operating expenses. The centralized Cash Management System enables Tarragon to (a) better forecast and report its cash position, (b) monitor collection and disbursement of funds and (c) maintain control over the administration of various bank accounts, all of which facilitates effective collection, disbursement and movement of cash.

8. To control Tarragon's treasury effectively, the Cash Management System is reviewed and monitored by, among others, Tarragon's internal accounting and cash management staff as well as an outside auditing firm.

**A.    The Debtors' Existing Bank Accounts**

9.    As of the Filing Date, Tarragon maintains over 100 active bank accounts (the "Bank Accounts"). A schedule of the Bank Accounts is attached as **Exhibit A**.[2]

10.    Tarragon maintains the following types of accounts:

Master Account: The Cash Management System primarily revolves around the Master Account, into which substantially all the funds received by Tarragon are either directly deposited or automatically swept from various zero-balance accounts. The Master Account is a corporate account used to concentrate all available funds that are not otherwise required to be segregated. Each night balances remain in the Master Account and gain earnings credit.

Depository Accounts: The Depository Accounts are individual property accounts that are used for rental deposits only. There are no disbursements made from those accounts. Funds in the Depository Accounts are automatically swept into the Master Account.

Operating Accounts: The Operating Accounts are segregated bank accounts used for rental deposits and checks. Segregated Operating Accounts generally are only used when specifically required by a lender, joint venture or partner.

Disbursement Accounts: Tarragon has approximately 50 Disbursement Accounts. The Disbursement Accounts are used to pay expenses for all non-segregated properties that have funds swept to the Master Account and for homebuilding projects. Funds are automatically transferred into the Disbursement Accounts on an as-needed basis in amounts large enough to cover anticipated disbursements from those accounts.

Security Deposit Accounts: The Security Deposit Accounts are used for tenant security deposits that are required by a lender or state to be segregated from other funds. Checks are not written from those Security Deposit Accounts to refund a tenant's security deposit. Rather, when a resident is refunded a security deposit, a

---

[2] The Debtors believe that the list of Bank Accounts in Exhibit A includes a complete list of all of Tarragon's bank accounts. However, in the event that one or more bank accounts may have been inadvertently omitted from Exhibit A, such accounts are included in the definition of Bank Accounts.

4

>check is issued from the respective properties' Disbursement Account or Operating Account (whichever is applicable). Thereafter, on a monthly basis, the respective Disbursement Account or Operating Account is reimbursed from the Security Deposit Accounts for the amount of the security deposit refunded.
>
>Letter of Credit/CD/Money Market Accounts: Letters of credit are assigned only as necessary and are secured with a Certificate of Deposits Account or Money Market Account equal to the amount of the letter of credit.
>
>Lender Accounts: The Lender Accounts are used for rental deposits for properties that are subject to a lender's cash management agreement. Funds from the Lender Accounts transfer to an Operating Account that is for a specific project rather than to the Master Account.

**B.    Flow of Funds in the Debtors' Cash Management System**

11.    The transfer of funds through the Cash Management System is described in detail herein and is illustrated in the flow chart attached as **Exhibit B**.

12.    Deposits.  In the ordinary course of business, Tarragon routinely receives cash, via check or wire transfer, upon the closings of sales of properties or units. Those sale proceeds are deposited into the Master Account. Tarragon also receives rental income derived from the properties in the Investment Division. Rental income from all properties, with the exception of those properties required to be segregated by a joint venture, partner or lender, such as General Electric Capital Corporation ("GECC"), are deposited into Depository Accounts. The Depository Accounts are swept daily into the Master Account. Additionally, for projects that have construction loans, monthly loan draws are wired from the lender to the Master Account. Other miscellaneous funds are deposited into a stand-alone account of Tarragon Corp. and transferred to the Master Account.

13.    Disbursements.  In the ordinary course of business, Tarragon uses its Disbursement Accounts to make payments with respect to rental properties' or homebuilding properties' operating and overhead expenses, as well as corporate expenses and costs. The

5

Disbursement Accounts are zero-balance accounts that are automatically funded with the amounts necessary to clear checks from the Master Account.

14. <u>Payroll.</u>  Payroll is funded by wire transfer from the Master Account to Automatic Data Processing, Inc.'s bank account maintained at Deutsche Bank in New York (the "ADP Bank Account") two (2) days before payroll is issued.  Additionally, by separate wire, related payroll obligations including payroll taxes are also transferred to the ADP Bank Account two (2) days before payroll is issued.

15. <u>Intercompany Transactions</u>.  In the ordinary course of their respective businesses, the Tarragon entities engage in intercompany financial transactions (collectively, the "Intercompany Transactions").  Transfers of cash to and from Bank Accounts are routinely made on account of the Intercompany Transactions, which typically include payments for the funding, if necessary, of the Debtors' and their affiliates' working capital requirements including, but not limited to, debt service on certain non-income producing properties.  All of those transfers are made in the ordinary course of business as part of the consolidated Cash Management System.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and their estates.

16. This Cash Management System is similar to those commonly employed by corporate enterprises comparable to Tarragon in economic scope and geographic reach.  Large, multi-entity businesses use similar cash management systems because of the numerous benefits provided, including, the ability to (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds.

6

C. **The Debtors' Existing Business Forms and Checks**

17. In the ordinary course of business, the Debtors use numerous varieties of checks and other business forms. To minimize expenses to their estates and to avoid confusion and unnecessary distraction on the part of employees, the Debtors believe it is appropriate for them to continue to use all correspondence and business forms including, but not limited to, letterhead, invoices, purchase orders, customer communications, checks and envelopes (collectively, the "Business Forms") as such forms were in existence immediately prior to the Filing Date – without reference to the Debtors' status as debtors-in-possession – rather than requiring the Debtors to incur the expense, delay and distraction of ordering entirely new business forms and integrating them into daily use.

### III.    RELIEF REQUESTED AND BASIS THEREFOR

A. **Continued Use of the Cash Management System and Existing Bank Accounts is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

18. Upon filing their Chapter 11 proceedings, the Debtors became bound by the Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines") established by the Office of the United States Trustee for the District of New Jersey (the "UST"). Pursuant to the Operating Guidelines, the Debtors' "failure to comply with the operating and/or reporting requirements . . . may result in the dismissal or conversion of these case to cases under Chapter 7 of the Bankruptcy Code." The Operating Guidelines state that, upon filing their Chapter 11 petitions, the Debtors:

> must immediately close all of [their] existing bank accounts and open new bank accounts which must be (i) designated as debtor in possession accounts ("DIP Accounts") and (ii) maintained subject to the following conditions:
>
>   a.    All money of the bankruptcy estate[s] must be deposited in the DIP Accounts . . .

Operating Guidelines, p. 1, ¶ 2.

7

19.     If the Debtors were required to open all new bank accounts and alter their existing Cash Management System, there likely would be a disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their operations. Such a disruption would negatively impact the Debtors' ability to make a smooth transition into Chapter 11. In contrast, maintaining the Cash Management System, including the Intercompany Transactions, will greatly facilitate the Debtors' transition into Chapter 11 by, among other things, minimizing delay in paying post-petition debts and eliminating administrative inefficiencies.[3] Accordingly, the Debtors respectfully request that the Court enter an Order authorizing their continued use of the Cash Management System and Bank Accounts, rather than opening new debtor-in-possession accounts.[4]

**B.    It is Appropriate for the Debtors to Continue Use of Existing Checks and Business Forms**

20.     As set forth above, in the ordinary course of business, the Debtors use a wide variety of checks and other business forms. To minimize expense to their estates and distraction to employees, the Debtors request authority to continue to use the Business Forms, substantially in the forms existing immediately before the Filing Date, without reference to their status as

---

[3] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to Tarragon, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a post-petition basis, including the payment of invoices for non-debtor entities relating to the pre-Filing Date period. All Intercompany Transactions involving Debtor entities will be reported on the Debtors' monthly operating reports. The continued performance of the ordinary course Intercompany Transaction is critical to insuring the Debtors' ability to operate their businesses as debtors-in-possession without interruption.

[4] The Debtors propose to maintain the Bank Accounts on an interim basis for the next sixty (60) days. If the UST does not file a written objection thereto before expiration of the sixty (60) day period, the accompanying Order provides that the Debtors shall be authorized to maintain and utilize the Bank Accounts post-petition on a permanent basis.

8

debtors-in-possession. Because of the complex nature of the Debtors' business operations, use of new business forms would greatly increase the Debtors' costs and add significantly to the administrative burdens of transitioning to operations in Chapter 11.

21. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size of these Chapter 11 cases, the number of creditors involved and the likely publicity attendant to the bankruptcy filings. In addition, all known creditors will be sent notices of the commencement of these cases and there will be a press release announcing the filing. In light of the comprehensive formal and informal notice that creditors will receive regarding the Debtors' Chapter 11 filing, the Debtors submit that changing business forms is unnecessary and unduly burdensome.

C. **Cause Exists for a Waiver of the Debtors' Compliance with Investment Guidelines of Section 345 of the Bankruptcy Code**

22. Section 345 of the Bankruptcy Code governs a debtor's deposits and investments of cash during a Chapter 11 case and authorizes deposits or investments of money "such as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," Section 345(b) of the Bankruptcy Code requires that the estate secure from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, unless the Court orders otherwise. In the alternative, the estate may

9

require that the entity deposit governmental securities pursuant to 31 U.S.C. § 9303.[5]  11 U.S.C. § 345(b).

23.     Section 345(b) also expressly provides that a court may modify these requirements for cause.  The Debtors submit that, under the existing circumstances, cause exists to authorize the Debtors to continue to deposit and invest cash in substantially the same manner as the Debtors have invested such funds prior to the Filing Date.

24.     It is within the Court's discretion to extend or waive the investment guidelines requirement under Section 345(b) of the Bankruptcy Code "for cause."  11 U.S.C. § 345(b); see also 140 Cong. Rec. H10752-01 (October 4, 1995) (Section 345(b) investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated debtors.").  Courts have previously held that, in determining whether "cause" exists for the waiver, the court should consider the sophistication and size of the debtors' business, the bank ratings of the financial institution where the funds are held, the complexity of the debtor's bankruptcy case, and the reasonableness of the debtor's request for relief from Section 345 in light of the overall circumstances.  In re Service Merchandise Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

25.     Cause exists to grant a waiver of the requirements of Section 345 of the Bankruptcy Code for several reasons.  The Debtors do not maintain any investment accounts of significance.  In light of the Debtors' sophisticated and complex Cash Management System and their regular deposits and sweeps, it would be unnecessary and wasteful for the Debtors to be

---

[5] This statutory provision provides that where a person is required by law to give a surety bond, that person, in lieu of such surety bond, may provide a governmental obligation. 31 U.S.C. § 9303.

10

38590/0031-3111023v1

forced to incur the expense of obtaining a bond given the safeguards embedded in the Cash Management System. The Debtors submit that their current practices provide sufficient protection for their cash and it would be in the estates' best interests for the Debtors to continue to follow these practices. The Bank Accounts are in financially stable banking institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC") insurance.[6] Thus, requiring adherence to the strictures of Section 345(b) is unnecessary and would needlessly impede the administration of the Debtors' cases.

WHEREFORE, the Debtors respectfully request that the Court enter an Order granting the Motion and such other relief as the Court deems just and appropriate under the circumstances.

>COLE, SCHOTZ, MEISEL,
>FORMAN & LEONARD, P.A.
>Proposed Attorneys for Debtors-in-Possession,
>Tarragon Corporation, *et al*.
>
>By:    */s/ Michael D. Sirota*
>       Michael D. Sirota
>       Warren A. Usatine

DATED: January 12, 2009

---

[6] FDIC insurance covers funds in deposit accounts, including checking and saving accounts, money market deposit accounts and certificates of deposit. The amount of FDIC insurance recently was increased to $250,000, except for non-interest bearing transaction accounts which currently have unlimited coverage.

11

38590/0031-3111023v1

**VERIFICATION**

WILLIAM S. FRIEDMAN, of full age, certifies as follows:

1.  I am the Chief Executive Officer of Tarragon Corporation, one of the within debtors and debtors-in-possession (the "Debtors"). As such, I have full knowledge of the facts set forth in, and am duly authorized to make this Application on the Debtors' behalf.

2.  I have read the Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3.  I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

DATED: January 12, 2009              */s/ William S. Friedman*
                                      WILLIAM S. FRIEDMAN

38590/0031-3111023v1