**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Proposed Attorneys for Tarragon Corporation, *et al.*
Debtors-in-Possession

|  |  |
|---|---|
|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY CASE NOS: 09- |
| In re: TARRAGON CORPORATION, *et al.* Debtors-in-Possession. | Chapter 11 (Joint Administration Pending) **AFFIDAVIT OF WILLIAM S. FRIEDMAN IN SUPPORT OF DEBTORS' "FIRST DAY MOTIONS"** |

STATE OF NEW JERSEY )
                    )SS.
COUNTY OF BERGEN    )

WILLIAM S. FRIEDMAN, of full age, being duly sworn according to law, upon his

oath, deposes and states:

1.      I am the Chief Executive Officer ("CEO") of Tarragon Corporation ("Tarragon

Corp."), one of the within debtors and debtors-in-possession.[1]  I have served as Tarragon Corp.'s

---

[1] The debtors in these cases are (collectively, the "Debtors") Tarragon Corp., Tarragon Development Corporation ("Tarragon Dev. Corp."), Tarragon South Development Corp., Tarragon Development Company LLC, Tarragon Management, Inc. ("TMI"), Bermuda Island Tarragon LLC ("Bermuda Island"), Orion Towers Tarragon, LLP ("Orion"), Orlando Central Park Tarragon L.L.C. ("Orlando Central"), Fenwick Plantation Tarragon LLC, One Las Olas, Ltd. ("Las Olas"), The Park Development West LLC ("Trio West"), 800 Madison Street Urban (continued…)

38590/0031-1530805v13

CEO since April 1997 and as Chairman of Tarragon Corp.'s Board of Directors since December 2000.[2] I am fully familiar with the Debtors' operations, business affairs and records, and am duly authorized to make this Affidavit on the Debtors' behalf.

## I. INTRODUCTION

2. On January 12, 2009 (the "Filing Date"), each of the Debtors filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"). Since the Filing Date, the Debtors have remained in possession of their assets and continued management of their business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3. To avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' operations, and to facilitate the Debtors' orderly transition into Chapter 11, the Debtors have requested the Court to consider, on an expedited basis, the following motions filed simultaneously with their Chapter 11 petition (collectively, the "First Day Motions"):

(a) Application for Expedited Consideration of Emergent and First Day Matters

(b) Application for Designation as Complex Chapter 11 Cases

---

(…continued)
Renewal, LLC ("800 Madison"), 900 Monroe Development LLC ("900 Monroe"), Block 88 Development, LLC, Central Square Tarragon LLC ("Central Square"), Charleston Tarragon Manager, LLC, Omni Equities Corporation, Tarragon Edgewater Associates, LLC, The Park Development East LLC ("Trio East") and Vista Lakes Tarragon, LLC.

[2] I also served as Tarragon Corp.'s President from April 1997 through June 2004. Additionally, I served in varying capacities with Tarragon Corp.'s predecessors, Vinland Property Trust ("Vinland Trust") and National Income Realty Trust ("National Trust").

2

38590/0031-1530805v13

(c) Motion for an Order Directing the Joint Administration of Debtors' Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Granting Other Related Relief

(d) Motion for an Order Extending the Debtors' Time to File Schedules and Statements of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(c)

(e) Motion for an Order Approving Debtors' Filing of a Consolidated List of Their Thirty (30) Largest Unsecured Creditors

(f) Motion for an Order Granting the Debtors Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1), to the Extent Applicable, to Allow the Debtors and Third Parties to Continue Pending Arbitration and State Court Proceedings (the "Stay Relief Motion")

(g) Motion for an Order (A) Authorizing the Debtors to Pay or Honor Pre-Petition Obligations Under Customer Programs and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests

(h) Motion for an Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms; (B) Authorizing Continued Intercompany Arrangements and Historical Practices; and (C) Waiving the Debtors' Compliance with Investment Guidelines Under 11 U.S.C. § 345(b)

(i) Motion for an Order: (A) Granting Interim Relief Pursuant to 11 U.S.C. § 366(b); (B) Authorizing the Payment of Adequate Assurance for Postpetition Utility Services; (C) Fixing Final Hearing Date to Determine Adequate Assurance; and (D) Granting Other Related Relief

(j) Motion for Emergency and Final Orders: (I) Authorizing the Debtors to (A) Satisfy, and to the Extent Applicable, Direct ADP and Any Payroll Banks to Honor, Pre-Petition Gross Salaries, Payroll Taxes and Related Employee Benefit Obligations to the Debtors' Employees and (B) Honor, in Their Discretion, Pre-Petition Sick, Vacation and Personal Days; and (II) Granting Other Related Relief (the "Payroll Motion")

(k) Motion for Entry of an Order Authorizing the Debtors and Their Non-Debtor Affiliates to Continue to Sell Residential Inventory in the Ordinary Course of Business and to Continue to Transfer the Sale Proceeds in Accordance With Their Cash Management System

(l) Motion for Entry of an Order Enforcing the Protections of Section 525(a) of the Bankruptcy Code

(m) Motion for an Order Establishing Procedures for Sale of Assets

3

(n) Motion for an Order Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code (A) Limiting Certain Transfers of Equity Interests of the Debtors and Claims Against the Debtors and (B) Approving Related Notice Procedures

(o) Motion for an Order Authorizing the Retention and Compensation of Professionals Utilized by the Debtors in the Ordinary Course of Their Business *Nunc Pro Tunc* to the Filing Date

(p) Motion for an Order Approving the Debtors' Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c)

(q) Debtors' Application for Orders Approving Their Retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. as Bankruptcy Counsel on Interim and Final Bases Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 6003(a)

(r) Debtors' Application for Orders Approving Their Retention of Jones Day as Special Corporate, Securities and Transactional Counsel on Interim and Final Bases Pursuant to 11 U.S.C. § 327(e) and Fed. R. Bankr. P. 6003(a)

(s) Debtors' Application for Orders Approving Their Retention of BDO Seidman LLP as Financial Advisors on Interim and Final Bases Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 6003(a)

(t) Debtors' Application for an Orders Approving Their Retention of Lazard Frères & Co. LLC as Investment Bankers on Interim and Final Bases Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 6003(a)

(u) Debtors' Application for Orders Approving Their Retention of Travis Wolff & Company, LLP, as Independent Auditors and Accountants on Interim and Final Bases Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 6003(a)

(v) Motion for an Administrative Order Establishing Procedures for Allowance and Interim Compensation and Reimbursement of Expenses to Professionals

4. The purposes of the First Day Motions include, among other things, to: (a) insure the Debtors' ability to continue operating in the ordinary course and to ease the transition into Chapter 11; (b) minimize disruption of the Debtors' ability to continue doing business and, thus, preserve their customers' confidence; (c) maintain and bolster employee morale so as to reduce employee attrition during the Debtors' Chapter 11 proceeding, which would have a detrimental

4

impact on the Debtors' business and customer service; and (d) maintain vital lending, customer and vendor relationships. Each of the First Day Motions is crucial to the Debtors' reorganization efforts and the preservation of the Debtors' assets and estates.

5. This Affidavit is intended to explain the circumstances precipitating the Debtors' Chapter 11 proceedings and to provide general information about the Debtors and their business operations that are germane to the First Day Motions. The factual statements in this Affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents and/or my opinions based on my experience and knowledge of the industry and the Debtors' operations and financial condition.

## II. FACTUAL BACKGROUND

### A. Corporate History and Structure

6. Tarragon Corp., incorporated in 1997, is a publicly traded Nevada corporation. Tarragon Corp.'s origins, however, date back to 1973. Tarragon Corp. is the successor by merger to Vinland Trust, a public real estate investment trust formed in 1973, and National Trust, a public real estate investment trust that began operations in 1978.

7. Tarragon Corp. holds a direct or indirect interest in over 100 subsidiaries, partnerships and joint ventures, inclusive of both debtor and non-debtor entities.[3] An organizational chart of Tarragon is attached as Exhibit A (the "Organizational Chart").

8. Tarragon Corp.'s common stock is publicly traded on The NASDAQ Global Select Market ("NASDAQ") under the symbol "TARR." According to Tarragon Corp.'s transfer agent's records, as of August 4, 2008, 28,987,734 shares of Tarragon Corp.'s common stock

---

[3] Tarragon Corp. and its direct and indirect, debtor and non-debtor affiliates are collectively referred to herein as "Tarragon".

were outstanding. On September 26, 2008, Tarragon Corp. received a deficiency notice from NASDAQ stating that Tarragon Corp. was not in compliance with NASDAQ Marketplace Rules because the minimum bid price of its common stock had closed below $1.00 per share for 30 consecutive business days. The NASDAQ deficiency notice has no immediate effect on the NASDAQ listing or trading of Tarragon Corp.'s common stock.

**B.    Tarragon's Business**

9.    Tarragon Corp. and its debtor and non-debtor affiliates are real estate developers, owners and managers with more than 30 years of experience in the real estate industry. As a developer, Tarragon has been recognized for its quality construction, creative design, commitment to principles of smart growth, and broad capabilities to meet the unique needs of the various communities in which it operates.

10.    Tarragon's headquarters are located in New York City. Tarragon also maintains regional offices in Connecticut, Florida and Texas. Tarragon has approximately 300 employees consisting of executives, site level employees and corporate staff.

11.    Tarragon operates 2 distinct business divisions, a real estate development division (the "Development Division") and an investment division (the "Investment Division"). The Development Division focuses on developing, renovating, building, and marketing homes in high-density, urban locations and in master-planned communities, as well as building luxury and affordable rental properties to sell upon completion and lease-up. The Investment Division owns and operates a portfolio of stabilized rental apartment communities located in Alabama, Connecticut, Florida, New Jersey, Texas, Tennessee, Maryland, Oklahoma, and Georgia.

**(i)    The Development Division**

12.    In its Development Division, Tarragon has focused on the development of the following distinct property types: (a) new low-rise and mid-rise rental apartment communities;

6

(b) high-rise and mid-rise condominiums; (c) townhomes, traditional new developments and low-rise condominiums; and (d) conversion of existing rental apartment communities to condominiums. Those development projects typically have been targeted at highly defined market segments such as first-time, move-up, retirement, empty-nester, and affluent second-home buyers in Connecticut, South Carolina, New Jersey, Florida and Texas. Tarragon's goal has been to obtain sites at a cost that makes development economically feasible, and it generally has acquired land subject to or after receiving zoning and other approvals to reduce development-related risk and preserve capital.

13. Tarragon historically financed its development activities through acquisition, development or construction loans and corporate borrowings, with the required equity investment coming principally from internally generated funds. Mortgage financing proceeds and proceeds from the sale of properties generated by Tarragon's rental real estate portfolio also historically have been significant sources of funding for development activities. Additionally, Tarragon often has undertaken development projects in partnership with third parties. Those third parties were selected based on their expertise in particular areas or projects or the partners' access to capital to facilitate obtaining construction financing and to fund a portion of the required equity.

14. As of January 7, 2009, Tarragon's Development Division's inventory consisted of 1,034 units in active development projects, including: (a) 80 units in high and mid-rise developments; (b) 10 units in townhome and traditional new home developments; (c) 405 units in condominium conversions; and (d) 539 units in rental developments. Tarragon's development pipeline consisted of 1,846 units including: (a) 352 units in high and mid-rise developments; (b)

7

200 units in mixed-use residential and commercial developments; (c) 72 units in townhome and traditional new developments; and (d) 1,222 units in rental developments.

15. As a result of the recent marked slowdown in new home sales, the decline in home prices and the increasingly more restrictive credit markets, the Development Division has deemphasized for-sale housing in future project planning in favor of development of traditional, low-rise rental apartments with an emphasis on suburban garden apartment developments.

**(ii)** **The Investment Division**

16. Tarragon's Investment Division owns and operates a portfolio of rental properties with stabilized operations (i.e. development or renovation is substantially complete and recurring operating income exceeds operating expenses and debt service). The Investment Division also provides management services to the Development Division's rental properties that are earmarked for conversion to condominiums or under construction and in the initial lease-up stage.

17. Tarragon, through TMI, manages its rental apartment communities in the Investment Division with a focus on adding value. Tarragon has implemented programs to optimize revenue generated by the investment properties, including, but not limited to, daily value pricing and lease inventory management, as well programs to enhance ancillary income from cable, television, telephone and high-speed internet services, laundry facilities, and vending machines. Tarragon utilizes an integrated accounting, financial and operational management information system, connecting regional offices and management sites with Tarragon's corporate headquarters in New York City.

18. Funds generated by the operation, sale and refinancing of Tarragon's investment real estate portfolio primarily have been used to finance expenses associated with Tarragon's

development operations and to repay debt and other obligations. Rental income also has been used to enhance the value of Tarragon's investment portfolio through consistent capital improvements.

19. As of January 7, 2009, Tarragon's Investment Division portfolio consisted of 7,392 stabilized apartment units and 3 apartment communities with 642 apartments in lease-up in its Investment Division portfolio. Additionally, Tarragon's Investment Division portfolio included approximately 102,000 square feet of commercial property.

### C. Tarragon's Financial Performance

20. On November 10, 2008, Tarragon filed its Form 10-Q with the Securities and Exchange Commission disclosing Tarragon's financial performance for the 9 months ended September 30, 2008 (the "10-Q"). As of September 30, 2008, Tarragon had consolidated assets totaling approximately $840,688,000 and consolidated liabilities totaling approximately $1,000,000,000.

21. As reported in the 10-Q, Tarragon's consolidated revenue was $48.5 million and $275.8 million for the 3 and 9 months ended September 30, 2008, respectively. Tarragon suffered losses from continuing operations of $58.4 million and $111.5 million, respectively, for the 3 and 9 months ended September 30, 2008, compared to $178.5 million and $254.5 million for the corresponding periods in 2007.

22. Sales revenue in 2008 has been adversely impacted by the volatility of the real estate market and the events affecting the sub-prime mortgage market. Total sales revenue decreased by $21.2 million and $2.6 million, respectively, for the 3 and 9 months ended September 30, 2008. In particular, Tarragon has experienced a slowdown in sales at its condominium conversion projects and townhome developments for which consolidated revenue

declined by $112 million and $50.2 million, respectively, for the 9 months ended September 30, 2008.

23. Rental income has been modestly impacted by the deteriorating housing industry. Rental and other revenue decreased $441,000 (or 2.3%) and $1.7 million (or 3%), respectively, for the 3 and 9 months ended September 30, 2008.

24. As a result of the Debtors' operating losses, the Debtors have not incurred significant federal income tax liability and, in fact, have incurred substantial net operating losses ("NOLs") The Debtors' NOLS are currently estimated to be in excess of $170 million, which, based on the present 35% corporate tax rate, are worth as much as $59.5 million in potential future federal tax savings.

### D. Pre-Petition Capital Structure[4]

25. Historically, Tarragon relied on project financing to fund growth opportunities in the Development Division and non-recourse mortgage financing in the Investment Division. In the Development Division, Tarragon obtained loans to finance the acquisition of land for future development or sale, and to finance the cost of construction and land infrastructure, as well as the cost of acquiring and/or renovating rental properties for conversion into condominium homes. Generally, one of Tarragon Corp.'s subsidiaries or joint ventures was the borrower on the loan and, in many cases, either Tarragon Corp. and/or Tarragon Dev. Corp. guaranteed repayment of those obligations.

    i.    **Tarragon Corp. Unsecured Debt**

---

[4] Nothing herein constitutes an admission by the Debtors as to the amount or extent of debt or the validity of liens.

26. Tarragon Corp. has unsecured debt totaling approximately $170 million, exclusive of contingent guaranty obligations, broken down as follows: (a) $125 million of subordinated unsecured debt to Taberna Capital Management LLC and certain of its affiliates (collectively, "Taberna") pursuant to the terms of Subordinated Indentures dated June 15, 2005, September 12, 2005 and March 1, 2006, as amended (the "Taberna Indentures"); (b) approximately $40 million of unsecured debt to affiliates of the Debtors, Beachwold Partners, L.P. ("Beachwold")[5] and Robert P. Rothenberg, Tarragon Corp.'s President ("Rothenberg") pursuant to the terms of promissory notes dated January 7, 2008 (the "Affiliate Notes"); and (c) other unsecured debt.

### ii.  Contingent Claims

27. As of the Filing Date, Tarragon Corp. also had contingent claims resulting from its guarantees of subsidiary project debt (described briefly below) totaling approximately $769 million. In addition, Tarragon and its development subsidiaries and affiliates are subject to warranty and construction defect claims arising in the ordinary course of business.

28. As of the Filing Date, there also were several asserted and contingent claims against various Tarragon entities for personal injury and property damage allegedly caused by, among other things, construction defects, water intrusion and mold. In certain of those claims and/or lawsuits, Tarragon Corp. and other holding company debtors have been named as current or potential defendants. Additionally, multiple lawsuits have been filed by purchasers of condominium units at Las Olas, asserting damages arising from alleged misrepresentation of the

---

[5] Beachwold is a Texas limited partnership of which I am the general partner and my wife and four (4) children are the limited partners.

38590/0031-1530805v13

square footage of their units.  The contingent claims described herein are in varied stages of maturity, ranging from the receipt of statutory construction defect notices to trial-ready lawsuits.

### iii.    Secured Debt at the Project Level

29.    In connection with Tarragon's various development projects, the costs of construction, renovations and acquisitions of land are financed through loans from institutional lenders secured by mortgages on the real estate owned by Tarragon Corp.'s subsidiaries.

30.    The following table summarizes the material terms of the Debtors' existing mortgage debt:[6]

| **Debtor** | **Lender** | **Maturity Date** | **Balance as of the Filing Date** |
| --- | --- | --- | --- |
| Bermuda Island | LaSalle/Bank of America | April 1, 2008 | $41,458,495 |
| Orion | LaSalle/Bank of America | September 28, 2008 | $7,690,400 |
| Orlando Central | LaSalle/Bank of America | October 5, 2008 | $5,454,717 |
| Las Olas | Bank Atlantic/Regions | July 1, 2012 | $2,860,262 |
| Trio West | iStar | July 1, 2009 | $15,536,810 |
| 800 Madison | Bank of America | June 11, 2010 | $66,564,955 |
| 900 Monroe | Bank of America | June 30, 2009 | $3,900,000 |
| Central Square | Regions Bank | January 5, 2009 | $8,970,000 |
| Trio East | Bank of America | June 30, 2009 | $3,600,000 |

---

[6] The non-debtor projects have aggregate secured debt of approximately $625 million. Nothing herein constitutes an admission by the Debtors as to the amount or extent of debt or the validity of liens.

12

### III. FACTORS PRECIPITATING THE DEBTORS' CHAPTER 11 FILING

#### A. Adverse Market Conditions

31. The homebuilding industry in the United States has, for the last several quarters, experienced a significant and sustained decrease in demand for new homes and an oversupply of new and existing homes for sale. The negative impact of those trends has been compounded by recent difficulties in the mortgage and overall credit markets. In fact, many other large homebuilders, including Levitt and Sons LLC, Kimball Hill, Inc., Tousa Inc., WCI Communities Inc., and Woodside Group LLC, have been forced to seek bankruptcy protection based on the significant downturn in the homebuilding industry.

32. Similar to the impact on Tarragon's competitors, Tarragon experienced declining home prices and sales volumes and dampening customer confidence. The downturn in the homebuilding industry has been particularly sudden and steep in Florida and other areas in which Tarragon is concentrated.

33. Historically, Tarragon's principal sources of cash have been proceeds from sales of for-sale or for-rent housing, borrowings, rental operations, and proceeds from the sale of rental real estate developments. Throughout 2007 and 2008, however, the decline in home prices and concomitant increase in sales discounts and sales incentives, based with additional lease-up and interest costs associated with certain properties, strained the company's liquidity. Tarragon's liquidity has been further impacted by an increased cost of labor and supplies, resulting in reduced margins for homes sold.

34. Moreover, the volatility of the mortgage lending industry has adversely affected the ability of Tarragon's buyers to obtain affordable home mortgages, detrimentally impacting Tarragon's sales. As a result of increased default rates, particularly in the sub-prime mortgage market, many lenders no longer are offering certain types of residential mortgage loans or have

13

significantly heightened their loan qualifications for such loans. The resulting difficulty in obtaining financing has reduced the pool of qualified and capable home buyers. Additionally, the restricted credit markets has increased buyer termination of contracts. Those defaults have limited Tarragon's ability to deliver units from their residential inventory and collect contracts receivable upon completion of projects.

35. In the third quarter of 2007, the deterioration in the real estate credit markets prevented Tarragon from completing financing transactions that had been under negotiation. The inability to close those transactions materially affected Tarragon's liquidity, including its ability to repay existing indebtedness as it became due and to meet other current obligations. Those market conditions also detrimentally affected Tarragon's ability to comply with financial covenants contained in existing debt agreements.

B.  **Tarragon's Efforts to Improve Liquidity**

36. In response to those adverse market conditions, Tarragon took several steps aimed at preserving cash and enhancing its liquidity. In response to the marked slowdown in sales, Tarragon decided not to convert a number of rental properties previously targeted for conversion to condominium homes for sale. Instead, Tarragon decided to operate those properties as rental properties and transferred them from the Development Division to the Investment Division. As a result of that decision, Tarragon incurred additional lease-up and interest costs associated with those apartment properties. In August 2007, Tarragon also decided to sell 16 of those properties in connection with its efforts to improve liquidity and reduce debt.

37. As of the Filing Date, Tarragon sold 15 of the 16 properties, generating net cash after payment of project-level obligations of $54.5 million. In addition, before the Filing Date, Tarragon sold 3 development properties that had been financed mostly with short-term, floating

14

rate debt. Accordingly, the sales of those assets improved liquidity primarily by reducing negative cash flow and reducing debt.

38. Tarragon also took certain measures to reduce general and administrative overhead expenses by implementing a reduction in workforce in August 2007. Since then, Tarragon has continued to trim its workforce and reduce overhead by eliminating 200 additional positions in 2008. In 2008, Tarragon also closed offices in Orlando and Jacksonville, Florida, and significantly decreased lease expenses by reducing the size of the Ft. Lauderdale office from 25,000 square feet to 5,000 square feet.

39. Finally, Tarragon reevaluated the economic feasibility of its active and pipeline development projects in light of 2008 market conditions. As a result of that evaluation, Tarragon delayed the commencement of 7 planned development projects and one planned conversion of an apartment complex into a hotel. Tarragon also terminated one project already under construction and contracts to acquire 2 additional developments.

C. **Forbearance Agreement with Taberna**

40. On October 30, 2008, Tarragon Corp. entered into a Restructuring Support and Forbearance Agreement with Taberna, the Indenture Trustee, Beachwold, and Rothenberg (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, Taberna agreed to support a financial restructuring of Tarragon Corp. and to refrain from exercising any rights and remedies under the Taberna Indenture through June 30, 2009, assuming the guaranty interest payments due on January 30, 2009 and April 30, 2009 were timely.

41. The Forbearance Agreement contemplated a financial restructuring in which the Taberna Notes and Affiliate Notes would be restructured and become obligations of a reorganized Tarragon Corp. or an affiliated issuer. The Forbearance Agreement further contemplated that that the sponsor of a restructuring plan and certain of Tarragon Corp.'s debt

holders would receive shares of reorganized Tarragon Corp.'s equity, representing a controlling interest in the reorganized company, in exchange for the assumption of the indebtedness of the Taberna Notes and Affiliate Notes. As of the Filing Date, however, the Debtors had not reached agreement with a plan sponsor on a restructuring of Tarragon consistent with that contemplated by the Forbearance Agreement.

## IV.    THE DEBTOR'S OBJECTIVES IN CHAPTER 11

42.    Prior to the Filing Date, the Debtors and their professionals devoted significant time evaluating the Debtors' business operations and funding requirements to identify the most comprehensive options for resolving their financial difficulties and maximizing value for the benefit of all stakeholders.

43.    Beginning in the summer of 2008, Tarragon Corp. engaged in discussions with Arko Holdings, Ltd. ("Arko"), a publicly traded Israeli company, regarding the recapitalization of Tarragon Corp. Those discussions facilitated the execution of a Forbearance Agreement with Taberna. While an Arko affiliate has committed to provide a $6.25 million debtor-in-possession financing facility, negotiations on a plan of reorganization were not concluded as of the Filing Date.

44.    Upon an orderly transition into Chapter 11, and in an effort to maximize stakeholder recoveries, the Debtors intend to continue exploring all strategic alternatives including, but not limited to, continued negotiations with Arko, as well as evaluating a possible sale or other restructuring or recapitalization, or combinations thereof. In that regard, the Debtors have engaged Lazard Frères & Co. LLC to evaluate those alternatives and to actively market the Debtors to other potential investors or purchasers.

16

## V. THE DEBTORS' NEED FOR EMERGENT RELIEF

45. The relief sought in the First Day Motions will enable the Debtors to stabilize and continue their operations while they explore strategic alternatives in Chapter 11. The relief sought in the First Day Motions (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss, (b) constitutes a critical element of achieving a successful reorganization and (c) best serves the Debtors' estate and creditors' interests. Failure to grant the First Day Motions would have an irreparable and detrimental effect on the Debtors' estates.

46. Due to the timing of these Chapter 11 filing, the Debtors also respectfully request entry of the Emergency Interim Order authorizing the Debtors to satisfy and, to the extent applicable, directing ADP and any payroll banks to honor certain pre-petition gross salaries and payroll taxes for their employees (the "Emergency Interim Order") submitted herewith. As set forth in the Payroll Motion, payroll checks were distributed on January 9, 2009 to those employees who do not receive direct deposit. Given the possibility that some of those checks might be presented before the hearing on the First Day Motions, the Debtors respectfully request that the Court enter the Emergency Interim Order to ensure that ADP and all banks presented with payroll checks honor those checks.

47. Additionally, the Debtors respectfully request that the Court enter an Order granting the Stay Relief Motion before a hearing on the First Day Motions. As set forth in the Stay Relief Motion, Tarragon Dev. Corp. is a defendant and counterclaimant, along with non-debtor affiliated entities, in an arbitration proceeding before the American Arbitration Association. **A final hearing before the arbitrators is scheduled to resume tomorrow, January 13, 2009, before a hearing will be scheduled on the First Day Motions.** Tarragon Dev. Corp. believes its likelihood of success on its counterclaim is strong and any recovery on

account of its claims will exceed any liability.  Therefore, the Debtors seek entry of an Order permitting that litigation to proceed without any delay.[7]  The inability to continue with the arbitration proceeding on January 13, 2009 would cause unnecessary hardship on the several participants that have prepared for the continuing arbitration hearing and would delay the prospects for recovery for the Debtors' estates from that action.

                                                          */s/ William S. Friedman*
                                                         WILLIAM S. FRIEDMAN

Subscribed and sworn to before me
this 12th day of January, 2009

*/s/ Warren A. Usatine*
Warren A. Usatine, Esq.
Attorney at Law of the State of New Jersey

---

[7] The Stay Relief Motion also seeks an Order confirming that another litigation in which debtor Central Square is the plaintiff may proceed without interruption.