**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Telecopier
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Proposed Attorneys for Tarragon Corporation, *et al.,*
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>TARRAGON CORPORATION, *et al.,*<br><br>         Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NO. 09-10555(DHS)<br><br>Chapter 11<br>(Jointly Administered)<br><br>**VERIFIED APPLICATION IN SUPPORT OF MOTION FOR A FINAL ORDER (1) APPROVING POST-PETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND (3) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362**<br><br>**HEARING DATE AND TIME:**<br>February 20, 2009, at 10:00 a.m.<br><br>**ORAL ARGUMENT REQUESTED** |

TO:   Honorable Donald H. Steckroth
      United States Bankruptcy Judge

The Verified Application of Tarragon Corporation, *et al*, the within debtors and debtors-in-possession (collectively, the "Debtors"),[1] by and through their proposed counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., respectfully represent:

## I. INTRODUCTION AND JURISDICTION

1. This Verified Application is submitted in support of the Debtors' motion for a final Order (1) approving post-petition financing, (2) granting liens and providing superpriority administrative expense status pursuant to 11 U.S.C. §§ 363 and 364 and (3) modifying automatic stay pursuant to 11 U.S.C. § 362 (the "Motion").

2. Before the Filing Date, the Debtors and their professionals devoted significant time evaluating the Debtors' business operations and funding requirements to identify the most comprehensive options for resolving their financial difficulties and maximizing value for the benefit of creditors. Through that process, the Debtors have determined that a restructuring of their business can be achieved only with a sponsor or restructuring partner that will infuse new capital into the Debtors' operations. To that end, the Debtors sought to identify, with the assistance of proposed investment bankers, Lazard Frères & Co. LLC ("Lazard"), investors for purposes of providing equity and/or debt to the Debtors.

---

[1] The Debtors are Tarragon Corporation ("Tarragon Corp."), Tarragon Development Corporation ("Tarragon Dev. Corp."), Tarragon South Development Corp., Tarragon Development Company LLC, Tarragon Management, Inc., Bermuda Island Tarragon LLC, Orion Towers Tarragon, LLP, Orlando Central Park Tarragon L.L.C., Fenwick Plantation Tarragon LLC, One Las Olas, Ltd., The Park Development West LLC 800 Madison Street Urban Renewal, LLC, 900 Monroe Development LLC, Block 88 Development, LLC, Central Square Tarragon LLC, Charleston Tarragon Manager, LLC, Omni Equities Corporation, Tarragon Edgewater Associates, LLC, The Park Development East LLC, Vista Lakes Tarragon, LLC. Debtors Murfreesboro Gateway Properties LLC, and Tarragon Stonecrest, LLC are not parties to the DIP Credit Agreement (defined herein) and, therefore, are not movants herein.

2

3. Beginning in the summer of 2008, Tarragon Corp. and its officers engaged in discussions with Arko Holdings, Ltd. ("Arko"), a publicly traded Israeli company, regarding the recapitalization of Tarragon Corp. and its affiliates. Those negotiations are ongoing but, as of the Filing Date, had not produced an agreement on an Arko-sponsored restructuring of the Debtors. In the context of these Chapter 11 proceedings, the Debtors, with the assistance of Lazard and their other professionals, intend to explore all strategic alternatives including, but not limited to continued negotiations with Arko, and to develop a reorganization plan that maximizes value for the benefit of all stakeholders.

4. The Debtors have the present ability to operate their business with cash currently on hand. The Debtors believe, however, that given the continuing decline of the housing industry and concomitant decrease in cash receipts and collections, a post-petition financing facility will be required to ensure the seamless continuation of the Debtors' business while they explore restructuring alternatives. As a result, the Debtors have negotiated a post-petition financing agreement with an affiliate of Arko, ARKOMD, LLC ("ARKOMD"), pursuant to which ARKOMD will provide, through a $6.25 million credit facility (the "DIP Facility"), funds necessary for the Debtors to pay their ongoing expenses.

5. To preserve the Debtors' business and assets for the benefit of their creditors and estates, the Debtors respectfully request that the Court approve the post-petition financing agreement with ARKOMD described herein and allow the Debtors to borrow funds and incur post-petition indebtedness pursuant to the terms of the Secured, Super-Priority Debtor-in-Possession Credit Agreement dated January 12, 2009 and related ancillary documents attached as **Exhibit A** (the "DIP Credit Agreement").

3

6.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (G), and (O).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## II.    BACKGROUND

7.      On January 12, 2009 (the "Filing Date"), the Debtors each filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing Date, the Debtors have remained in possession of their assets and continued management of their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.      A detailed description of the Debtors' businesses and facts precipitating the filing of the Debtors' Chapter 11 proceedings is set forth in the Affidavit of William S. Friedman (the "Friedman Affidavit") submitted in support of the Debtors' various "First Day Motions."  Those facts are incorporated herein by reference.

9.      As set forth in the Friedman Affidavit, Tarragon Corp. and its direct and indirect, debtor and non-debtor affiliates (collectively, "Tarragon") are real estate developers, owners and managers.  Tarragon operates two (2) business divisions, a real estate development division (the "Development Division") and an investment division (the "Investment Division").  The Development Division focuses on developing, renovating, building and marketing homes in high-density, urban locations and in master-planned communities.  The Investment Division owns and operates a portfolio of stabilized rental apartment communities.

38590/0031-2619903v4

A.  **Tarragon's Pre-Petition Indebtedness**

10. As set forth in the Friedman Affidavit, Tarragon Corp. has unsecured debt totaling approximately $170 million, exclusive of contingent guaranty obligations, as follows: (a) $125million of subordinated unsecured debt to Taberna Capital Management LLC and certain of its affiliates pursuant to the terms of Subordinated Indentures dated June 15, 2005, September 12, 2005 and March 1, 2006, as amended; (b) approximately $40 million of unsecured debt to affiliates of the Debtors, Beachwold Partners, L.P. and Robert P. Rothenberg (Tarragon Corp.'s president) pursuant to the terms of promissory notes dated January 7, 2008; and (c) other unsecured debt.

11. In addition, as set forth in detail in the Friedman Affidavit, before the Filing Date numerous debtor and non-debtor affiliates of Tarragon Corp. incurred secured debt to finance the costs of construction, renovations or acquisitions of land. Those entities granted their respective lenders mortgages on their real property and improvements, easements, fixtures, and personal property thereon, as well as a security interest in rent, revenues and profits generated from the project. As of the Filing Date, the total amount of the outstanding secured debt of the Tarragon Corp. debtor and non-debtor projects is approximately $165 million and $595 million, respectively.

12. In connection with Tarragon's various development projects, Tarragon Corp. and/or Tarragon Dev. Corp. typically guarantees repayment of the loan or grants a completion guarantee with respect to the project. As of the Filing Date, Tarragon Corp.'s guaranteed obligations total approximately $769 million.

B.  **The Debtors' Need For and Description of the DIP Facility**

13. The Debtors' cash flow projections establish their ability to operate with current and anticipated cash on hand through the week ended March 27, 2009. The interests of all

5

parties, however, will best be served by a financing facility that provides additional liquidity and assures adequate capitalization of the Debtors throughout the reorganization process. The DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their budgeted operating expenses, thereby ensuring the value of the Debtors' estates is preserved for the benefit of all stakeholders.

14. Before the Filing Date, the Debtors engaged in good faith and extensive arm's length negotiations with ARKOMD. Those negotiations culminated in an agreement by ARKOMD to provide post-petition financing on the terms and conditions set forth in the DIP Credit Agreement.

15. ARKOMD will make funds available to the Debtors subject to allowable variance in accordance with the terms of the budget attached as **Exhibit B** (the "Budget"), which budget will periodically be updated by the Debtors as contemplated by the DIP Credit Agreement. As set forth in the Budget, the Debtors anticipate a first draw on the DIP Facility in or about the week of March 27, 2009.

16. The following is a summary of the significant terms of the DIP Facility:[2]

| | | |
|---|---|---|
| (a) | **Amount and Type of Facility and Availability:** | Revolving credit facility in the amount of $6.25 million. ARKOMD will make available an advance in an amount consistent with the Budget. Periodic budgets provided to ARKOMD that will provide visibility on future anticipated draws. |
| (b) | **Termination Date:** | The earliest of (a) 180 days after the Filing Date, (b) the effective date of any plan for the Debtors confirmed pursuant to Section 1129 of the Bankruptcy Code; (c) the date of consummation of |

---

[2] This section is intended to provide a summary of the DIP Facility only. The reader is directed to the DIP Credit Agreement for a more complete recitation of their terms. Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the DIP Term Sheet.

38590/0031-2619903v4

|     |     |     |
| --- | --- | --- |
|     |     | a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; and (d) following an event of default, the date ARKOMD declares all obligations to be immediately due and payable and declares the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains.  The DIP will also terminate if a Final Order approving the Motion is not entered within 45 days. |
| (c) | **Use of Proceeds:** | Proceeds of the DIP Facility shall be used for working capital and general business purposes in accordance with the Budget.  The DIP Facility shall not be used (a) to finance any investigation, action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests or claims of ARKOMD (or any of Lender's Affiliates, insiders, agents or representatives) or its rights and remedies under the DIP Credit Agreement, other loan documents or the Final Order and (b) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of ARKOMD, except as contemplated by the Budget or an Approved Plan. |
| (d) | **Collateral Security and Priority:** | First priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien, senior and superior in priority to the liens, security interests and claims of all other secured and unsecured creditors of the Borrowers' estate upon the following collateral: (a) Tarragon's Equity Interests, as set forth more fully on Exhibit E to the DIP Credit Agreement and (b) any otherwise unencumbered assets and property of the Debtors (other than (i) stock, limited partnership equity, general partnership equity or limited liability company interests not constituting Tarragon's Equity Interests or (ii) any asset or property of a non-debtor Borrower Party, other than Tarragon's Equity Interests, if the grant of a security interest hereunder or under the DIP Credit Agreement constitutes or results in a breach or an event of default (following the passage of all applicable |

7

cure periods) under any applicable loan or security agreement) (the "DIP Collateral").[3] The liens to be created and granted to ARKOMD (i) are created pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) are a first valid, prior, perfected, unavoidable, and superior to any security, pledge, mortgage, or collateral interest or lien or claim to DIP Collateral, and are subject only to the Carve Out, and (iii) shall secure all DIP Obligations.

(e) **Interest Rates:** 12% per annum payable in arrears. Upon an event of default, the interest rate shall be increased by 2% per annum.

(f) **Fees** The Debtors paid to Lender a commitment fee in the amount of $125,000 upon execution of the DIP Credit Agreement. Additionally, the Debtors shall reimburse Lender for up to $275,000 in fees, costs and expenses incurred in connection with the DIP Facility, with $125,000 in such fees payable on the first advance date with remaining $150,000 in fees, costs and expenses to be paid as soon as the Debtors borrow or require the entire amount of the Commitment or on the Commitment Termination Date, whichever is first to occur.

(g) **Remedies** ARKOMD is entitled to all remedies customarily available to post-petition lenders in Chapter 11 cases, including the right to realize on all Collateral and exercise any remedy available under the DIP credit agreement, without the need for further stay relief, provided however, the enforcement of remedies shall require 10 business days' notice to the Debtors and their counsel for the Committee and the Office of the United States Trustee

17. In accordance with the guidelines for financing requests in this District, the Debtors make the following disclosures as to certain "extraordinary provisions" in the DIP Facility Documents:

---

[3] The DIP Credit Agreement provides ARKOMD with a lien on the Debtors' cash only upon an Event of Default.

| | | |
|---|---|---|
| (a) | **Carve-Outs** | The Carve-Out includes (a) the payment of unpaid fees payable pursuant to 28 U.S.C. § 1930, (b) the fees due to the Clerk of the Court, (c) the actual fees and expenses incurred by professionals for the period prior to the occurrence of an event of default (less the unused portion of retainers held by such professionals), retained by an order of the Court, provided they are within the amounts set forth in the budget and are subsequently allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code and (d) the payment of, following the occurrence of any event of default, after which Lender elects not to continue to provide the Debtor with financing, or otherwise terminates the DIP Facility, allowed professional fees and disbursements incurred after such event of default or termination of all Case Professionals (i) retained by the Debtors in an aggregate amount not to exceed $350,000 and (ii) retained by the Committee in an aggregate amount not to exceed $150,000. |
| (b) | **Section 506(c) Waiver** | No costs or expenses of administration which have been incurred or may be incurred in the cases at any time shall be charged against ARKOMD, it claims or the DIP Collateral. |
| (c) | **Termination Event/Events of Default:** | Events of Default include, but are not limited to: (a) the filing of any plan by the entry of an order in the Chapter 11 case confirming a plan that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all obligations on or before the effective date of the plan, (b) the bringing of a motion by the Debtors to obtain financing pursuant to section 364 (unless such financing satisfies the Obligations in full) or to use cash collateral pursuant to section 363(c) without the Lender's consent, (c) the appointment of an interim or permanent trustee or the appointment of a receiver or examiner, but only with regard to certain of the Debtors, (d) the sale without ARKOMD's consent of all or substantially all of the Debtors' assets that does not provide for in payment of full of the obligations under the DIP Facility |

9

38590/0031-2619903v4

   (d) **Exit Fee**   ARKOMD shall earn an exit fee of 6% of the maximum commitment upon the Debtors' filing of a plan of reorganization or liquidation that is not an Approved Plan.

18. Although these and other listed provisions may be considered "extraordinary" under the Financing Guidelines, they are typical of DIP financing terms, and the Debtors believe that any other DIP Lender would insist on similar, if not identical, provisions.

### III. RELIEF REQUESTED AND BASIS THEREFOR

**A. The DIP Facility Should Be Approved Under Section 364 of the Bankruptcy Code**

19. Section 364 of the Bankruptcy Code governs a debtor's ability to obtain post-petition credit and provides, in pertinent part, as follows:

> (c) If the trustee [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --
>
>  (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
>  (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
>  (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

20. Courts have observed that in satisfying the standards of section 364 of the Bankruptcy Code, a debtor need only make a reasonable effort to seek sources of credit of the type set forth in section 364(a) and (b) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee has demonstrated by good faith that credit was not available without senior lien by unsuccessfully contacting other financial institutions in the immediate geographic area); 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-32 (Bankr. S.D.N.Y.

10

1992) ("[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every possible lender"); In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (finding that the debtor demonstrated the unavailability of unsecured financing where they approached several lending institutions). When there are few lenders likely, able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989).

21. The standards of section 364(c) are satisfied here. In light of the current state of the credit markets and the Debtors' lack of material unencumbered real estate assets to pledge to a lender, the Debtors could not reasonably obtain financing from another lender on the same or more favorable terms and conditions as the proposed DIP facility. Given the impending maturity dates of several of the Debtors' secured loans and their unsuccessful attempts to enter into forbearance agreements with several of their lenders, the Debtors were confident that none of their pre-petition secured lenders would be willing to provide post-petition financing. The Debtors also approached other stakeholders about the possibility of providing DIP financing, but were unsuccessful.

22. Based on the foregoing, the Debtors decided to pursue post-petition financing from ARKOMD, an affiliate of a party with whom the Debtors are having ongoing negotiations regarding a potential plan of reorganization. The Debtors' management concluded that ARKOMD is the best and likely only alternative available at the present time for post-petition financing of the nature contemplated in the DIP Credit Agreement. Consequently, the Debtors' efforts to obtain post-petition financing satisfy the statutory requirement of section 364(c) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee has

demonstrated by good faith that credit was not available without senior lien by unsuccessfully contacting other financial institutions in the immediate geographic area); 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-32 (Bankr. S.D.N.Y. 1992) ("[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every possible lender"); In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (finding that the debtor demonstrated the unavailability of unsecured financing where they approached several lending institutions). When there are few lenders likely, able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989

23.     Given the tightening of the financial markets, the Debtors moved quickly and in a targeted manner to ensure they would be able to negotiate a financing facility. There is no reason to believe they could have located a different post-petition lender offering terms more favorable than ARKOMD. The Debtors' management took the steps it deemed necessary and exercised their sound and reasonable business judgment in negotiating the DIP Facility.

**B.     The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

24.     The Debtors are unable to obtain unsecured credit in the ordinary course of business or as an administrative expense. In the Debtors' business judgment, the DIP Facility was the best financing option available under the circumstances of these cases.

25.     The proposed terms of the DIP Facility were negotiated in good faith and at arms'-length between the Debtors and ARKOMD. The terms are fair, reasonable and appropriate under the circumstances of those cases and in light of the current economic climate. As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Facility is to enable the Debtors to maintain the value of their estates while formulating a

confirmable plan of reorganization. See generally, In re First South Sav. Ass'n, 820 F.2d 700, 710-15 (5th Cir. 1987).

### C. The Debtor Has Exercised its Sound Business Judgment in Entering Into the DIP Facility

26. After appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility provides the best alternative available. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. See In re Simasko Prods. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

27. In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981). Courts generally will not second guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Id. at 513-14.

28. The Debtors have exercised their sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Facility. Accordingly, the Debtors should be granted authority to enter into the

13

DIP Facility and borrow funds from ARKOMD pursuant to Sections 364(c) of the Bankruptcy Code, and take all other actions contemplated by the DIP Facility and as requested herein.

## IV. CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order granting the Motion and such other relief as the Court deems just and appropriate under the circumstances.

        Respectfully submitted,

        COLE, SCHOTZ, MEISEL,
        FORMAN & LEONARD, P.A.
        Proposed Attorneys for Tarragon Corporation, *et al.*

        By: */s/ Michael D. Sirota*
            Michael D. Sirota
            Warren A. Usatine

DATED: January 15, 2009

## **VERIFICATION**

WILLIAM S. FRIEDMAN, of full age, certifies as follows:

1. I am the Chief Executive Officer of Tarragon Corporation, one of the within debtors and debtors-in-possession (the "Debtors"). As such, I have full knowledge of the facts set forth herein, and am authorized to make this Application on the Debtors' behalf.

2. I have read the foregoing Verified Application and certify that the factual statements contained therein are true based upon my personal knowledge, information and belief.

3. I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

                                                             */s/ William S. Friedman*  
                                                             WILLIAM S. FRIEDMAN

DATED: January 14, 2009

38590/0031-2619903v4