**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
Attorneys for Tarragon Corporation, *et. al.*,
Movants and Debtors-in-Possession

| | | |
|---|---|---|
| In re: | : | UNITED STATES BANKRUPTCY COURT |
| | : | FOR THE DISTRICT OF NEW JERSEY |
| TARRAGON CORPORATION, *et. al.*, | : | HONORABLE DONALD H. STECKROTH |
| | : | LEAD CASE NO. 09- 10555 (DHS) |
| Debtors-in-Possession. | : | |
| | : | (JOINTLY ADMINISTERED) |

: Chapter 11
:
: **APPLICATION OF TARRAGON**
: **CORPORATION *ET. AL.* (THE "DEBTORS"),**
: **IN SUPPORT OF THEIR MOTION FOR AN**
: **ORDER QUASHING THE RULE 2004**
: **SUBPOENA, NOTICE OF DEPOSITION OF**
: **WILLIAM FRIEDMAN, AND REQUEST FOR**
**PRODUCTION OF DOCUMENTS ISSUED TO**
**THE DEBTORS BY NORTHLAND**
**INVESTMENT CORPORATION AND ITS**
**AFFILIATES, PURSUANT TO FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE 2004**
**AND 9016, AND FEDERAL RULE R. CIV. P. 45.**

Hearing Date and Time: _____ , 2009
_____: _.m.

**ORAL ARGUMENT REQUESTED**

TO:    HONORABLE DONALD H. STECKROTH, U.S.B.J.:

The Application ("Application") of Tarragon Corporation and the Debtors jointly

administered with Tarragon Corporation (collectively, "Debtors" or "Tarragon") by and through

their counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") respectfully

represents:

## I.    <u>INTRODUCTION</u>

1.    This Application is submitted in support of the Debtors' motion (the "Motion")

for an Order quashing the Subpoena issued jointly to Tarragon and William Friedman together

with the Notice of Deposition and "Request for Production of Documents" directed to Tarragon

and the other Debtors (collectively, the "Northland Subpoena").  The Northland Subpoena was

issued by Northland Investment Corporation and its affiliates (collectively, "Northland")

pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016, and Federal Rule of Civil

Procedure 45 in the above-captioned proceeding.  The Northland Subpoena is a thinly veiled

improper attempt by Northland to obtain discovery relevant to litigation pending against

Tarragon and Ansonia LLC in New York State Court (the "New York Litigation").[1]  Northland

is desperately seeking discovery in this court to support its theory asserted in the New York

Litigation that Tarragon and Ansonia LLC breached obligations to contribute properties to a joint

venture with Northland because Tarragon was planning an alternative transaction with Arko

Holdings Ltd. ("Arko") and Arko did not want the contribution of properties to the joint venture

to proceed.  In fact, as set forth below, this transaction failed because Northland commenced two

lawsuits against Tarragon, interfered with Tarragon's relationship with its lender, General

---

[1] That lawsuit captioned <u>Northland Portfolio, L.P. et als v. Tarragon Corp. et als.</u>, Supreme Court of New York, Commercial Part, Index No.: 602425/08 was commenced on August 20, 2008, and an Amended Complaint was filed on September 4, 2008 by the same plaintiffs.  Thereafter on December 17, 2008, Northland filed a Second Amended Complaint. Tarragon has filed a Verified Answer and Counterclaim.  For a more detailed description of the New York Litigation <u>see</u> ¶¶ 15-18, <u>infra</u>.  In the Amended Complaint, Northland also sued William Friedman, the Debtors' Chairman and Chief Executive Officer, and Robert Rothenberg, the Debtors' President.  The complaint against Friedman and Rothenberg was dismissed in December, 2008.  Northland has appealed the dismissal order.

Electric Capital Corporation ("GE"), and Northland's improper conduct caused GE to withhold its required consent to the transaction.[2]

2.      The Northland Subpoena is an abuse of the purposes and intent of Rule 2004. Case law clearly establishes that Rule 2004 cannot be used as a substitute for discovery in other proceedings. (¶¶ 34-44, infra).  Northland improperly seeks Rule 2004 discovery of Tarragon's relationship with Arko under the guise of inquiring into the proposed debtors-in-possession financing with Arko's affiliate, ARKOMD, LLC ("ARKOMD").  In reality, Northland's discovery request is an attempt by Northland to bolster and prove the allegations asserted in the New York Litigation.  Northland is barred from obtaining discovery in that action.  Northland cannot obtain discovery in that action relating to Tarragon because the New York Litigation against Tarragon is automatically stayed as a result of these chapter 11 filings.  It cannot obtain discovery in that action relating to its claims against Mr. Friedman or Mr. Rothenberg because the state court dismissed the complaint against them.[3]  Northland cannot seek discovery relating to claims against the remaining defendant, Ansonia LLC, because Ansonia has a pending motion to dismiss the complaint for failure to adequately plead a cause of action.[4]

---

[2] Indeed, Tarragon has counterclaimed in the New York Litigation and believes when all is said and done it will recover significant damages against Northland and, for reasons set forth herein at ¶ 13, infra, Northland is not a creditor of the Debtors.

[3] Northland filed a notice of appeal from the dismissal but has yet to perfect the appeal.

[4] Ansonia filed a motion to dismiss the First Amended Complaint.  In response to that motion, the court allowed Northland 10 days to file a second amended complaint.  When the Second Amended Complaint also failed to plead a cognizable cause of action, Ansonia renewed its motion.  New York Civil Practice Law & Rules ("CPLR") 3214(b) provides that a motion to dismiss also stays discovery.  Notwithstanding that stay, it was not until February 9, 2009 that Northland agreed to adjourn its deposition of Arko in the New York Litigation seeking discovery on the very same issues on which it is seeking discovery from Tarragon and Friedman under the Northland Rule 2004 Subpoena.  Although Northland recently postponed that deposition, it has not yet fully acknowledged that discovery can only proceed if Ansonia's motion to dismiss is (. . . continued)

3

3.       Although the Northland Subpoena is ostensibly intended to discover information allegedly pertinent to the proposed DIP Financing, the true purpose of the Subpoena is to obtain in this proceeding the information Northland desperately seeks, but is barred from obtaining to attempt to establish a claim in the New York Litigation.  That is an abuse of Rule 2004 and, therefore, the motion to quash must be granted.[5]

## II.       FACTUAL BACKGROUND

### A.       The Chapter 11 Proceeding and the Northland Subpoena.

4.       On January 12, 2009, the ("Filing Date"), Tarragon and a number of its affiliated entities filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On January 13, 2009, and February 5, 2009, additional affiliates filed Chapter 11 petitions.  All of the Tarragon cases have been administratively consolidated for joint administration.  Since the Filing Date, Tarragon has remained in possession of its assets and continued management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.       On January 15, 2009, Tarragon filed a motion seeking approval of DIP Financing with ARKOMD (the "DIP Financing Motion").  That DIP Financing Motion was originally returnable February 20, 2009.  Northland sent the Northland Subpoena to Warren Usatine, one of

---

(continued . . .)
denied.  (See letter from Northland's counsel dated February 9, 2009 attached to the Lipsky Affidavit as Exhibit "9".)

[5] As reflected below, the Subpoena should also be quashed because it has not been properly served.

38590/0031-5342250v6

the Debtors' attorneys on February 5, 2009.  Although the Northland Subpoena is also addressed

to William Friedman, it was never personally served on Mr. Friedman or Tarragon.[6]

6.    At the request of the Committee's counsel, the DIP Financing Motion was

adjourned until March 5, 2009 to give the Committee and its professionals additional time to

review the terms and conditions of the DIP Financing Motion and to obtain any additional

information they needed to evaluate the motion.[7]

7.    On February 13, 2009, Northland filed an objection to the DIP Financing Motion.

The Northland Subpoena was originally returnable February 19, 2009.  By agreement the

deposition was adjourned without a new date.[8]

**B.    Tarragon's Prepetition Business.**

8.    As is more fully set out in the Affidavit of William S. Friedman in support of the

Debtors' First-Day motions dated January 12, 2009 (the "First Day Affidavit")(Docket no.23),

---

[6] DNJ Local Bankruptcy Rule 2004-1 (b) requires any party in interest seeking to compel an examination or production of documents to serve a subpoena pursuant to F.R.B.P. 2004(c). The Subpoena is addressed to William Friedman c/o Warren Usatine, Esq., while both the Notice of Deposition and the "First Request for Production of Documents" are addressed to Tarragon, attention William Friedman c/o Warren Usatine, Esq.  A copy of the Notice and Subpoena was e-mailed to Warren Usatine, Esq.  However, Cole, Schotz does not represent Mr. Friedman and has no authority to accept process on his behalf.  Further, neither he, or any other Tarragon employee was served with the Subpoena.  To the extent that any examination of Mr. Friedman, if one is permitted, or the production of any of the documents which the Notice of Deposition directs *him* (not Tarragon) to produce, are sought from him or regarding him personally, and not solely in his representative capacity as Tarragon's CEO, Mr. Friedman must be personally served.

[7] The Debtors, through their professionals, are fully cooperating with the Committee and its professionals and providing the Committee with information it has requested pursuant to the Confidentiality Agreements executed by the Committee.

[8] It was agreed by counsel for Northland and counsel for the Debtors that the Debtors would have until Monday, February 23, 2009 to move to quash, if no agreement on discovery was reached, and that subject to the court's calendar, the motion would be heard on shortened notice.

Tarragon and its debtor and non-debtor affiliates are real estate developers, owners and managers with more than 30 years of experience in the real estate industry.  Tarragon operates two distinct business divisions, a real estate development division (the "Development Division") and an investment division (the "Investment Division").  The Development Division focuses on developing, renovating, building, and marketing homes in high-density, urban locations and in master-planned communities, as well as building luxury and affordable rental properties to sell upon completion and lease-up.  The Investment Division owns and operates a portfolio of stabilized rental apartment communities located in Alabama, Connecticut, Florida, New Jersey, Texas, Tennessee, Maryland, Oklahoma, and Georgia.

9.     Tarragon historically financed its development activities through acquisition, development or construction loans and corporate borrowings, with the required equity investment coming principally from internally generated funds.  Mortgage financing proceeds and proceeds from the sale of properties generated by Tarragon's rental real estate portfolio also historically have been significant sources of funding for development activities.  Additionally, Tarragon often has undertaken development projects in partnership with third parties.  Those third parties were selected based on their expertise in particular areas or projects or the partners' access to capital to facilitate obtaining construction financing and to fund a portion of the required equity.

## C.     The Contribution Agreement and the New York State Legislation

10.     Recognizing the need for an alternative funding source due to the significant downturn in residential sales and financing which was accelerated by the sub-prime mortgage lending debacle, Tarragon sought a financially strong third party with expertise and access to capital with whom to form a significant joint venture, and Tarragon thought it had found a suitable joint-venture partner in Northland.

11.     On March 31, 2008, Northland, Tarragon and Ansonia LLC ("Ansonia") entered

into an Agreement to Contribute (the "Contribution Agreement")[9].  Under the terms of the

Contribution Agreement, Northland, Tarragon and Ansonia agreed over time to contribute

membership or limited partnership interests in various companies they respectively owned to a

separate company, Northland Properties LLC ("Newco").  Newco was to be a joint venture

owned by Northland, Tarragon and Ansonia.

12.     Under the terms of the Contribution Agreement, Tarragon agreed to contribute

membership interests of thirty (30) separate companies (the "Tarragon Contributed Companies")

that, in turn, owned real estate valued in the hundreds of millions of dollars (the "Tarragon

Properties").  In conjunction with the Contribution Agreement, Northland and Tarragon formed

an entity, Northland Properties Management, LLC (NPM), to manage Newco's real estate.  Also

on March 31, 2008, Tarragon entered into an agreement with NPM whereby NPM would provide

property management services to the Tarragon Properties (the "Interim Management

Agreement"), in anticipation of the closing of the Contribution Agreement.  The Contribution

Agreement, Interim Management and NPM Operating Agreements (collectively, the

"Agreements") were integrated contracts.  Because any change in management of the properties

owned by the Tarragon Contributed Companies required approval of Tarragon's lender, GE,

Northland agreed to immediately return management to Tarragon if GE did not approve this

management change[10].  Notwithstanding this agreement when, as indicated below, GE refused to

---

[9] Tarragon is the general partner and Ansonia is the limited partner of Ansonia
Apartments LP ("LP").  LP in turn, owns certain other entities that were to be contributed under
the Contribution Agreement.

[10] See March 31, 2008 letter agreement between Northland and Tarragon annexed as
Exhibit "11" to the Lipsky Affidavit.

7

consent to this change in management, Northland nevertheless refused to immediately relinquish its management of these properties, causing Tarragon Contributed Companies' potential default of their loan with GE[11].

13.     Northland is not a creditor of Tarragon.  To the contrary, Tarragon is a creditor of Northland based on Northland's repeated breaches of the Agreements and its fiduciary duty to Tarragon as a co-venturer.  For example, consummation of the Contribution Agreement required consent from GE, Tarragon's primary lender and first mortgage holder of twenty-three (23) of the thirty (30) Tarragon Contributed Companies.  The total amount of GE's secured loans exceeded $400 million.

14.     Even though GE effectively had veto power over the transaction, Northland failed to disclose material facts to GE, wrongfully communicated directly with GE in violation of the Contribution Agreement and repeatedly harassed GE despite GE's repeated demands that this conduct cease.  Further, in August 2008, Northland engaged in a series of actions which caused GE to refuse to consent to the Contribution Agreement (the "GE Consent') and harmed Tarragon's relationship with its primary lender, GE.

15.     On August 4, 2008, Northland Fund II, L.P. ("Northland Fund") sued Tarragon in Massachusetts State Court based on Northland Fund II's claimed termination of an agreement to purchase the membership interest of Tarragon Bermuda Island, LLC (the "Bermuda Island Contract"), the owner of a 360 unit apartment complex located in Naples, Florida (the "Apartment Complex"), for the sum of $42,500,000.00.  Despite the fact that Northland Fund II

---

[11] Northland attempted to hold these properties hostage by unilaterally imposing ridiculous and onerous conditions on its unconditional obligation to relinquish management, contrary to its agreement and the state court judge's order.

improperly terminated the Bermuda Island Contract, Northland concealed the existence of this lawsuit from GE.[12]

16.     Tarragon, in compliance with its contractual obligations, advised GE of the dispute involving the Apartment Complex.  Initially, GE pressed forward with its evaluation of the joint venture transaction.  Specifically, on August 11, 2008, GE advised Tarragon that GE had all the information necessary to make a decision regarding the GE Consent and would be doing so in the next week or two.  Despite the fact that Northland had actual notice that GE was

---

[12] (See a copy of Tarragon's Answer, Cross-Claim and Third-Party Complaint in the Massachusetts state court action regarding the Bermuda Island Contract annexed to the Lipsky Affidavit as Exhibit 10.)  On or about March 5, 2008, Tarragon entered the Bermuda Purchase Contract with Northland Fund LP ("Northland Fund") to sell all of Tarragon's membership interest in Bermuda LLC, the owner of a 360 unit apartment complex located in Naples, Florida (the "Apartment Complex"), for the sum of $42,500,000.00 (the "Bermuda Island Agreement").  Specifically, pursuant to the agreement, Northland Fund agreed to assume the existing mortgage loan (the "Bermuda Loan"), exceeding $42 million, between Tarragon and its lender.  The Bermuda Island Agreement was not contingent on any other transaction and provided for a March 31, 2008 time of the essence closing.

On six separate occasions, Northland Fund rescheduled the closing of the Bermuda Island Agreements.  During each instance that Northland Fund rescheduled the closing, Northland continually represented in bad faith that its intention was to finalize the transaction.  By July 2008, however, Northland's managing member, Steven Rosenthal ("Rosenthal"), admitted in an e-mail that Northland Fund would not close the Bermuda Island transaction until the closing of the Joint Venture Agreement.  That is, Northland Fund sought, in bad faith, to leverage the fact that the Bermuda Loan had already matured and that Tarragon was suffering from cash flow problems, to compel Tarragon to close the Joint Venture Agreement even though the Bermuda Island Agreement was not contingent on this separate transaction.

Thus, when Northland Fund, on the day before the July 31, 2008 closing date, sought to adjourn the time of the essence closing yet again, Tarragon refused.  The following day Northland Fund issued a letter "terminating" the Bermuda Island Agreement.  To add insult to injury, even though Northland stated it would not close on the sale, it initially refused to return the management of the Apartment Complex (including control of the bank accounts, leases, keys, accounting records, etc.) back to Tarragon.  In short, Northland, without any legal basis, held the property hostage for more than one week and only until Tarragon was on the steps of the proverbial Courthouse did Northland agree to return management control of the Apartment Complex back to Bermuda Island.  Tarragon is considering a claim against Northland for its conduct in this matter as well.

38590/0031-5342250v6

about to issue its determination, **on August 20, 2008 Northland commenced the New York Litigation demanding that it be granted exclusive access to communicate with GE regarding the GE Consent.  In addition, Northland in the New York Litigation asserted ludicrous claims seeking $1 Billion against Tarragon and its two principal officers, William Friedman and Robert Rothenberg.**

17.    Northland's filing of these two separate lawsuits against Tarragon during a three week period – and their conduct within these litigations – caused the obvious result.  On August 26, 2008, GE issued a letter to Tarragon denying consent to the Contribution Agreement and NPM's continued management of the Tarragon Properties (the "Denial Letter") (A true and correct copy of the Denial Letter is attached to the Sean M. Lipsky Affidavit as Exhibit "7").  Simply stated, Northland breached their fiduciary and contractual duties to Tarragon by engaging in a pattern of conduct that virtually ensured that Tarragon's primary lender would not consent to the joint venture transaction.

18.    Northland's request for a mandatory preliminary injunction was quickly rejected by the New York court on September 17, 2008 (See Lipsky Affidavit, Exhibit 3, Order of the New York Court, dated September 17, 2008[13], denying Plaintiffs' Motion for a Preliminary Injunction.).  For multiple reasons, Northland was quickly directed by the court to file an amended complaint.  Northland complied, filing a First Amended Complaint, adding Mr. Friedman and Mr. Rothenberg as defendants.  A motion to dismiss the Amended Complaint was granted as to Mr. Friedman and Mr. Rothenberg on December 2, 2008 (See Lipsky Affidavit, Exhibit "4"), and Northland appealed that decision (but has not yet perfected that appeal).

---

[13] The Order is attached to Mr. Lipsky's Affidavit together with a true and correct copy of the September 17, 2008 hearing transcript to which it refers.

38590/0031-5342250v6

Ansonia filed a motion to dismiss the complaint for failure to state a claim.  The state court gave

Northland 10 days to file a further amended Complaint in an effort to state a cognizable claim

against Ansonia.  On December 17, 2008, Northland filed the Second Amended Complaint

naming all of the same defendants as the First Amended Complaint.[14]  A true and correct copy of

the Second Amended Complaint (without exhibits) is attached to the Lipsky Affidavit as Exhibit

"5".  The Second Amended Complaint also failed to plead a cause of action against Ansonia.  On

January 7, 2009, Ansonia filed a second motion to dismiss the New York Litigation with respect

to allegations against it.  That motion is pending[15].

19.    Northland is stayed from seeking discovery in the New York Litigation relating to

its claims against Tarragon by virtue of the automatic stay of 11 U.S.C. § 362.  It is precluded

from seeking discovery relating to its claims against Friedman and Rothenberg because the state

court dismissed Northland's claims against them.  Northland is stayed from seeking discovery

relating to its claims against Ansonia because Ansonia has renewed its motion to dismiss, and

under New York Civil Practice Law & Rules ("CPLR") 3214(b) that motion stays all discovery

relating to these claims.

20.    Unable to plead, let alone prove, a claim against Friedman, Rothenberg or

Ansonia in the New York Litigation, Northland now seeks Rule 2004 discovery in the Tarragon

Chapter 11 case in a desperate attempt to try and find even a modicum of support for its

discredited theory that Tarragon, Ansonia, Friedman and Rothenberg breached and/or conspired

---

[14] The Second Amended Complaint continues to plead claims against Friedman and
Rothenberg, noting, however, that its complaint against them has been dismissed.

[15] The return date of that motion is currently set for March 3, 2009 (See Lipsky Affidavit,
paragraph 11).

to breach the Contribution Agreement in order to engage in what Northland describes as a more profitable transaction with Arko.

21.     Even a cursory comparison of the New York litigation with the Notice and Subpoena demonstrates that the primary purpose of the 2004 Subpoena is to gain information which Northland believes may help it sustain its causes of action in the New York Litigation.

**D.     The Northland Subpoena is Clearly Aimed at Building Claims in the New York Litigation and Must Be Quashed**

22.     Northland attempts to disguise its Subpoena as an attempt to discover information relevant to the proposed DIP Financing through its definition of the areas of inquiry in the Notice.  The Notice states:  "The areas of inquiry will include, but are not limited to the following:  Verified Application in Support of Motion for Final Order (1) Approving Post-Petition Financing, (2) Granting Liens and Providing Super priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 363 and 364 and (3) Modifying Automatic Stay Pursuant to 11 U.S.C. § 362 (Dkt. No. 65)".  However, a review of the first three Requests for Production of Documents attached to the Subpoena reveal Northland's true goal – discovery in the stayed New York Litigation in an effort to prove claims against Tarragon and the other defendants in that litigation.

23.     Northland's true goal is not to address legitimate questions concerning the proposed DIP Financing with Arko.  That is the role of the Creditor's Committee and its professionals.  The United States Trustee properly denied Northland's request for membership in the Committee.[16]

_____

[16] Northland is not a creditor and breached its fiduciary duties to Tarragon as a joint venture partner.  Case law clearly established that these factors disqualified Northland from serving as a member of the Creditors Committee.  In re Venturelink Holdings, Inc., 299 B.R. (. . . continued)

38590/0031-5342250v6

24.     No fewer than six paragraphs of Northland's Second Amended Complaint address Northland's theory that Tarragon and Ansonia breached the Contribution Agreement in order to pursue a more lucrative deal with Arko.  In essence, the Complaint alleges that Tarragon (and the other defendants) breached the Contribution Agreement to pursue an alternative deal with Arko, because Arko was only interested in a deal if Tarragon improved its liquidity by removing properties from the Contribution Agreement and selling them separately.  Of course, Tarragon disputes these allegations as utterly lacking in merit.

25.     Paragraph 4 of the Second Amended Complaint (annexed to the Lipsky Affidavit as Exhibit "5"), states that starting in June, 2008, the defendants breached the Contribution Agreement by beginning negotiations with Arko (referred to in that paragraph of the Complaint as "a third party investor").  This paragraph of the Second Amended Complaint further alleges that defendants Friedman and Rothenberg did so to further their personal interests, and that defendants "manipulated the GE consent process, culminating in GE's August 26 letter denying consent".

26.     Paragraph 41 of the Second Amended Complaint states:  "Business issues" to be addressed before the first closing under the Contribution Agreement emerged on June 18, 2008, including improving Tarragon's liquidity by taking certain properties out of the deal and selling them separately.  (There is no specific mention of Arko in this paragraph, but the heading immediately above it which referred to pursuing an alternative transaction makes it obvious that Northland is alleging Defendants were looking to breach the agreement with Northland to pursue an Arko deal.)

_____

(continued . . .)
420, 423 (Bankr. N.D. Tex. 2003); Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233 (3d Cir. 2001); In re Johns-Manville Corp., 26 B.R. 919, 925 (Bankr. S.D. N.Y. 1983).

13

27.     Paragraph 42 of the Second Amended Complaint states:  Tarragon attempts to renegotiate the Contribution Agreement related partly to the negotiations with Arko, a potential "new partner," tied to and motivated by Friedman and Rothenberg seeking to further their personal interests.

28.     In paragraph 43 of the Second Amended Complaint, Northland alleges that Friedman and Rothenberg pursued an alternative transaction with Arko involving a significant cash infusion into Tarragon, guided by their self-interest, and that Friedman and Rothenberg's decision to abandon the Northland deal in favor of a different deal harmed Tarragon and Ansonia.

29.     In paragraph 44 of the Second Amended Complaint Northland asserts that the defendants had to get out of the Northland deal to do the Arko deal since Arko was not interested in a deal unless Tarragon's liquidity was improved, for example by removing properties from the Contribution Agreement and selling them separately.

30.     Document Requests 1, 2 and 3 in the Requests for Production all demand documents that are directly related to the Second Amended Complaint's allegations concerning Arko, as follows:

"1.  All communications and documents between ARKO and any of the Debtors concerning any investment by ARKO in the Debtors, any joint venture between ARKO and any of the Debtors, any financing to be provided by ARKO to the Debtors or any similar transaction between ARKO and any of the Debtors.

2.  All communications and documents concerning any due diligence performed or conducted by the Debtors concerning ARKO.

38590/0031-5342250v6

3.  All communications and documents concerning any valuation, appraisals or other similar

materials provided to ARKO by the Debtors."

31.      As a further indication that Northland's real motivation in seeking Rule 2004

discovery in this proceeding is to obtain information in the New York Litigation, on December

11, 2008, Northland served a deposition subpoena *duces tecum* on Arko in the New York

Litigation.  (A true and correct copy thereof is annexed to the Lipsky Affidavit as Exhibit "8")  It

contains a schedule of deposition topics and a schedule of document requests.  These topics and

requests are striking similar to the requests made to Tarragon and Friedman in the Rule 2004

Subpoena..  The topics and document requests directed to Arko in the New York Litigation

include the topics and requests set forth below:

SCHEDULE A:          DEPOSITION TOPICS

Topic No. 1:

      All contacts, communications, or other dealings with Tarragon or any of its officers,

directors, or employees relating to any proposed or potential investment in or business venture

with Tarragon or any of its affiliates.

Topic No. 4:

      All contacts, communications, or other dealings with Tarragon or any of its officers,

directors, or employees relating to any real estate properties owned by Tarragon or any of its

affiliates.

SCHEDULE B:          REQUEST FOR PRODUCTION OF DOCUMENTS

Document Request No. 2:

      Produce all documents concerning any proposed or potential investment in or business

venture with Tarragon or any of its affiliates.

<u>Document Request No. 5</u>:

Produce all documents concerning any real estate properties owned by Tarragon or any of its affiliates.

On February 9, 2009, Northland postponed the Arko deposition in the New York Litigation because, as noted above, discovery in that litigation is stayed.  (See letter from Northland's counsel dated February 9, 2009 attached to the Lipsky Affidavit as Exhibit "8".)  Northland's Rule 2004 Subpoena is a thinly veiled attempt to obtain the information it cannot obtain in that proceeding.

32.     Northland has not commenced an adversary proceeding against Tarragon, it has not filed a proof of claim, and it has not received relief from stay to pursue the New York Litigation.  The real purpose of the Northland Subpoena is to further Northland's claims in the New York Litigation.  That is an abuse of Rule 2004 and the Subpoena should be quashed.

## III.     RELIEF REQUESTED AND BASIS THEREFOR

33.     Rule 45(c)(1) of the Federal Rules of Civil Procedure, which is made applicable to this case by Fed. R. Bankr. P. 9016, provides that a person or an attorney "responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing the undue burden or expense subject to that subpoena."  Fed. R. Civ. P. 45(c)(1).  Moreover, Rule 45(3)(A) provides, in pertinent part, as follows:

(3)     *Quashing or Modifying a Subpoena.*

(A)     *When Required.*  On timely motion, the issuing court must quash or modify a subpoena that:

(i)     fails to allow a reasonable time to comply; . . .

(iii)     requires disclosure of privileged or other protected matter if no exception or waiver applies; or

(iv)     subjects a person to undue burden.

Fed. R. Civ. P. 45(c)(3)(A)(i), (iii) and (iv).

34.     Once a motion to quash a subpoena is filed, the subpoena's issuer must show

good cause for the Rule 2004 examination.  <u>See</u> <u>In re Eagle-Picher Indus., Inc.</u>, 169 B.R. 130,

134 (Bankr. S.D. Ohio 1994).  Once good cause is established, the objecting party must convince

the court of the impropriety of the Rule 2004 examination.  <u>See</u> <u>In re Buick</u>, 174 B.R. 299, 304

(Bankr. D. Colo. 1994).

**A.** **<u>Northland's Improperly Issued Rule 2004 Subpoena is a Thinly
Veiled Attempt To Circumvent both the Automatic Stay and The Stay
on Discovery in The New York Litigation To Accumulate Evidence To
Establish The Claims Asserted in That Litigation.  Therefore the
Motion to Quash Should be Granted.</u>**

35.     Courts have quashed Rule 2004 subpoenas where that subpoena was primarily

issued to obtain information that would benefit the issuer's pending litigation against the

proposed examinee outside of the bankruptcy court.  <u>See</u> <u>Snyder v. Soc'y Bank</u>, 181 B.R. 40, 42

(S.D. Tex. 1994), <u>aff'd sub. nom.</u> <u>In re Snyder</u>, 52 F.3d 1067 (5th Cir, 1995) (mem.)

(characterizing the use of Rule 2004 to further a state court action as an abuse of Rule 2004 and

stating that the bankruptcy court did not abuse its discretion by denying production under a

subpoena issued under Rule 2004 where appellant's primary motivation was to use those

materials in a state court action against the examinee). <u>In re Enron Corp., et. al.</u>, 281 B.R. at 842

(Bankr. S.D.N.Y. 2002)(same); <u>In Re Duratech Industries, Inc</u>., 241 B.R. 291 (Bankr. E.D.N.Y.

1999), aff'd 241 B.R. 283 (E.D.N.Y. 1999) (A competitor with whom the debtor was engaged in

litigation in district court sought Rule 2004 discovery from the debtor under the pretext of

gathering information with which to draft a competing chapter 11 plan.  Both the bankruptcy

court and the district court found that the competitor's application failed the "smell test", and the

application was denied.)

36.    Indeed, this Court recently recognized that "[t]here are limits on the availability of Rule 2004 as a discovery tool."  In re Summit Global Logistics, No. 08-11566 (DHS), 2008 WL 1446722, at *3 (Bankr. D.N.J. April 8, 2008) (emphasis added).  This Court, in Summit Global, refused to allow a litigant in a pending adversary proceeding to side-step the discovery mechanisms under Federal Rules of Civil Procedure by taking Rule 2004 discovery.  In Summit Global the plaintiff in an adversary proceeding (Hecny) served a 2004 discovery subpoena in the main bankruptcy case.  Ostensibly, the Rule 2004 Subpoena was aimed at analyzing a proposed §363 sale to determine whether the purchasers were purchasing in good faith and whether the purchase price was reasonable and fair to creditors[17].  This court granted a motion to quash. Among the grounds on which the motion was granted was that there was a pending adversary and it was clear that the discovery requests were really aimed at investigating the claims in that adversary proceeding.  As in Summit Global, the Northland Subpoena is not really aimed at determining whether DIP Financing with ARKOMD is appropriate.  Northland seeks Rule 2004 discovery from Tarragon and Friedman to try and prove their state court claims at a time when they are barred from taking discovery in the New York Litigation.

37.    "The well recognized rule is that once an adversary proceeding or contested matter is commenced, discovery is made pursuant to Fed. R. Bankr. P. 7026 et seq., rather than by a Fed. R. Bankr. P. 2004 examination."  In re The Bennett Funding Group, Inc., 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (citing In re Bakalis, 199 B.R. 443, 447-48 (Bankr. E.D.N.Y. 1996); See In re Summit Global Logistics, 2008 WL 1446722, at *3; In re Nicholas Mattera, No. 05-39171, 2007 WL 1813763, *2 (Bankr. D.N.J. June 13, 2007); In re 2435 Plainfield, 223 B.R. at

---

[17] The court had already approved the sale and Hecny appealed the sale order on April 3, 2008 but did not seek a stay, and the asset sale closed on April 4, 2008.  There was, however, still a pending adversary proceeding with Hecny.

455-56; <u>In re M4 Enterprises, Inc.</u>, 190 B.R. 471, 475 (Bankr. N.D.GA. 1995); <u>In re Drexel

Burnam Lambert Group, Inc.</u>, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (stating "[t]he cases

are in agreement that once [a contested matter] is in progress a creditor/party does not have a

right to a 2004 examination."); <u>In re Ecam Publications, Inc.</u>, 131 B.R. 556, 559 (Bankr.

S.D.N.Y. 1991); <u>In re Blinder, Robinson & Co., Inc.</u>, 127 B.R. 267, 274 (D. Colo. 1991); <u>In re

Valley Forge Plaza Assocs.</u>, 109 B.R. 669, 674-75 (Bankr. E.D. Pa. 1990).

      38.     Courts have extended this rule to bar Rule 2004 discovery which is designed to

obtain information in litigation pending in non-bankruptcy courts. <u>Snyder v. Soc'y Bank</u>, supra,

at 42. Northland cannot use Rule 2004 to obtain discovery aimed at proving its case in the New

York Litigation. In <u>In Re Enron Corp., et al,</u> 281 B.R. 836 (Bankr. S.D.N.Y. 2002), the court

addressed a litigant's improper attempt to use Rule 2004 discovery to support its claims in

securities fraud litigation pending in another court. The court in <u>Enron</u> followed the principle

that "Rule 2004 examinations should not be used to obtain information for use in an unrelated

case or proceeding pending before another tribunal.", <u>In re Enron</u>, supra, 281 B.R. at 842. The

<u>Enron</u> court ruled that the plaintiff in the securities fraud action, who was also a party in interest

in the bankruptcy case, was, despite protestations to the contrary, improperly seeking to use Rule

2004 for discovery in the securities fraud action. The plaintiff's motion seeking Rule 2004

discovery was denied. As in the instant matter, at the time the plaintiff in <u>Enron</u> sought

Rule 2004 discovery plaintiff was stayed from taking discovery in the securities fraud litigation

because pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15

USC §78u(b)(3)(B), all discovery is stayed pending a judicial determination of a pending motion

to dismiss.  The <u>Enron</u> court noted that plaintiff had a motion pending in the securities fraud

matter to be allowed to take discovery in that case.[18]

39.     The <u>Enron</u> Court in denying plaintiff's motion for Rule 2004 discovery, referred

extensively to a similar problem posed in <u>Bennett Funding,</u> 203 B.R. 24 (Bankr. N.D.N.Y.

1996).  In that case some defendants in the chapter 11 trustee's pending adversary proceeding

argued that the trustee should be compelled to use the Federal Rules of Civil Procedure (as

incorporated into the Bankruptcy Rules) rather than a Rule 2004 exam.  The trustee argued that

no matter raised in the pending adversary proceeding would be addressed in the proposed Rule

2004 examination, but the court reasoned that "even a carefully crafted examination of [the third-

party defendant] by the Trustee could not avoid delving into issues regarding the other

defendants and subject matter covered in the . . . complaint."  <u>Id.</u> at 30.  As such, the Court found

that a "Fed. R. Bank. P. 2004 examination of [the third-party defendant] according to the

subpoena as drafted by the Trustee <u>would necessarily involve issues and parties within the scope</u>

<u>of the adversary proceeding</u> already initiated by the Trustee, and therefore the Trustee is limited

to discovery as to [the third-party defendant] in accordance with the Fed. R. Bankr. P. 7026 <u>et</u>

<u>seq.</u>"  <u>Id.</u> (emphasis added).

40.     The <u>Bennett Funding</u> court also held that discovery of "<u>evidence related to the</u>

<u>pending proceeding</u> must be accomplished in accordance with the more restrictive provisions set

forth in the Federal Rules of Civil Procedure."  <u>Bennett Funding Group</u>, 203 B.R. at 29

(emphasis added).  Further, the court found that the parties and the subject matter of the Rule

2004 examination would be inseparable from the adversary proceeding because of the complex

---

[18] CPLR 3214(b) would allow Northland to make a similar motion in the New York
Litigation as it pertains to discovery during the pendency of Ansonia's motion to dismiss.

relationship between the parties, thereby creating an unavoidable and unintentional back door

through which the trustee could avoid following the Federal Rules of Civil Procedure by using

Rule 2004. The <u>Bennett Funding</u> court concluded that this was not permissible. 203 B.R. at 29,

30. The <u>Enron</u> Court fully agreed. 281 B.R. at 841.

      41.    Courts are "wary" of parties attempting to utilize the broad nature of Rule 2004

discovery to avoid the more restrictive discovery procedures set forth in the Federal Rules of

Civil Procedure, as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7026

through 7037. <u>See</u> <u>Bennett Funding Group</u>, 203 B.R. at 28 (citing <u>Valley Forge Plaza</u>, 109 B.R.

at 675). This Court must be wary of Northland's attempt to obtain discovery under Rule 2004

where it is currently unable to obtain that discovery in the New York Litigation because the

CPLR prohibits discovery while Ansonia's dismissal motion is pending, and the automatic stay

prohibits discovery against Tarragon.

      42.    The Subpoena as drafted necessarily involves issues and parties within the scope

of the pre-petition New York Litigation and therefore Northland will be limited to discovery in

accordance with Fed. R. Bankr. P. 7026, *et seq*. if and when it receives relief from the automatic

stay to continue pursuit of that litigation.[19]

      43.    It is clear that the proposed Rule 2004 examination is intended to explore the

relationship between Tarragon and Arko in an attempt to establish that Tarragon and Ansonia

"breached" and Friedman and Rothenberg conspired to have Tarragon and Ansonia to "breach"

---

[19] Northland also has the option of filing a proof of claim in these proceedings. Tarragon's inevitable dispute of that claim would be a contested matter under Bankruptcy Rules 3007 and 9014, and Fed. R. Bankr. 7026 <u>et</u> <u>seq</u>. would apply to discovery in that contested matter.

38590/0031-5342250v6

the Agreement to Contribute because, under Northland's theory, Arko did not want that

transaction to proceed.

44.    As evidenced above, if the automatic stay is lifted, even a "carefully crafted

examination [by Northland] could not avoid delving into issues regarding [Tarragon] and subject

matter covered in the . . . [pleadings and related discovery]."  Bennett Funding Group, 203 B.R.

at 30.  It is unquestionable that the discovery sought is related to the pending New York

Litigation.  Northland is clearly and improperly attempting to use the broad discovery right

contemplated by Rule 2004 to amass ammunition for its pending New York Litigation, and is

attempting to do so without having either requested or received relief from the automatic stay.

45.    The fact that the Debtors have filed a motion seeking authority to enter into a

post-petition financing arrangement with an Arko related entity [docket item 65] does not justify

Northland's Notice and Subpoena, especially since there is a duly-organized and active Official

Committee of Unsecured Creditors in this case, and the Committee [which does not include

Northland among its members] is reviewing the terms, conditions and advisability of the

proposed DIP Financing.  This is an important factor to be considered in ruling on Tarragon's

Motion to Quash since there are clear indications that the motivation for the request is not for the

purpose of investigating matters which may affect the administration of the bankruptcy estate,

but to advance Northland's personal agenda of attempting to prove a claim against Tarragon and

advance its New York Litigation claims against Friedman, Rothenberg and Ansonia.  In re Enron

Corp., et al, 281 B.R. at 843, FN 7.  ("[A]n ongoing investigation [by a creditors' committee] is a

factor to be considered when there are other clear indications that the motivation for the request

is not for the purpose of investigating matters which may affect the administration of the

bankruptcy estate, but to advance the non-bankruptcy agenda of the applicant.")

38590/0031-5342250v6

46.     Accordingly, the Motion to Quash the Notice and Subpoena should be granted

pursuant to Fed. R. Bankr. P. 2004 and 9016 and Fed. R. Civ. P. 45.

## IV.     CONCLUSION

47.     Based on all of the foregoing arguments and authorities, it is respectfully

requested that the Court enter the accompanying Order quashing the Rule 2004 Notice and

Subpoena, and grant the Debtors such other and further relief as the Court deems just and

appropriate under the circumstances.

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Tarragon Corporation, *et al.*,
Movants and Debtors-in-Possession


By: ___*/s/ Gerald H. Gline*_____
            Michael D. Sirota, Esq.
            Gerald H. Gline, Esq.

DATED:  February 23, 2009

38590/0031-5342250v6