**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Warren Usatine, Esq.
Attorneys for Tarragon Corporation, *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>TARRAGON CORPORATION, *et al.*,<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NOS. 09-10555 (DHS)<br><br>Chapter 11<br><br>(Jointly Administered) |

---

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125**
**OF THE BANKRUPTCY CODE FOR THE DEBTORS'**
**CHAPTER 11 PLAN OF REORGANIZATION**

---

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................3
  A.   Background ...................................................................................................3
  B.   Voting ...........................................................................................................6

II.  GENERAL INFORMATION ..................................................................................6
  A.   Description of the Debtors' Business ...........................................................6
  B.   Tarragon's Business Operations ..................................................................7
  C.   Tarragon's Pre-Petition Financial Performance.........................................10
  D.   The Pre-Petition Capital Structure .............................................................11

III. FACTORS PRECIPITATING THE DEBTORS' CHAPTER 11 FILINGS.........................14
  A.   Adverse Market Conditions ........................................................................14
  B.   Tarragon's Pre-Petition Efforts to Improve Liquidity ...............................15
  C.   Pre-Petition Forbearance Agreement with Taberna ....................................16
  D.   Circumstances and Timing of the Filing of the Petitions ...........................17
  E.   Litigation with Northland ...........................................................................20

IV. THE CHAPTER 11 CASE ....................................................................................24
  A.   First Day Motions .......................................................................................24
  B.   Procedural Orders .......................................................................................24
  C.   Appointment of the Creditors' Committee .................................................31
  D.   Claims Process and Bar Date......................................................................32
  E.   Cash Collateral ...........................................................................................33
  F.   Asset Sales ..................................................................................................34
  G.   The Debtors' Negotiations With Certain Secured Creditors ......................37
  H.   Tarragon's Relationship with Ursa Development Group, LLC and
       Hoboken Development Group, LLC............................................................42
  I.   Status of Certain Litigation Matters Being Pursued by the Debtors...........43

V.  SUMMARY OF THE PLAN..................................................................................47
  A.   Introduction.................................................................................................47
  B.   Flow of proceeds from Assets contained in the Liquidation Portfolio. ......53
  C.   Flow of proceeds from Assets contained in the Investment Portfolio. .......54
  D.   Flow of proceeds from Assets contained in the Homebuilding
       Portfolio. .....................................................................................................55
  E.   Flow of Funds from Former Tarragon. .......................................................55
  F.   Recovery of Funded Confirmation Expenses from Liquidation Assets
       Distributions.  Former Tarragon shall apply the Net Proceeds received
       from Liquidation Assets to the extent of the Funded Confirmation
       Expenses, as follows: ..................................................................................56
  G.   Flow of Funds from HFZ M/F Company. ...................................................57
  H.   Classification of Claims and Interests and Their Treatment Under the
       Plan ..............................................................................................................57

I.  Distributions under the Plan and Treatment of Disputed, Contingent
    and Unliquidated Claims and Equity Interests..........................................................71
J.  Treatment of Executory Contracts and Unexpired Leases .........................................78
K.  Releases and Related Provisions................................................................................80
L.  Miscellaneous Provisions..........................................................................................83

VI.  VOTING AND CONFIRMATION PROCEDURES ...........................................................88
A.  Voting Instructions....................................................................................................88
B.  Parties in Interest Entitled to Vote ...........................................................................90
C.  Voting Tabulation .....................................................................................................91
D.  Voting Record Date ..................................................................................................94
E.  The Confirmation Hearing ........................................................................................95
F.  Procedure for Objections ..........................................................................................95
G.  Statutory Requirements for Confirmation of the Plan ...............................................96
H.  Best Interest of Creditors and Liquidation Analysis..................................................97
I.  Financial Feasibility................................................................................................100
J.  Acceptance by Impaired Classes .............................................................................101
K.  Confirmation Without Acceptance by All Impaired Classes....................................101
L.  Acceptance..............................................................................................................103

VII.  PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO
     CONFIRMING AND CONSUMMATING THE PLAN ...................................................103
A.  Certain Bankruptcy Considerations .........................................................................104
B.  Factors Affecting Distributions to Holders of Allowed Claims after the
    Effective Date .........................................................................................................106
C.  Certain Federal Income Tax Consequences of the Plan ...........................................108

VIII. RECOMMENDATION ..................................................................................................113

38590/0031-5166228v22

This Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code for the

Debtors' Chapter 11 Plan of Reorganization ("Disclosure Statement"), the Debtors' Joint Plan of

Reorganization under Chapter 11 of the Bankruptcy Code, a copy of which is annexed hereto as

Exhibit A (the "Plan"), the accompanying ballots and related materials delivered herewith are

being provided by the Debtors to known holders of Claims and Interests pursuant to Section

1125 and 1126 of the Bankruptcy Code in connection with the Debtors' solicitation of votes to

accept the Plan.  Unless otherwise defined, all capitalized terms contained in this Disclosure

Statement have the meanings ascribed to them in the Plan.

**The voting deadline to accept or reject the Plan is 5:00 P.M., prevailing Eastern**

**Time, _____, 2009 (the "Voting Deadline"), unless extended by Order of the United**

**States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  Your**

**vote on the Plan is important.**

By Order, the Bankruptcy Court approved this Disclosure Statement as containing

adequate information to permit the Holders of Claims and Interests against the Debtors to make a

reasonably informed decision in exercising their right to vote on the Plan.  Approval of this

Disclosure Statement by the Bankruptcy Court, however, does not constitute a determination on

the merits of the Plan.

This Disclosure Statement and the related documents submitted herewith are the only

documents authorized by the Bankruptcy Court to be used in connection with the solicitation of

votes on the Plan.  The Bankruptcy Court has not authorized any representations concerning the

Debtors' business operations, the value of the Debtors' assets or the value of any securities to be

issued or benefits offered pursuant to the Plan, except as explicitly set forth in this Disclosure

Statement.

There has been no independent audit or review of the financial information contained in this Disclosure Statement except as expressly indicated herein.  This Disclosure Statement was compiled from information obtained by the Debtors from numerous sources believed to be accurate to the best of the Debtors' knowledge, information and belief.

Neither the Securities and Exchange Commission nor any other governmental authority has passed on, confirmed or determined the accuracy or adequacy of the information contained in this Disclosure Statement or on the decision to accept or reject the Plan.  Holders of Claims or Interests must rely on their own examination of the Debtors and the terms of the Plan, including the merits and risks involved.  Before submitting ballots, Holders of Claims or Interests entitled to vote on the Plan should read and carefully consider this Disclosure Statement in its entirety.

For the convenience of Holders of Claims or Interests, this Disclosure Statement summarizes the terms of the Plan.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote to accept or reject the Plan. Nothing stated herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.  Certain statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions.  There can be no assurance that such statements will reflect actual outcomes.  All Holders of Claims or Interests should carefully read and consider fully the risk factors set forth in Article VII of this Disclosure Statement before voting to accept or reject the Plan.

Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to the full text of the applicable agreement, including the definitions of terms contained in such agreement.

The statements contained herein are made as of the date hereof, unless another time is specified.  The delivery of this Disclosure Statement shall not be deemed or construed to create any implication that the information contained in this Disclosure Statement is correct at any time after the date hereof.

Holders of Claims or Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice.  Therefore, each such Holder should consult with his, her or its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.

Although the Debtors' management has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, none of the financial information contained in this Disclosure Statement has been audited or reviewed and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement.  While the Debtors' management believes that such financial information fairly reflects the financial condition of the Debtors, the Debtors' management is unable to represent or warrant that the information contained herein and attached hereto is without inaccuracies.

## I.    <u>INTRODUCTION</u>

### A.    <u>Background</u>

On January 12, 2009, Tarragon Corporation ("Tarragon Corp.") and certain of its affiliates (collectively, the "January 12, 2009 Debtors ") filed petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code").  In addition to Tarragon Corp. the

entities that filed for Chapter 11 protection on the Commencement Date were: Tarragon Development Corporation ("Tarragon Dev. Corp."), Tarragon South Development Corp. ("Tarragon South"), Tarragon Development Company LLC ("Tarragon Dev. LLC"), Tarragon Management, Inc. ("TMI"), Bermuda Island Tarragon LLC ("Bermuda Island"), Orion Towers Tarragon, LLP ("Orion"), Orlando Central Park Tarragon L.L.C. ("Orlando Central"), Fenwick Plantation Tarragon LLC ("Fenwick"), One Las Olas, Ltd. ("Las Olas"), The Park Development West LLC ("Trio West"), 800 Madison Street Urban Renewal, LLC ("800 Madison"), 900 Monroe Development LLC ("900 Monroe"), Block 88 Development, LLC ("Block 88"), Central Square Tarragon LLC ("Central Square"), Charleston Tarragon Manager, LLC ("Charleston"), Omni Equities Corporation ("Omni"), Tarragon Edgewater Associates, LLC ("Tarragon Edgewater"), The Park Development East LLC ("Trio East"), and Vista Lakes Tarragon, LLC ("Vista").

On January 13, 2009, Murfreesboro Gateway Properties, LLC ("Murfreesboro") and Tarragon Stonecrest, LLC ("Stonecrest," and together with Murfreesboro, the "January 13, 2009 Debtors") filed petitions for Chapter 11 bankruptcy protection as well.  Finally, on February 5, 2009, Tarragon Stratford, Inc. ("Stratford"), MSCP, Inc. ("MSCP") and TDC Hanover Holdings LLC ("Hanover," and together with Stratford and MSCP, the "February 5, 2009 Debtors ", and together with the January 12, 2009 and January 13, 2009 Debtors, the "Debtors ") filed their petitions for Chapter 11 bankruptcy protection.

Since their respective commencement dates, the Debtors have remained in possession of their assets and the management of their business as Debtors-in-Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the voting classes contained in the Plan to make an informed judgment about whether to accept or reject the Plan.  **A hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on _____, 2009, at __:__ _.m., prevailing Eastern Time**, before the Honorable Donald H. Steckroth, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before _____, 2009 at 5:00 p.m., prevailing Eastern Time, in the manner described in Article VI, Section F of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan and all of the exhibits pertaining thereto (Exhibit A);

- Order of the Bankruptcy Court, among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

- Organizational Chart of Tarragon as of the Commencement Date (Exhibit C);

- The Debtors' Cash Flow Projections (Exhibit D);

- Emergence Plan Analysis (Exhibit E);

- The Debtors' Liquidation Analysis (Exhibit F);

- Post-Confirmation Organizational Chart (<u>Exhibit G</u>);

- Liquidation Trust Agreement (<u>Exhibit H</u>);

- Agreement with HFZ Capital Group, LLC (<u>Exhibit I</u>); and

- Agreement with ARKOMD, LLC (<u>Exhibit J</u>).

In addition, a Ballot is enclosed with the Disclosure Statement enabling those Holders of

Claims entitled to vote to accept or reject the Plan to cast their vote.

## B.    <u>Voting</u>

Voting instructions are contained in Article VI, Section A of this Disclosure Statement.

To be counted, your original Ballot must be duly completed, executed and filed with **Kurtzman**

**Carson Consultants LLC ("Kurtzman"), by the Voting Deadline.  Ballots filed after the**

**Voting Deadline may not be counted**.

## II.    <u>GENERAL INFORMATION</u>

### A.    <u>Description of the Debtors' Business</u>

#### 1.    **Corporate History and Structure**

Tarragon Corp., incorporated in 1997, is a publicly traded Nevada corporation.  Tarragon

Corp. is the successor by merger to Vinland Trust, a public real estate investment trust formed in

1973, and National Trust, a public real estate investment trust that began operations in 1978.

Tarragon Corp. holds a direct or indirect interest in over 100 subsidiaries, partnerships

and joint ventures, inclusive of both debtor and non-debtor entities (collectively, "Tarragon").

An organizational chart of Tarragon as of the Commencement Date is attached as <u>Exhibit C</u>.

Tarragon Corp.'s common stock is publicly traded on The NASDAQ Global Select

Market ("NASDAQ") under the symbol "TARR."  According to Tarragon Corp.'s transfer

agent's records, as of August 4, 2008, 28,987,734 shares of Tarragon Corp.'s common stock

were outstanding.  On September 26, 2008, Tarragon Corp. received a deficiency notice from

NASDAQ stating that it was not in compliance with NASDAQ Marketplace Rules because the

minimum bid price of its common stock had closed below $1.00 per share for 30 consecutive

business days.  The NASDAQ deficiency notice had no immediate effect on the NASDAQ

listing or trading of Tarragon Corp.'s common stock.  On January 12, 2009, Tarragon Corp.

received a NASDAQ Staff Determination Notice in connection with the commencement of the

bankruptcy cases indicating that, pursuant to NASDAQ Marketplace Rules, Tarragon Corp.'s

stock would be delisted from the NASDAQ.  Trading on Tarragon Corp.'s stock was suspended

on January 22, 2009.

### B.        Tarragon's Business Operations

Tarragon is a real estate developer, owner and manager with more than 30 years of

experience in the real estate industry.  As a developer, Tarragon has been recognized for its

quality construction, creative design, commitment to principles of smart growth, and broad

capabilities to meet the unique needs of the various communities in which it operates.

Tarragon's headquarters are located in New York City.  Tarragon also maintains regional

offices in Connecticut, Florida and Texas.  Tarragon has approximately 300 employees

consisting of executives, site level employees and corporate staff.

Tarragon operates two distinct business divisions, a real estate development division (the

"Development Division") and an investment division (the "Investment Division").  The

Development Division focuses on developing, renovating, building, and marketing homes in

high-density, urban locations and in master-planned communities, as well as building luxury and

affordable rental properties to sell upon completion and lease-up.  The Investment Division owns

and operates a portfolio of stabilized rental apartment communities located in Alabama,

Connecticut, Florida, New Jersey, Texas, Tennessee, Maryland, Oklahoma and Georgia.

### 1.      The Development Division

In its Development Division, Tarragon has focused on the development of the following distinct property types: (i) new low-rise and mid-rise rental apartment communities; (ii) high-rise and mid-rise condominiums; (iii) townhomes, traditional new developments and low-rise condominiums; and (iv) conversion of existing rental apartment communities to condominiums. These development projects typically have been targeted at highly defined market segments such as first-time, move-up, retirement, empty-nester, and affluent second-home buyers in Connecticut, South Carolina, New Jersey, Florida and Texas.  Tarragon's goal has been to obtain sites at a cost that makes development economically feasible, and it generally has acquired land subject to or after receiving zoning and other approvals to reduce development-related risk and preserve capital.

Tarragon historically financed its development activities through acquisition, development or construction loans and corporate borrowings, with the required equity investment coming principally from internally generated funds.  Mortgage financing proceeds and proceeds from the sale of properties generated by Tarragon's rental real estate portfolio also historically have been significant sources of funding for development activities.  Additionally, Tarragon often has undertaken development projects in partnership with third parties.  These third parties were selected based on their expertise in particular areas or projects or the partners' access to capital to facilitate obtaining construction financing and to fund a portion of the required equity.

As of  January 7, 2009, Tarragon's Development Division's inventory consisted of 1,034 units in active development projects, including: (i) 80 units in high and mid-rise developments; (ii) 10 units in townhome and traditional new home developments; (iii) 405 units in condominium conversions; and (iv) 539 units in rental developments.  Tarragon's development

pipeline consisted of 1,846 units including: (i) 352 units in high and mid-rise developments; (ii)

200 units in mixed-use residential and commercial developments; (iii) 72 units in townhome and

traditional new developments; and (iv) 1,222 units in rental developments.

As a result of the recent marked slowdown in new home sales, the decline in home prices

and the increasingly more restrictive credit markets, the Development Division has

deemphasized for-sale housing in future project planning in favor of development of traditional,

low-rise rental apartments with an emphasis on suburban garden apartment developments.

### 2.    The Investment Division

Tarragon's Investment Division owns and operates a portfolio of rental properties with

stabilized operations (i.e. development or renovation is substantially complete and recurring

operating income exceeds operating expenses and debt service).  The Investment Division also

provides management services to the Development Division's rental properties that are

earmarked for conversion to condominiums or under construction and in the initial lease-up

stage.

Tarragon, through TMI, manages its rental apartment communities in the Investment

Division with a focus on adding value.  Tarragon has implemented programs to optimize revenue

generated by the investment properties, including, but not limited to, daily value pricing and

lease inventory management, as well as programs to enhance ancillary income from cable,

television, telephone and high-speed internet services, laundry facilities, and vending machines.

Tarragon utilizes an integrated accounting, financial and operational management information

system which connects regional offices and management sites with Tarragon's corporate

headquarters in New York City.

Funds generated by the operation, sale and refinancing of Tarragon's investment real

estate portfolio primarily have been used to finance expenses associated with Tarragon's

development operations and to repay debt and other obligations.  Rental income also has been used to enhance the value of Tarragon's investment portfolio through consistent capital improvements.

As of January 7, 2009, Tarragon's Investment Division portfolio consisted of 7,392 stabilized apartment units and 3 apartment communities with 642 apartments in lease-up in its Investment Division portfolio.  Additionally, Tarragon's Investment Division portfolio included approximately 102,000 square feet of commercial property.

## C.    Tarragon's Pre-Petition Financial Performance

On November 10, 2008, Tarragon filed its Form 10-Q with the Securities and Exchange Commission disclosing Tarragon's financial performance for the nine months ended September 30, 2008 (the "10-Q").  As of September 30, 2008, Tarragon had consolidated assets totaling approximately $840,688,000 and consolidated liabilities totaling approximately $1,000,000,000.

As reported in the 10-Q, Tarragon's consolidated revenue was $48.5 million and $275.8 million for the three and nine months ending on September 30, 2008, respectively.  Tarragon suffered losses from continuing operations of $58.4 million and $111.5 million, respectively, for the three and nine months ending on September 30, 2008, compared to $178.5 million and $254.5 million for the corresponding periods in 2007.

Sales revenue in 2008 was adversely impacted by the volatility of the real estate market and the events affecting the sub-prime mortgage market.  Total sales revenue decreased by $21.2 million and $2.6 million, respectively, for the nine and three months ending on September 30, 2008.  In particular, Tarragon experienced a slowdown in sales at its condominium conversion projects and townhome developments for which consolidated revenue declined by $112 million and $50.2 million, respectively, for the nine months ending on September 30, 2008.

Rental income was modestly impacted by the deteriorating housing industry. Rental and other revenue decreased $441,000 (or 2.3%) and $1.7 million (or 3%), respectively, for the three and nine months ending on September 30, 2008.

As a result of the Debtors' operating losses, the Debtors have not incurred significant federal income tax liability and, in fact, have incurred substantial net operating losses ("NOLs"). The Debtors' NOLs currently are estimated to be approximately $300 million, which, based on the present 35% corporate tax rate, are worth as much as $105 million in potential future federal tax savings.

## D.    The Pre-Petition Capital Structure

Historically, Tarragon relied on project financing to fund growth opportunities in the Development Division and non-recourse mortgage financing in the Investment Division.  In the Development Division, Tarragon obtained loans to finance the acquisition of land for future development or sale, and to finance the cost of construction and land infrastructure, as well as the cost of acquiring and/or renovating rental properties for conversion into condominium homes. Generally, one of Tarragon Corp.'s subsidiaries or joint ventures was the borrower on the loan and, in many cases, either Tarragon Corp. and/or Tarragon Dev. Corp. guaranteed repayment of those obligations.

### 1.    Tarragon Unsecured Debt

As of the Commencement Date, Tarragon Corp. had unsecured debt totaling approximately $170 million, exclusive of contingent guaranty obligations and unliquidated litigation claims, broken down as follows: (i) $125 million of subordinated unsecured debt to Taberna Capital Management LLC and certain of its affiliates (collectively, "Taberna") pursuant to the terms of Subordinated Indentures dated June 15, 2005, September 12, 2005 and March 1, 2006, as amended (the "Taberna Indentures"); (ii) approximately $40 million of unsecured debt

to affiliates of the Debtors, Beachwold Partners, L.P. ("Beachwold")  and Robert P. Rothenberg,

Tarragon Corp.'s President ("Rothenberg") pursuant to the terms of promissory notes dated

January 7, 2008 (the "Affiliate Notes"); and (iii) other unsecured debt to vendors and other

claimants, including a credit line with Bank of America, N.A. ("Bank of America") secured by

assets owned by certain subsidiaries of Tarragon Corp.

## 2.    Contingent Claims

As of the Commencement Date, Tarragon Corp. also had contingent claims resulting

from its guarantees of affiliate and subsidiary project debt (described briefly below) totaling

approximately $769 million.  In addition, Tarragon and its development subsidiaries and

affiliates are subject to warranty and construction defect claims arising in the ordinary course of

business.

As of the Commencement Date, there also were several asserted and contingent claims

against various Tarragon entities for personal injury and property damage allegedly caused by,

among other things, construction defects, water intrusion and mold.  In certain of those claims

and/or lawsuits, Tarragon Corp. and other holding company Debtors have been named as current

or potential defendants.  The contingent claims are in varied stages of maturity, ranging from the

receipt of statutory construction defect notices to trial-ready lawsuits.

## 3.    Secured Debt at the Project Level

In connection with Tarragon's various development projects, the costs of construction,

renovations and acquisitions of land are financed through loans from institutional lenders secured

by mortgages on the real estate owned by Tarragon Corp.'s direct and indirect subsidiaries.

The following table summarizes the Debtors' mortgage debt as of the Commencement

Date:[1]

| Debtor | Lender | Maturity Date | Balance as of the Commencement Date |
|---|---|---|---|
| Bermuda Island | Bank of America | April 1, 2008 | $41,458,495 |
| Orion | Bank of America | September 28, 2008 | $7,690,400 |
| Orlando Central | Bank of America | October 5, 2008 | $5,454,717 |
| Las Olas | Bank Atlantic/Regions Bank | July 1, 2012 | $2,860,262 |
| Trio West | iStar FM Loans LLC ("iStar") | July 1, 2009 | $15,536,810 |
| 800 Madison | Bank of America | June 11, 2010 | $66,564,955 |
| 900 Monroe | Bank of America | June 30, 2009 | $3,900,000 |
| Central Square | Regions Bank | January 5, 2009 | $8,970,000 |
| Trio East | Bank of America | June 30, 2009 | $3,600,000 |
| Murfreesboro | National City Bank ("National City") | July 14, 2009 | $23,000,000 |
| Stonecrest | National City | July 14, 2008 | $5,600,000 |
| | | Total | $184,635,639 |

As set forth herein, the secured debt on certain Debtor projects was satisfied or reduced

as a result of asset sales and settlements that occurred during the Chapter 11 cases.

---

[1] The non-debtor projects have aggregate secured debt of approximately $625 million. Nothing herein constitutes an admission by the Debtors as to the amount or extent of debt or the validity of liens.

### III.   FACTORS PRECIPITATING THE DEBTORS' CHAPTER 11 FILINGS

#### A.   Adverse Market Conditions

The homebuilding industry in the United States has, for the last several quarters, experienced a significant and sustained decrease in demand for new homes and an oversupply of new and existing homes for sale.  The negative impact of those trends has been compounded by recent difficulties in the mortgage and overall credit markets.  In fact, many other large homebuilders, including Levitt and Sons LLC, Kimball Hill, Inc., Tousa Inc., WCI Communities Inc., and Woodside Group LLC, have been forced to seek bankruptcy protection based on the significant downturn in the homebuilding industry.

Similar to the impact on Tarragon's competitors, Tarragon experienced declining home prices and sales volumes and dampening customer confidence.  The downturn in the homebuilding industry has been particularly sudden and steep in Florida and other areas in which Tarragon is concentrated.

Historically, Tarragon's principal sources of cash have been proceeds from sales of for-sale or for-rent housing, borrowings, rental operations, and proceeds from the sale of rental real estate developments.  Throughout 2007 and 2008, however, the decline in home prices and concomitant increase in sales discounts and sales incentives, based with additional lease-up and interest costs associated with certain properties, strained Tarragon's liquidity.  Tarragon's liquidity has been further impacted by an increased cost of labor and supplies, resulting in reduced margins for homes sold.

Moreover, the volatility of the mortgage lending industry adversely affected the ability of Tarragon's buyers to obtain affordable home mortgages, detrimentally impacting  Tarragon's sales.  As a result of increased default rates, particularly in the sub-prime mortgage market, many lenders discontinued certain types of residential mortgage loans or significantly heightened their

loan qualifications for such loans.  The resulting difficulty in obtaining financing reduced the pool of qualified and capable home buyers.  Additionally, the restricted credit markets increased buyer termination of contracts.  Those defaults limited Tarragon's ability to deliver units from their residential inventory and collect contracts receivable upon completion of projects.

In the third quarter of 2007, the deterioration in the real estate credit markets prevented Tarragon from completing financing transactions that had been under negotiation.  The inability to close those transactions materially affected Tarragon's liquidity, including its ability to repay existing indebtedness as it became due and to meet other current obligations.  Those market conditions also detrimentally affected Tarragon's ability to comply with financial covenants contained in existing debt agreements.

## B.      Tarragon's Pre-Petition Efforts to Improve Liquidity

In response to those adverse market conditions, Tarragon took several steps aimed at preserving cash and enhancing its liquidity.  In response to the marked slowdown in sales, Tarragon decided not to convert a number of rental properties previously targeted for conversion to condominium homes for sale.  Instead, Tarragon decided to operate those properties as rental properties and transferred them from the Development Division to the Investment Division.  As a result of that decision, Tarragon incurred additional lease-up and interest costs associated with those apartment properties.  In August 2007, Tarragon also decided to sell 16 of those properties in connection with its efforts to improve liquidity and reduce debt.

As of the Commencement Date, Tarragon sold 15 of the 16 properties, generating net cash after payment of project-level obligations of $54.5 million.  In addition, before the Commencement Date Tarragon sold three development properties that had been financed mostly with short-term, floating rate debt.  Accordingly, the sales of those assets improved liquidity primarily by reducing negative cash flow and reducing debt.

Tarragon also took certain measures to reduce general and administrative overhead expenses by implementing a reduction in workforce in August 2007.  Thereafter, Tarragon continued to trim its workforce and reduce overhead by eliminating 200 additional positions in 2008.  Also in 2008, Tarragon closed offices in Orlando and Jacksonville, Florida, and significantly decreased lease expenses by reducing the size of the Ft. Lauderdale office from 25,000 square feet to 5,000 square feet.

Finally, Tarragon reevaluated the economic feasibility of its active and pipeline development projects in light of 2008 market conditions.  As a result of that evaluation, Tarragon delayed the commencement of seven planned development projects and one planned conversion of an apartment complex into a hotel.  Tarragon also terminated one project already under construction and contracts to acquire two additional developments.

**C.      Pre-Petition Forbearance Agreement with Taberna**

On October 30, 2008, Tarragon Corp. entered into a Restructuring Support and Forbearance Agreement with Taberna, the Indenture Trustee, Beachwold, and Rothenberg (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, Taberna agreed to support a financial restructuring of Tarragon Corp. and to refrain from exercising any rights and remedies under the Taberna Indenture through June 30, 2009, assuming the guaranty interest payments due on January 30, 2009 and April 30, 2009 were timely.

The Forbearance Agreement contemplated a financial restructuring in which the Taberna Notes and Affiliate Notes would be restructured and become obligations of a reorganized Tarragon Corp. or an affiliated issuer.  The Forbearance Agreement further contemplated that the sponsor of a restructuring plan and certain of Tarragon Corp.'s debt holders would receive shares of reorganized Tarragon Corp.'s equity, representing a controlling interest in the reorganized company, in exchange for the assumption of the indebtedness of the Taberna Notes and Affiliate

Notes.  As of the Commencement Date, however, the Debtors had not reached agreement with a

plan sponsor on a restructuring of Tarragon consistent with that contemplated by the Forbearance

Agreement.  In view of the fact that an agreement had not been reached with an investment

partner, Tarragon Corp. did not make interest payments to Taberna due on January 30, 2009 or

April 30, 2009.

Prior to the Commencement Date, the Debtors and their professionals devoted significant

time evaluating the Debtors' business operations and funding requirements to identify the most

comprehensive options for resolving their financial difficulties and maximizing value for the

benefit of all stakeholders.  Beginning in the summer of 2008, Tarragon Corp. engaged in

discussions with Arko Holdings, Ltd. ("Arko"), a publicly traded Israeli company, regarding the

recapitalization of Tarragon Corp.  Those discussions facilitated the execution of the

Forbearance Agreement with Taberna.  While an Arko affiliate committed to provide a $6.25

million debtor-in-possession financing facility (discussed below), negotiations on a plan of

reorganization were not concluded as of the Commencement Date.

Upon their orderly transition into Chapter 11, and in an effort to maximize stakeholder

recoveries, the Debtors continued to explore all strategic alternatives including, but not limited

to, continued negotiations with Arko, as well as evaluating a possible sale or other restructuring

or recapitalization, or combinations thereof.  In that regard, the Debtors engaged Lazard Frères &

Co. LLC to evaluate those alternatives and to actively market the Debtors to other potential

investors or purchasers.

**D.**     **Circumstances and Timing of the Filing of the Petitions**

Prior to commencement of the bankruptcy proceedings, Tarragon Corp.'s management

conducted a thorough analysis of the nature and extent of each entity's assets and liabilities.  As

a result of this analysis, on the Commencement Date, the January 12, 2009 Debtors filed

petitions for Chapter 11 bankruptcy protection.

The January 12, 2009 Debtors constitute far fewer than all of the more than 100 Tarragon

entities listed in the organizational chart attached hereto as Exhibit C, and were strategically

selected by Tarragon's management and advisors based on the particular facts and circumstances

of the specific entities.  An important factor in determining whether a project owner sought

Chapter 11 protection was the existence of alleged defaults on mortgages (primarily as a result of

maturity) and the status of discussions with their respective mortgage lenders regarding

forbearance and related issues.  More specifically, several Tarragon project-owning entities were

omitted from the initial Tarragon Chapter 11 filing based on perceived progress in lender

discussions regarding a forbearance agreement or similar accommodations that would obviate

the need, at least in the immediate term, to cause the entity to seek Chapter 11 protection.  Those

considerations were instrumental in identifying the January 12, 2009 Debtors.

Additional factors emerged when, upon being informed of the January 12, 2009 Debtors'

Chapter 11 filings, National City notified Murfreesboro and Stonecrest of its intention to

commence an action against those entities seeking, among other things, certain emergent relief

from the Tennessee state court.  The intended relief to be sought included the immediate

appointment of a rent receiver for projects encumbered by deeds of trust in favor of National

City, which deeds of trust secure notes due by Murfreesboro and Stonecrest to National City with

balances of approximately $23,000,000 and $5,600,000, respectively.  Additionally, National

City indicated that it would seek an injunction preventing Murfreesboro and Stonecrest from

collecting rents.  As a result, Tarragon's management decided on January 13, 2009, to file

petitions for protection under Chapter 11 of the Bankruptcy Code for Murfreesboro and Stonecrest to preserve the value of their assets for stakeholders.

Approximately two weeks later, Tarragon Corp. determined that three additional Debtors, Stratford, MSCP, and Hanover -- the February 5, 2009 Debtors -- were in need of Chapter 11 bankruptcy protection.  The February 5, 2009 Debtors have ownership interests in non-debtor affiliates Exchange Tarragon LLC, East Hanover Tarragon LLC, Capitol Ave. Tarragon LLC, Mariner's Point Tarragon LLC, and Merritt-Stratford, L.L.C. (the "Paradigm Borrowers") and are party to three notes due to Paradigm Credit Corp. ("Paradigm") in the aggregate principal amount of $29,800,000 (collectively, the "Paradigm Loan").

Before the commencement of the January 12, 2009 Debtors' Chapter 11 cases, Tarragon Corp., Tarragon South, the Paradigm Borrowers and the February 5, 2009 Debtors negotiated a forbearance agreement with Paradigm (the "Paradigm Forbearance Agreement").  The Paradigm Forbearance Agreement extended the maturity dates of the Paradigm Loan, revoked Paradigm's pre-petition exercise of equity pledges and waived default interest.  In turn, the Paradigm Borrowers agreed, among other things, to cross-collateralize the Paradigm Loan and committed to pay interest to Paradigm on a monthly basis.  In the course of their ongoing review of cash flow, asset values and other information concerning the relevant properties, however, the Paradigm Borrowers determined that the Paradigm Forbearance Agreement no longer continued to make economic sense.  In anticipation of the potential exercise of remedies by Paradigm, to preserve the value of their assets and for the benefit of their stakeholders, the February 5, 2009 Debtors filed their petitions for bankruptcy protection.

An Order directing joint administration of the January 12, 2009 Debtors' cases and the January 13, 2009 Debtors' cases was entered on January 15, 2009.  Subsequently, the Debtors

filed a motion seeking entry of an Order deeming the February 5, 2009 Debtors parties to the

First Day Motions (as defined *infra*), including the motion seeking joint administration.  In their

motion, the Debtors set forth the developments that led to the necessity to file additional

petitions, including, as described more fully above, changes in certain Debtors' relationships

with certain lenders.  The Bankruptcy Court entered an Order granting the motion on February

20, 2009.

### E.    <u>Litigation with Northland</u>

Before the Commencement Date, Tarragon Corp. entered into an agreement with

Northland Investment Corporation ("Northland Investment") , Northland Portfolio, L.P.,

Northland Fund, L.P., Northland Fund III, L.P., Northland Austin Investors LLC, Austin

Investors L.P., Drake Investors L.P. and Tatstone Investors (collectively, "Northland

Investment"), a series of privately held real estate investment companies, limited partnerships

and limited liability companies, to form two joint ventures.  Under the terms of a Contribution

Agreement dated March 31, 2008 (the "Contribution Agreement"), Northland Investment,

Tarragon Corp. and Ansonia LLC, a non-debtor affiliate of Tarragon Corp. ("Ansonia"), agreed,

over time, to contribute their membership or limited partnership interests in various companies

(the "Contributed Companies") to a newly formed company called Northland Properties LLC

(the "Northland Real Estate Venture").  The respective ownership and management interests in

the Northland Real Estate Venture were to be based on the relative value of each party's

contributed assets.

The Contributed Companies identified by Tarragon Corp. for contribution to the

Northland Real Estate Venture collectively owned 6,942 units and had non-recourse debt of $459

million.  Based on the parties' joint assessment of the equity in all of the properties to be

contributed, Tarragon Corp. and Ansonia, a partner in 24 of the contributed properties, initially

would own 22.4% of the Northland Real Estate Venture and Northland Investment would own

the remaining 77.6%. Consummation of the Northland Real Estate Venture was subject to lender

consents and other customary closing conditions.

Contemporaneously with the formation of the Northland Real Estate Venture, Tarragon

Corp. and Northland formed a second joint venture called Northland Properties Management

LLC ("Northland Management," which, together with Northland Investment, collectively shall

be referred to as "Northland") to provide property, asset and construction management services

to the properties in the Northland Real Estate Venture (the "Northland Management Venture").

Northland Management Venture was to be owned by Tarragon Corp. and Northland in the same

proportion as the contemplated ownership in the Northland Real Estate Venture.

In May 2008, Northland Management Venture assumed management of 24 Tarragon

apartment communities under an interim Management Agreement. In addition, the employment

of 25 of Tarragon's corporate employees and 215 site level employees was transferred to

Northland Management Venture at that time.

### 1.    Massachusetts Litigation

Tarragon Corp. entered into a contract with Northland Fund II, L.P. ("Northland Fund

II") to sell all of Tarragon Corp.'s membership interests in Bermuda Island for the sum of

$42,500,000 (the "Bermuda Island Contract"). Pursuant to the Bermuda Island Contact,

Northland Fund II agreed to assume the existing mortgage loan from Bermuda Island to its

lender and to close on the sale by March 31, 2008 (one day before the maturity of the loan).

Before the March 31, 2008 "time of the essence" closing date, Northland Fund II

requested that the closing date be rescheduled to April 30, 2008. Tarragon Corp. was reluctant to

delay the March 31, 2008 closing. Based on Northland Fund II's representation that it intended

to finalize the transaction shortly, however, Tarragon Corp. agreed to extend the closing date to

April 30, 2008.  Subsequently, on several occasions, Northland Fund II requested to further delay

the closing date and Tarragon Corp. ultimately agreed to extend the closing to July 31, 2008.

When Tarragon Corp. refused to grant any further extensions of the closing date, and demanded

that Northland Fund II close on the acquisition, Northland Fund II issued a letter on July 31,

2008, stating it was terminating the contract because the mortgage lender's consent to the

transaction was inadequate.

On August 4, 2008, Northland Fund II commenced a lawsuit against Tarragon Corp. in

the Superior Court of Massachusetts, County of Middlesex, Civil Action No.: 08-2944 (the

"Massachusetts Litigation").  In that lawsuit, Northland Fund II claimed that it was entitled to

terminate the Bermuda Island Contract and recover its deposit.  Tarragon Corp. filed an answer

to the complaint and asserted counterclaims against Northland Fund II for wrongful termination

of the Bermuda Island Contract.  The security deposit advanced by Northland Fund II under the

Bermuda Island Contract, which is subject to dispute between Tarragon Corp. and Northland

Fund II, is being held by the title company pending the outcome of the Massachusetts Litigation.

### 2.	New York Litigation

Before the Commencement Date, Tarragon Corp. did not receive the requisite lender

consents to the Northland Real Estate Venture.  Consequently, the Contribution Agreement was

terminated.

On August 20, 2008, Northland Investment filed suit against Tarragon Corp., Ansonia,

Rothenberg and William S. Friedman (the "Northland Defendants") in New York Supreme

Court, Index No.: 602425/08 (the "New York Litigation"), claiming, *inter alia*, that the

Northland Defendants breached the Contribution Agreement by failing to use their best efforts to

obtain General Electric Capital Corporation's ("GECC") consent.  Northland Investment also

sought entry of a preliminary injunction against Tarragon Corp. and Ansonia relative to the

Contribution Agreement.  On September 17, 2008, the Court denied Northland's Investment's

preliminary injunction application.  On September 24, 2008, Tarragon Corp. filed an answer to

the complaint and asserted a series of counterclaims against Northland Investment and Northland

Management.

In view of the failed Northland Real Estate Venture, Tarragon Corp. requested that

Northland Management voluntarily transition back to Tarragon Corp., management of the

Tarragon properties that were being managed by Northland Management Venture under an

interim Management Agreement.  Northland refused, thereby forcing Tarragon Corp. to resort to

legal action.  On September 17, 2008, the Court in the New York Litigation ordered Northland to

complete the transition of property management duties relative to Tarragon Corp.'s properties

within seven to ten days after September 17, 2008.  Northland refused to comply with that Order

as well.

Despite Northland's refusal to comply with the September 17, 2008 Order, and its

repeated threats against Tarragon Corp. and the property employees, management of the

Contributed Properties was transitioned back to Tarragon Corp. by September 27, 2008.  Shortly

thereafter, by letter dated October 2, 2008, Tarragon Corp. formally terminated the Northland

Real Estate Venture and Northland Management Venture.  On December 2, 2008, the New York

Litigation was dismissed as to William S. Friedman and Rothenberg.  As a result of the

automatic stay and the dismissal of Northland's claims against William S. Friedman and

Rothenberg, the Northland litigation has been inactive since the Commencement Date, except for

a notice to preserve its right to appeal the dismissal that was filed by Northland (but not yet

perfected) and pending motion to dismiss the claims against Ansonia.

**3.      Post-Petition Litigation with Northland**

On March 30, 2009, Tarragon Corp. commenced an adversary proceeding by filing a

complaint against Northland Investment and Northland Management, Adv. Pro. No. 09-1469.  In

its complaint Tarragon Corp. asserted, *inter alia*, that Northland breached the Joint Venture

Agreement, interim Management Agreement and the terms of the Northland Management

Operating Agreement and Northland Fund II wrongfully terminated the Bermuda Island

Contract.  On May 15, 2009, Northland filed an answer to the complaint denying Tarragon

Corp's claims.  On June 3, 2009, Northland filed an amended answer and counterclaim asserting,

*inter alia,* that Tarragon Corp. breached the Contribution Agreement by failing to use their best

efforts to obtain GECC's consent.  No discovery schedule has been issued by the Court as of this

date.

## IV.      THE CHAPTER 11 CASE

The following is a brief description of certain major events that have occurred during the

Chapter 11 Cases.

**A.      First Day Motions**

Concurrently with the filing of their petitions, the Debtors filed a number of "first day

motions" to insure their ability to continue operating in the ordinary course of business, to

minimize the disruption of their ability to provide services to their customers, to minimize

employee attrition and to maintain vital vendor relationships:  The orders ("First Day Orders")

entered in connection with the Debtors' "first day motions" played a crucial role in achieving an

orderly transition into Chapter 11.  A brief summary of the First Day Orders appears below.

**B.      Procedural Orders**

1.      **Orders authorizing joint administration of affiliated cases**

The Court entered an Order on January 15, 2009 authorizing the joint administration of

Tarragon's case and the cases filed by its affiliates on January 12, 2009 and January 13, 2009.

On February 5, 2009, the Debtors filed a motion for an "Order Pursuant to 11 U.S.C. Section

105(a) Directing that Certain Orders in the Chapter 11 Cases of Tarragon Corporation, et al., be

made applicable to Tarragon Stratford, Inc., MSCP, Inc. and TDC Hanover Holdings LLC",

which related entities filed petitions for Chapter 11 bankruptcy protection on February 5, 2009.

2.      **Other procedural orders**

On January 15, 2009, the Court entered an Order designating the Debtors' cases as

complex Chapter 11 cases.  In addition, the Court entered Orders: (i) authorizing the Debtors to

file a consolidated list of their thirty largest unsecured creditors; (ii) extending the Debtors' time

to file schedules of assets and statements of financial affairs; (iii) authorizing the Debtors to

retain and compensate professionals used by the Debtors in the ordinary course of their business

*nunc pro tunc* to the Commencement Date; and (iv) authorizing the Debtors to retain Kurtzman

as its claims and noticing agent.

3.      **Operational Orders**

a.      **Orders concerning the sale of assets**

In the ordinary course of its business, after evaluating and identifying an asset as either

unproductive, nonessential or capable of generating the greatest return through a sale, Tarragon

generally markets the asset for sale to reduce or retire associated debt and improve overall

liquidity.  To avoid any debate as to whether asset sales constitute transactions outside the

Debtors' ordinary course of business that would require individual court approval, and to provide

confidence to buyers that the Debtors have the requisite authority to sell and avoid unnecessarily

burdening the Court and the parties-in-interest with numerous motions seeking similar relief on

similar grounds, the Debtors sought approval of a streamlined process for review and approval of

certain asset sales.  The Court entered an interim Order on January 15, 2009 and a final Order on

February 20, 2009 authorizing procedures for the sale of assets by the Debtors.

Additionally, the Court entered an Order authorizing the Debtors and their non-debtor

affiliates to continue to sell residential inventory in the ordinary course of business and to

continue to transfer the sale proceeds in accordance with their cash management system on

January 15, 2009.

### b.       Customer Programs

Before the Commencement Date, the Debtors engaged in the ordinary course of business

in various customer programs to enhance customer satisfaction, sustain goodwill and ensure that

the Debtors remain competitive in the markets in which they operate.  The Court entered an

Order on January 15, 2009 authorizing, but not directing, the Debtors to honor prepetition

obligations under existing customer programs and authorizing financial institutions to receive,

process, honor and pay all checks presented for payment and electronic payment requests

relating to such obligations.

### c.       Utility Providers

The Debtors rely on a large number of utility service providers including water,

telephone, electricity, video conferencing, ISDN, gas and internet service in the ordinary course

of their business.  In order to prevent the business interruption likely to result in the event of

interruption of service of one or more utilities, the Debtors filed a motion for an Order deeming

their utility service providers adequately assured of future performance.  On January 15, 2009,

the Court entered an interim Order granting the motion and scheduling a final hearing on

adequate assurance for a later date.  On February 20, 2009, the Court entered a final Order

deeming utilities adequately assured of future performance to all utilities with the exception of

PSE&G, which objected to the Debtors' motion and requested a larger security deposit.  On

March 30, 2009, the Court entered a final Order deeming PSE&G adequately assured of future

performance.

### d.    Wages and Benefits

The Debtors' workforce is integral to the continued operation of their businesses.  As a

result, the Debtors filed a motion seeking authorization to honor, in the ordinary course of

business, certain payroll and related obligations to their employees owed as of the

Commencement Date as well as authorization to continue, in their sole discretion, all employee

health and benefit plans and programs in effect as of the Commencement Date.  On January 15,

2009, the Court entered an Order authorizing such transactions and directing the Debtors' payroll

service and any payroll banks to honor transactions related to pre-petition gross salaries, payroll

taxes and related employee benefit obligations to the Debtors' employees.

### e.    Cash Management

Tarragon uses an integrated, centralized cash management system in its ordinary course

of business.  The centralized cash management system enables Tarragon to (i) better forecast and

report its cash position, (ii) monitor collection and disbursement of funds and (iii) maintain

control over the administration of various bank accounts, all of which facilitates effective

collection, disbursement and movement of cash.  To prevent business interruption and to avoid

administrative inefficiencies that would result if they were required to modify their existing cash

management system, the Debtors filed a motion for an Order (i) authorizing the Debtors to

continue using their existing cash management system, bank accounts and business forms; (ii)

authorizing continue intercompany arrangements and historical practices; and (iii) waiving the

requirement of the Debtors' compliance with investment guidelines under 11 U.S.C. Section

345(b).  On January 15, 2009, the Court granted the motion on an interim basis for sixty days.

On March 16, 2009, the acting United States Trustee ("UST") objected to the Debtors' continued

waiver of the requirements of Section 345 of the Bankruptcy Code.  In response to that objection,

the Debtors obtained Uniform Depository Agreements with certain of their banks and closed

accounts that maintained a zero balance and were not used in the operation of their business.

The only outstanding issue related to two bank accounts at Compass Bank which serve as

collateral for outstanding letters of credit.  The UST agreed to waive the requirements of Section

345(b) for those accounts, provided that the Debtors provide monthly bank statements to the

UST.  On April 2, 2009, the Court entered a final Order on the motion.

### 4.     Post-Petition Financing

While at the outset of their cases, the Debtors believed that they would have sufficient

cash on hand to operate their businesses, the Debtors could not be certain, given the continuing

decline of the housing industry and concomitant decrease in cash receipts and collections, that

they would be able to continue to do so.  As a result, the Debtors determined that a post-petition

financing facility would be required to ensure the seamless continuation of the Debtors' business

while they explore restructuring alternatives.  Accordingly, the Debtors negotiated a post-petition

financing agreement with an affiliate of Arko known as ARKOMD, LLC ("ARKOMD"),

pursuant to which ARKOMD would provide, through a $6.25 million credit facility (the "DIP

Facility"), funds necessary for the Debtors to pay their ongoing expenses.

The Court entered an Order authorizing the Debtors to obtain the post-petition financing

on March 5, 2009.  The Order provided that ARKOMD will make funds available to the Debtors

subject to allowable variances in accordance with the terms of a budget.  As security for the

repayment of the obligations, the Debtors granted ARKOMD a first priority lien on certain

equity interests in the Debtors and any otherwise unencumbered assets and property.

The original maturity date of the DIP Facility was 180 days after the Commencement

Date, subject to extension to 240 days after the Petition Date (September 10, 2009) assuming no

material budget deviations by the Debtors.  On July 13, 2009, the Bankruptcy Court entered a

consent Order among the Debtors, the Creditors' Committee (defined below) and ARKOMD

authorizing an amendment to the DIP Facility.  The amendment effectively extended the

maturity date to November 10, 2009, but reduced the maximum DIP Facility commitment to

$3 million for all periods after September 10, 2009.  Following the Bankruptcy Court's approval

of the amendment, the Debtors drew $3 million on the DIP Facility.

### 5. Miscellaneous Orders

#### a. Relief from the Automatic Stay to Permit the Continuation of Pending Arbitration and State Court Proceedings

Prior to the Commencement Date, certain of the Debtors and certain of their non-debtor

affiliates were involved in disputes concerning construction and other issues relating to their

businesses.  One dispute (the "Alta Mar Litigation"), between: (i) certain Debtors and non-debtor

affiliates including Alta Mar Development LLC; (ii) Soares Da Costa Construction Services,

LLC; and (iii) the Insurance Company of the State of Pennsylvania, had progressed to the point

of arbitration, which was scheduled to take place for several days immediately following the

Commencement Date and to continue on certain dates in February and March.  The second

litigation, referred to as the "Central Square Litigation," was a breach of contract action

commenced by Central Square against Great Divide Insurance Company in the Circuit Court of

the 17th Judicial Circuit, Broward County, Florida.  Based upon a belief that neither their estates

nor creditors would suffer undue prejudice or hardship if the automatic stay was modified, as

well the significant likelihood that the Debtors will recover on account of their claims in the

litigations to the benefit of creditors, the Debtors filed a motion seeking relief from the automatic

stay to permit the litigations to proceed.  The motion was granted on January 12, 2009, and an

amended Order was entered on January 13, 2009.

### b.    Enforcement of Section 525(a) of the Bankruptcy Code

The Debtors' business is subject to stringent specifications, building codes and other

residential real estate development and home building regulations imposed by state and local

governments. As such, the Debtors must obtain certain required permits and comply with

applicable regulations, building codes and other residential real estate development and home

building requirements imposed by state and local governments.  Certain local regulations may

discriminate against debtors-in-possession engaged in real estate development and construction.

To prevent harm to the estate that could arise if governmental parties or quasi-governmental

entities relied on such discriminatory provisions or regulations, the Debtors filed a motion to

assist the Debtors' field personnel in apprising governmental parties of the existence and effect

of Section 525(a) of the Bankruptcy Code and, in particular, the protection that Section 525(a)

affords the Debtors.   The motion was granted by an Order entered on January 15, 2009.

### c.    Preservation of Net Operating Losses

Due to significant operating losses in the recent past, the Debtors accrued NOLs.  NOLs,

if they can be preserved and used in the future, are a potentially valuable asset.  However,

Debtors do not make any representations or warranties that such NOLs can be preserved or used

in the future.  Under the Internal Revenue Code (the "IRC"), to the extent the Debtors are able to

preserve the NOLs, the Debtors can carry forward their NOLs to offset their future taxable

income for up to twenty taxable years and thereby reduce their future aggregate tax obligations.

To protect the NOLs, the Debtors filed a motion seeking an Order that certain notice and

waiting periods govern transfers of equity interests in and of, and claims against, the Debtors.

The Court entered an interim Order granting the motion on January 15, 2009.  A final Order as it

relates to transfers of equity interests was entered on February 20, 2009. A final Order as it relates to transfers of claims, other than those held by Taberna and Paradigm, was entered on March 5, 2009. Taberna and Paradigm objected to the motion. Paradigm's objection was subsequently withdrawn. Pursuant to a series of Orders, the restrictions on claims trading with respect to Taberna have been continued pending a final hearing.

## C.  **Appointment of the Creditors' Committee**

Section 1102 of the Bankruptcy Code requires that, absent an Order of the Bankruptcy Court to the contrary, the UST must appoint an official committee of unsecured creditors (the "Creditors' Committee") as soon as practicable. On February 4, 2009, the UST appointed the Creditors' Committee. The Creditors' Committee is composed of the following members:

Howard D. Altschul, Chairperson
Taberna Capital Management, LLC
450 Park Avenue, 11th Flr.
New York, NY 10022

Hetal Patel
A.J.D. Construction Co., Inc.
948 Highway 36
Leonardo, NJ 07737

Donna Langford
K. Langford Lawn Care, Inc.
230 3rd Street, N.W.
Naples, FL 34120

Stuart Vorcheimer
Sovor Associates
34 Otbow Place
Wayne, NJ 07470

Robert K. Posner
Posner Advertising
30 Broad Street
New York, NY 10004

The Creditors' Committee retained the following professionals:

Daniel A. Lowenthal, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Bernard A. Katz, CPA
J.H. Cohn LLP
333 Thornall Street
Edison, NJ 08837

**D.**  **Claims Process and Bar Date**

**1.**  **Section 341(a) Meeting of Creditors**

A meeting of creditors pursuant to 11 U.S.C. §341 was conducted on March 4, 2009.

**2.**  **Schedules and Statements**

The Debtors filed schedules of assets and liabilities ("Schedules") and statements of

financial affairs ("SOFAs") on February 26, 2009.  The Schedules and SOFAs provide

information concerning each of the Debtors' assets, liabilities, Executory Contracts and other

information as of the Commencement Date, all as required by Section 521 of the Bankruptcy

Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure.

**3.**  **Bar Date**

On March 5, 2009, the Court entered an Order establishing May 4, 2009 as the deadline

for each person or entity asserting a claim against any of the Debtors, including claims pursuant

to Section 503(b)(9) of the Bankruptcy Code, to file a written proof of claim against the specific

Debtor as to which the claim is asserted.[2]  The Bar Date Order also established July 12, 2009 as

the date for all governmental units to file a written proof of claim against the Debtors.

---

[2] Due to the volume of claims filed, the Debtors have not had an opportunity to complete
an analysis of those claims.  Pursuant to the terms of the Plan, the Liquidation Trustee shall, on
or after the Effective Date, have the exclusive right to move and file objections to the unsecured
claims filed against the Debtors.  The reorganized Debtors will have the exclusive right to move
and file objections to all Administrative Expense Claims and Priority Claims.
(continued…)

E.    **Cash Collateral**

1.    **National City**

On February 6, 2009, Murfreesboro and Stonecrest filed a motion for authorization to use cash collateral of lender National City to pay for ordinary and necessary operating expenses, including personnel, utilities, repair and maintenance, insurance, and real estate taxes in connection with tenant-occupied residential rental properties in Tennessee.  Pursuant to the motion, Murfreesboro and Stonecrest agreed to grant replacement liens to National City in all of their post-petition assets to the same extent, validity and priority as were held by National City pre-petition.  Additionally, Murfreesboro and Stonecrest granted to National City a super-priority administrative expense claim to the extent that their use of cash collateral were to result in a diminution in value of National City's collateral and the adequate protection granted were to prove insufficient.  The Court entered interim Orders granting the motion on February 13, 2009, March 17, 2009, April 2, 2009 and April 30, 2009.  On June 19, 2009, in conjunction with the consummation of a settlement agreement with, among others, National City (described herein), the Court entered an Order authorizing Murfreesboro and Stonecrest to use National City's cash collateral on a final basis.

2.    **Bank of America**

Pending finalization of negotiations of a global settlement with Bank of America (described herein), Bermuda Island, Orlando Central and 800 Madison (collectively, the "BofA Borrowers") required immediate access to cash generated from the operation of their respective properties to pay for ordinary and necessary operating expenses pursuant to agreed upon budgets

(…continued)

with Bank of America.  Accordingly, the Court entered a series of cash collateral Orders

authorizing the BofA Borrowers' use of Bank of America's cash collateral.

The BofA Borrowers granted Bank of America adequate protection for the use of its cash

collateral by granting Bank of America replacement liens in all of their post-petition assets to

same extent, validity, priority as was held by Bank of America pre-petition.  Additionally, the

BofA Borrowers granted Bank of America super-priority administrative expense claims to the

extent their use of cash collateral resulted in a diminution of value of Bank of America's

collateral and the adequate protection proved insufficient.  As additional adequate protection

with respect to 800 Madison, by interim Order dated June 1, 2009, 800 Madison agreed to

provide Bank of America with an accounting and turn over to it all net operating income

generated from the property.

**F.**     **Asset Sales**

    **1.**     **Trio West**

On January 16, 2009, the Court granted Trio West's motion (the "Trio West Sale

Motion") for an Order approving bidding procedures concerning the sale of substantially all of

its assets.  The circumstances giving rise to the motion and the results of Trio West's efforts, are

summarized below.

Trio West owned a newly constructed 140-unit mid-rise condominium apartment

development in Palisades Park, New Jersey (the "Trio West Development"), construction of

which was financed with a $50,000,000 loan (the "Trio West Loan") advanced by iStar FM

Loans LLC (as assignee of Fremont Investment & Loan) ("iStar").  To secure Trio West's

obligations under the Trio West Loan, Trio West granted iStar a lien on, *inter alia*, the Trio West

Development and any proceeds generated therefrom.  As additional security, Tarragon Corp.

guaranteed repayment of the Trio West Loan up to a maximum amount of $5 million.  The Trio

West Loan matured on January 1, 2009, and as of the Commencement Date, had a outstanding amount due to iStar of approximately $15,945,000. As a result of the Trio West Loan having matured, and before the Commencement Date, iStar initiated a foreclosure action against Trio West and other defendants in the Superior Court of New Jersey, Chancery Division, Bergen County.

Prior to the Commencement Date, Trio West had marketed the Trio West Development's apartment units for sale to individual homebuyers, had successfully sold 69 units, but was unable to sell the remaining units. The impending maturity date of the Trio West Loan and inability to dispose of the individual units led Trio West to pursue a bulk sale of the remaining 71 units in the Trio West Development (the "Trio West Assets"). Although Tarragon Corp. did not directly solicit bids for the bulk sale of the units, it was generally known to parties in the industry that purchase condominium units in bulk, as well as parties to whom Tarragon Corp. previously sold apartment units in bulk, that the Trio West Assets were for sale. Trio West received three expressions of interest and/or offers. MWHF Palisades Park, LLC (the "Proposed Trio West Purchaser") submitted the highest offer by a material amount. As a result, Trio West decided to pursue a sale of the Trio West Assets to the Proposed Trio West Purchaser and, on November 11, 2008, entered into a Purchase and Sale Agreement, as thereafter amended (the "Trio West APA"). Pursuant to the Trio West APA, the Proposed Trio West Purchaser agreed to purchase the Trio West Assets, in bulk, for the total price of $18,100,300 (the "Trio West Purchase Price").

In connection with its sale efforts, Trio West retained Cushman & Wakefield of New Jersey, Inc. ("C&W") to market the Trio West Assets. Among C&W's duties was to identify and contact entities who may be interested in purchasing the Trio West Assets.

In Part I of the Trio West Sale Motion, Trio West requested that the Court enter an Order (the "Trio West Bidding Procedures Order"): (i) approving the Trio West APA as a "stalking horse" bid and authorizing Trio West to solicit bids for the sale of the Trio West Assets pursuant to Sections 363 and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 6004; (ii) approving bidding procedures, including the payment of an Expense Reimbursement and Break-Up Fee to the Proposed Trio West Purchaser; (iii) scheduling (a) the bid deadline; (b) the auction date with respect to the sale of the Trio West Assets; and (c) the sale hearing date to consider Part II of the Trio West Sale Motion; (iv) approving the form, manner and sufficiency of notice of the auction and the sale hearing; and (v) granting other related relief described herein.

In Part II of the Trio West Sale Motion, Trio West requested that the Court enter an Order (the "Trio West Sale Order"), following the Trio West sale hearing, among other things, authorizing Trio West to sell the Trio West Assets to the Proposed Trio West Purchaser, or a qualified bidder submitting a higher and better offer, free and clear of liens, claims and interests pursuant to Section 363 of the Bankruptcy Code and Fed. R. Bankr. P. 6004.

No higher or better offer was submitted, and thus no auction was conducted. On February 20, 2009, the Court held a hearing to authorize Trio West to sell the Trio West Assets and otherwise consummate the transactions contemplated by the Trio West APA or a higher and better offer as reflected in an asset purchase agreement. On February 20, 2009, the Court entered an Order approving the sale to the Proposed Trio West Purchaser free and clear of liens. The sale closed on February 27, 2009.

## 2.     Orlando Central

On February 10, 2009, Orlando Central entered into a Purchase and Sale Agreement (the "OCP Sale Agreement") with RGC Realty Group, LLC (the "OCP Purchaser") pursuant to which Orlando Central agreed to sell, and OCP Purchaser agreed to purchase, property located at

7001 Lake Ellenor Avenue, Orlando Central Park, Orange County, Florida (the "OCP

Property"). On March 6, 2009, the Debtors, in accordance with the Final Order Establishing

Procedures for Sale of Assets entered on February 20, 2009, filed and served a Notice of Sale of

the OCP Property. No objections were filed to the prospective sale. On April 3, 2009, the Court

entered an Order approving the sale of the OCP Property to the OCP Purchaser. The purchase

price for the OCP Property was $2,150,000. The proceeds of which were paid to Bank of

America, the holder of a mortgage lien on the OCP Property. A closing occurred on April 8,

2009.

On May 11, 2009, Orlando Central entered into a Purchase and Sale Agreement with JCQ

Services, Inc. (the "Second OCP Purchaser") pursuant to which Orlando Central agreed to sell,

and the Second OCP Purchaser agreed to purchase, property located at 7200 Lake Ellenor Drive,

Orlando Central Park, Orange County, Florida (the "Second OCP Property"). On May 15, 2009,

the Debtors, in accordance with the Sales Procedure Order, filed and served a Notice of Sale of

the Second OCP Property. No objections were filed to the prospective sale. On June 4, 2009,

the Court entered an Order approving the sale of the Second OCP Property to the Second OCP

Purchaser. The purchase price for the Second OCP Property was $2,800,000, the proceeds of

which were paid to Bank of America, the holder of a mortgage lien on the Second OCP

Property.[3]

## G.     The Debtors' Negotiations With Certain Secured Creditors

---

[3] In addition, in accordance with the Sales Procedure Order, on June 22, 2009, the
Debtors filed a Notice of Sale for property owned by non-debtor So. Elms National Associates
Limited Partnership. As of the date of this Disclosure Statement, that sale had not closed.

### 1.    Paradigm

Before the Commencement Date, Paradigm provided financing to the Paradigm

Borrowers for real estate projects located in New Jersey, Connecticut and Florida (the "Paradigm

Properties").  Repayment of the above loans was secured by, among other things, a mortgage on

the real property owned by the Paradigm Borrowers.  As additional security, Tarragon Corp.

guaranteed repayment of the loans and MSCP, Stratford, Tarragon South and Hanover

(collectively, the "Paradigm Guarantors") each pledged their equity interests in the Paradigm

Borrowers to Paradigm.

In view of the unprecedented decline in real estate values, it was clear that any equity in

the Paradigm Properties was speculative, at best, and that equity was eroding at 24% per annum

due to the default interest rate in the governing promissory notes.

Accordingly, the Paradigm Borrowers and the Paradigm Guarantors, along with the input

from the Creditors' Committee, engaged in discussions to amicably resolve the claims of

Paradigm.  On March 30, 2009, the parties entered into a Settlement Agreement and Mutual

Release (the "Paradigm Settlement Agreement").  The Paradigm Settlement Agreement provides

that the Paradigm Borrowers will (i) transfer the Paradigm Properties to Paradigm or its

designee, and/or (ii) irrevocably waive any right to contest, defend, delay, impede, enjoin,

prevent, interfere with or frustrate the foreclosure of the Paradigm Properties.  In exchange,

Paradigm agreed to release the Paradigm Borrowers and the Paradigm Guarantors from any

liability on the promissory notes, including any exposure for deficiency claims and claims

against the Paradigm Guarantors.

On April 23, 2009, the Court entered an Order approving the terms of the Paradigm

Settlement Agreement.

### 2.     National City

Before the Commencement Date, National City, Capmark VI 2006-6 and Capmark VII-CRE (the "NatCity Lenders") provided financing to Murfreesboro, Stonecrest and non-debtor Floresta Tarragon, LLC for real estate projects located in Tennessee and Florida.  Repayment of these loans were secured by, among other things, a mortgage on the real property owned by the respective borrower.  As additional security, Tarragon Corp. guaranteed repayment of the loans.

In view of the unprecedented decline in real estate values and current economic climate, it was impossible to predict how long it would take to sell the Murfreesboro and Stonecrest properties and what proceeds, if any, could be realized.  Additionally, the Debtors determined that there would be no benefit to them or their estates to engage in costly and protracted litigation with the NatCity Lenders over the value of those properties or whether, in view of the absolute assignment of rents contained in the respective loan documents, the rents generated by those properties constituted "cash collateral."  Accordingly, Tarragon Corp., Murfreesboro and Stonecrest, with input from the Creditors Committee, engaged in rigorous discussions to resolve the NatCity Lenders' claims and to address disposition of the Tennessee properties.

Following the parties' extensive negotiations, on May 8, 2009, the parties agreed to the terms of a settlement (the "NatCity Settlement Agreement").  The NatCity Settlement Agreement provided, in relevant part, that upon entry of a final, non-appealable Order approving the settlement (the "Compromise Order"), National City shall be granted relief from the automatic stay under Section 362(a) of the Bankruptcy Code and the National City's collateral shall be deemed abandoned under Section 554 of the Bankruptcy Code to allow National City and the NatCity Lenders, as the case may be, to (i) proceed with the their complaint to appoint a receiver and the relief sought therein (except as to entry of a money judgment), (ii) sell the Tennessee properties in a non-judicial foreclosure as provided for in the loan documents, and (iii) exercise

such other rights and remedies available under the loan documents or applicable non-bankruptcy law as to their collateral.  In exchange, the NatCity Lenders agreed to waive all other claims against Tarragon Corp., including a potentially significant deficiency claim. Significantly, the Tarragon Corp. estate will not be saddled with a significant deficiency claim which would have to be addressed in and satisfied pursuant to the Plan.

On May 28, 2009, the Court approved the NatCity Settlement Agreement,  Subsequently, in accordance with the NatCity Settlement Agreement, Murfreesboro and Stonecrest surrendered their respective properties to National City, ceased use of cash collateral, and remitted to National City any cash collateral remaining after payment of expenses allowed by the interim cash collateral orders.

### 3.        Bank of America

In connection with Tarragon's various development projects, the costs of construction, renovations and acquisitions of land are financed through loans from institutional lenders secured by mortgages on the real estate owned by Tarragon Corp.'s subsidiaries.  Bank of America provided financing to Tarragon Corp., 800 Madison, 900 Monroe, Bermuda Island, Orion, Orlando Central, Park East (collectively, the "BofA  Financing Borrowers") for projects located in New Jersey, Florida and Connecticut (the "BofA Financing Loans").

Since the Filing Date, the BofA Financing Borrowers evaluated their options with respect to the properties encumbered by mortgages in favor of Bank of America.  The unprecedented decline in real estate values and general downturn in the economy has negatively impacted the BofA Financing Borrowers' ability to dispose of their respective properties and, correspondingly, their ability to satisfy their outstanding obligations on the BofA Financing Loans.  The impending or already lapsed maturity dates of the BofA Financing Loans and

inability to generate sufficient sale proceeds to satisfy the BofA Financing Loans by the maturity

dates led the BofA Financing Borrowers to commence discussions with Bank of America

regarding the terms of a forbearance agreement and an extension of the maturity dates of the

BofA Financing Loans.  The parties' agreement will be embodied in an agreed upon Settlement

Agreement (the " BofA Financing Settlement Agreement").

The BofA Financing Settlement Agreement provides that Bank of America will forbear

from exercising any rights under the loan documents and will extend the maturity dates of the

BofA Financing Loans to allow the BofA Financing Borrowers to sell the mortgaged properties.

If at the end of the applicable forbearance period for each BofA Financing Loan, or at the BofA

Financing Borrowers' election at any time during the forbearance period, for the mortgaged

properties that have not been sold, the BofA Financing Borrowers have agreed to (i) consent to

relief from the automatic stay to permit Bank of America to foreclose and consent to an

uncontested foreclosure with respect to such mortgaged properties, or (ii) conduct a sale of the

mortgaged properties pursuant to 11 U.S.C. § 363(b), at which sale Bank of America will have

the right to bid-in the full amount of the outstanding balance under the loan documents for that

mortgaged property.

The BofA Financing Settlement Agreement also provides that Bank of America will

provide post-petition financing to 800 Madison to complete construction of its property and

funding of an interest reserve.  Tarragon Corp. and Tarragon Dev. Corp. will, in turn, deliver a

guaranty of the BofA Financing Loans, which guaranty shall be secured solely by a first priority

lien on 60% of the net proceeds payable to Tarragon Corp. and Tarragon Dev. Corp. from a sale

of the 800 Madison Property.

Additionally, the BofA Financing Settlement Agreement provides that retroactive to January 12, 2009 and during the forbearance period, Bank of America agrees to allow the BofA Financing Borrowers to use the income generated by their respective properties for payment of necessary operating expenses, subject to an approved budget.

### H.   Tarragon's Relationship with Ursa Development Group, LLC and Hoboken Development Group, LLC

The Debtors, through Tarragon Corp. and Tarragon Dev. Corp, have had a business relationship with Ursa Development Group, LLC and Hoboken Development Group, LLC (collectively, "Ursa") since 2002 developing real estate in Hoboken, New Jersey.  Before the Commencement Date, the Debtors and Ursa successfully completed six residential developments in Hoboken with over 800 apartment units and related community facilities and amenities.  As of the Commencement Date, the parties had plans to construct several other developments in Hoboken in connection with the redevelopment of the northwestern and western areas of the city.

The relationship between the Debtors and Ursa is governed by the terms of twelve limited liability company operating agreements (the "Ursa Operating Agreements") pursuant to which one or more of the Debtors and Ursa are members and/or managing members of limited liability companies (the "Ursa LLCs").  Pursuant to the terms of the Ursa Operating Agreements, cash is available for distribution to Tarragon Corp. and/or Tarragon Dev. Corp. and Ursa as follows: (i) first, pro rata, based on the outstanding principal balances of their respective members loans until all loans, together with interest thereon at 15% per annum compounded annually, have been repaid; (ii) second, pro rata, based on their respective capital contributions until each has received total distributions resulting in a 12% internal rate of return; and (iii) third, based on a final fixed percentage set forth in the Ursa Operating Agreements.  As of December 31, 2008,

the Debtors had approximately $24 million of unrecovered capital invested in the Ursa LLCs and

made additional loans to the Ursa LLCs totaling $2.8 million.

On March 3, 2009, Ursa filed a motion for entry of an Order (i) pursuant to Section

365(d)(2) of the Bankruptcy Code to compel assumption or rejection of the Ursa Operating

Agreements, and (ii) pursuant to Section 362 of the Bankruptcy Code for relief from the

automatic stay to permit Ursa to employ dispute resolution procedures it the Ursa Operating

Agreements (the "Ursa Motion").  The Debtors objected to the Ursa Motion and after oral

argument on April 29, 2009, the Bankruptcy Court denied the Ursa Motion without prejudice.

The Debtors propose to assume the Ursa Operating Agreements upon confirmation of the

Plan.  Consistent with its position in connection with the Ursa Motion, Ursa likely will assert that

the Debtors are in default under the Ursa Operating Agreements and that those defaults must be

cured as a condition to the Debtors' assumption of those agreements.  The Debtors dispute that

they are default under the Ursa Operating Agreements and will oppose any cure demands by

Ursa.

## I.   **Status of Certain Litigation Matters Being Pursued by the Debtors.**

As of the Commencement Date, certain of the Debtors and/or non-debtor Affiliates were

parties in litigation matters the Debtors believed would result in affirmative recoveries for

Tarragon.  Below are summaries of certain of those actions the Debtors believe are material.

### 1.   **Village of Riverwood Litigation.**

On January 29, 2007, Tarragon Dev. Corp. entered into a Purchase and Sale Agreement

(the "Riverwood Contract") to purchase 39.869 acres, known as Tract N in the Village of

Riverwood, Davidson County, Tennessee (the "Riverwood Property"), from Brown's Farm and

Chris Pardue (collectively, the "Riverwood Sellers") for the sum of $5,000,000. Tarragon Dev.

Corp. claims that the Riverwood Sellers breached the Riverwood Contract by failing to satisfy

various conditions that were a prerequisite to closing title to the Riverwood Property.

Correspondingly, the Riverwood Sellers claim that Tarragon Dev. Corp. breached the Riverwood

Contract by not closing title to the Riverwood Property.

On June 5, 2009, Tarragon Dev. Corp. commenced an adversary proceeding against the

Riverwood Sellers in United State Bankruptcy Court for the District of New Jersey, entitled

*Tarragon Development Corp. adv. Brown's Farm et als.*, CASE NO. 09-10555 (DHS), ADV.

PRO NO. 09-1469 (DHS) (the "Riverwood Action").  In the Riverwood Action, Tarragon Dev.

Corp. has sought to recover damages incurred as a result of Riverwood Sellers' breach of the

Riverwood Contract, including the return of a $500,000 deposit (consisting of $250,000 cash and

a $250,000 promissory note) and $125,000 in extension fees which are being held by the title

insurance company. The Defendants' response to the adversary proceeding complaint is due on

August 13, 2009.

> **2.      Alta Mar Litigation.**

Alta Mar Development LLC, a non-debtor Tarragon affiliate ("Alta Mar"), developed a

condominium apartment complex in Fort Myers, Florida (the "Alta Mar Development").  The

residential units of the Alta Mar Development have been sold.

In connection with the construction of the Alta Mar Development, Alta Mar engaged

Soares Da Costa Construction Services, LLC ("SDC") as the contractor on the project pursuant

to the terms of a construction contract (the "Construction Contract").  Before the commencement

of the bankruptcy cases, SDC filed a Demand for Arbitration against Alta Mar, Balsam

Acquisitions, LLC (another non-debtor affiliate) and Tarragon Dev. Corp. (collectively, the

"Alta Mar Defendants") with the American Arbitration Association, bearing case number 50 110

S 00346 06.  SDC alleged the Alta Mar Defendants did not perform under the Construction

Contract and caused SDC to suffer delay damages in connection with the Alta Mar

Development.  SDC seeks damages against the Alta Mar Defendants in the amount of

$5,653,962.

In response to SDC's arbitration demand, the Alta Mar Defendants asserted

counterclaims against SDC and Insurance Company of the State of Pennsylvania, SDC's

bonding company, for damages incurred as a result of SDC's inability to complete the

construction of the Alta Mar Development.  The Alta Mar counterclaim seeks damages in the

total amount of $17,368,197.04.

In connection with the Debtors' "first day" motions, the Debtors were granted relief from

the automatic stay, to the extent applicable, to allow the Alta Mar Litigation to proceed.  At that

time, the Alta Mar Defendants believed their likelihood of success on the Alta Mar counterclaim

was strong and any recovery on those claims would exceed any liability to SDC on it affirmative

claims.

The arbitration concluded in May of 2009 and a decision from the arbitrators is expected

shortly.

**3.      Central Square Litigation.**

Central Square owns vacant land in Lauderdale Lakes, Florida that was being held for

future development into a rental apartment community.  Before the Commencement Date,

Central Square commenced a lawsuit against Great Divide Insurance Company ("Great Divide")

in the Circuit Court of the 17th Judicial Circuit, Broward County, Florida, bearing Case No.

07000612 (the "Central Square Litigation").  The Central Square Litigation seeks damages

against Great Divide for breach of contract arising from its failure to remit insurance proceeds to

Central Square for hurricane damage that was covered by an insurance policy.  The insurance

coverage was $4.1 million, with a 5% deductible for windstorm hurricane coverage.  Central

Square had an estimate from a local contractor for $7.6 million to repair the property.  The

defendant paid $770,000 for the property damage.   Central Square sued for the remaining limits

on the policy.  Great Divide has counterclaimed for misrepresentation and is seeking repayment

of the $770,000.

In connection with the Debtors' "first day" motions, the Debtors were granted relief from

the automatic stay, to the extent applicable, to allow the Central Square Litigation to proceed.  A

trial on the Central Square Litigation concluded the week of June 15, 2009.

The jury in the Central Square Litigation determined that the insurance contract was not

validly assigned to Central Square resulting in a verdict in favor of Great Divide.  Central Square

believes that the trial court judge erred in allowing the question of the contract assignment to

even appear on the jury verdict form.  Central Square has filed a motion for a new trial.  The

return date of that motion has not yet been set.

### 4.    Knightsbridge Litigation.

Tarragon Stoneybrook Apartments, LLC, a non-debtor Tarragon affiliate

("Stoneybrook"), is the plaintiff in an action pending in the Circuit Court for Orange County,

Florida against Summitt Contractors, Inc. ("Summitt") and its bonding company Federal

Insurance Company for water damage and mold infiltration resulting from construction defects

(the "Knightsbridge Litigation").  Summitt has, in turn, filed a declaratory action against its

insurer.

Stoneybrook's claims in the Knightsbridge Litigation total $8,868,259.91 as follows: (i)

$7,710,666.32 for external remediation expenses, and (ii) $1,157,593.59 for rent concessions,

vacancy loss and employee expenses.

On December 12, 2008, Stoneybrook defeated Summitt's motion for summary judgment.

On March 27, 2009, a mediation session was held and Stoneybrook and Summit settled the

Knightsbridge Litigation for $3,250,000.00.

     **5.**     **Ridgefield Claim.**

Tarragon Corp. has a claim for the return of a $1,000,000 deposit paid in conjunction

with an Agreement of Sale to purchase property located at 1 Bell Drive, Ridgefield Borough,

New Jersey. As of the filing of this Disclosure Statement, that claim had yet to be formally

asserted.

<h2 style="text-align:center;">V.    <u>SUMMARY OF THE PLAN</u></h2>

**THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF, OR A SUBSTITUTE FOR, THE PLAN. CAPITALIZED TERMS USED BUT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANING SET FORTH IN THE PLAN.**

**A.**    <u>**Introduction**</u>

In formulating the Plan, the Debtors' goal was to maximize recovery to creditors by

liquidating assets and distributing the proceeds in accordance with the priorities and

requirements of the Bankruptcy Code, while also preserving a core of investment properties that

will allow the Debtors to emerge from Chapter 11 as a viable operating enterprise. The Debtors

had to balance the competing interests of the various classes of Creditors and to use its best

efforts to formulate a Plan that is fair and feasible. The Plan was developed after extensive

investigation and analysis of the Debtors' current cash flow, overhead, expenses, and projected

cash flow. The Debtors believe that the Plan will result in the greatest possible recovery to

Creditors and will allow for the Debtors' continued viability.

     **1.**     <u>**Reorganized Tarragon**</u>

Upon the Effective Date, Tarragon Corp. shall become Reorganized Tarragon, pursuant to which all of the existing shares of Tarragon Corp., including those shares owned by the Affiliated Debt Holders, shall be cancelled of record.  In exchange for HFZ Capital Group, LLC ("HFZ") agreeing to purchase certain preferred stock of Reorganized Tarragon ("Tarragon Preferred Stock") having a cumulative preferred dividend of 8% in an amount of up to $5,000,000 (the "Preferred Stock Purchase") of which at least $1 million will be purchased on the Effective Date to provide initial working capital to Reorganized Tarragon, HFZ shall receive 40% of the new issue common stock of Reorganized Tarragon.

Subsequent to the Effective Date, HFZ will purchase, at par, at such time or times as required by the Affiliated Debt Holders, additional preferred stock of Reorganized Tarragon in an amount equal to $5 million *less* the amount of the initial Preferred Stock Purchase in increments of no less than $500,000 (the "Additional Preferred Stock").   The proceeds of such sale shall be used to enable Reorganized Tarragon to pay, when required, its future operating costs and expenses, including liquidation expenses of Liquidation Assets described below and debt service, to the extent that the income of Reorganized Tarragon, as reasonably determined by the Affiliated Debt Holders, is insufficient to pay in a timely manner such costs and expenses.

The Board of Directors of Reorganized Tarragon (the "Reorganized Tarragon Board") will agree upon a monthly operating budget following the Effective Date, which will include Reorganized Tarragon's future operating costs and expenses, including liquidation expenses of Liquidation Assets and debt service.  At such times when the Affiliated Debt Holders determine that Reorganized Tarragon's cash flow is insufficient to pay, when required, any budgeted item, HFZ will purchase the Additional Preferred Stock.

In the event that HFZ shall fail to purchase any of the Additional Preferred Stock when required, then, in addition to any other remedies available at law or equity: (i) the Affiliated Debt Holders shall have the right to arrange for a replacement investor to purchase Class B Preferred Stock of Reorganized Tarragon ("Class B Preferred Stock"), which shall be the same as the Tarragon Preferred Stock except that the Class B Preferred Stock shall be repaid prior to the Tarragon Preferred Stock, (ii) if such failure to purchase shall occur prior to the second anniversary of the Effective Date, HFZ shall not be entitled to have a director on the Reorganized Tarragon Board and the purchaser of the Class B Preferred Stock shall have the right to appoint two directors to the Reorganized Tarragon Board, (iii) if such failure to purchase shall occur on or after such second anniversary, HFZ shall be entitled to have one director on the Reorganized Tarragon Board and the purchaser of the Class B Preferred Stock shall have the right to have one director on the Reorganized Tarragon Board, and (iv) Reorganized Tarragon shall have the right to repurchase for an aggregate of $1,000, a percentage of the common shares of Reorganized Tarragon owned by HFZ and of the membership interests of HFZ in HFZ M/F Company equal to 1% for each $200,000 of Class B Preferred Stock to be purchased by the replacement investor and reissue (or transfer) such common stock and HFZ M/F Company membership interests to the replacement investor.

Reorganized Tarragon shall maintain book entries to distinguish between Tarragon Preferred Stock issued for funds advanced by HFZ for carrying costs of Investment Assets (the "Tarragon Preferred Stock (Investment)") and all other uses.

The Affiliated Debt Holders shall receive 60% of the common stock of Reorganized Tarragon in exchange for the waiver of approximately $40 million of affiliated unsecured claims held by the Affiliated Debt Holders.  In addition, William S. Friedman and Arie Kotler shall each

agree to guarantee certain existing obligations of Tarragon Corp. to GECC.  Furthermore,

William S. Friedman and Rothenberg shall agree to amend existing employment contracts to

reduce compensation.  Finally, the members of Ansonia, LLC shall agree to waive any veto

rights they control, conditioned on arrangements for Robert Rothenberg's continued participation

in portfolio management and so long as there is no materially adverse tax  consequences relating

to any proposed transaction which is not otherwise covered from the proceeds of such

transaction.

### 2.     HFZ M/F Company

On or promptly following the Effective Date, Reorganized Tarragon and HFZ shall form

HFZ M/F Company.  Reorganized Tarragon shall contribute, and shall cause its affiliates to

contribute, to HFZ M/F Company all of the equity interests (the "Downstreamed Equity

Interests") in the entities (the "Downstreamed Entities") which own the Assets contained in the

Liquidation Portfolio, the Investment Portfolio and the Homebuilding Portfolio.  In exchange for

the contributions of the Downstreamed Equity Interests, Reorganized Tarragon and its Affiliates

who are transferors of Downstream Equity Interests (collectively, the "Reorganized Tarragon

Transferors") shall receive, in the aggregate, 83.333% of the equity interests in HFZ M/F

Company.  HFZ shall own the other 16.667% of the equity interests of HFZ M/F Company.

### 3.     Former Tarragon

On or promptly following the Effective Date, HFZ M/F Company shall form Former

Tarragon.  HFZ M/F Company shall contribute to Former Tarragon all of the Downstreamed

Equity Interests.

### 4.     New Business

On or promptly following the Effective Date, HFZ M/F Company shall form New Business.  HFZ M/F Company shall contribute to New Business all of the Assets contained in the New Business Portfolio.

### 5.    Liquidation Assets

On or promptly following the Effective Date, Former Tarragon shall form Liquidation Assets.  Former Tarragon shall contribute to Liquidation Assets the Downstreamed Equity Interests of entities owning the Liquidation Portfolio.

### 6.    Investment Assets

On or promptly following the Effective Date, Former Tarragon shall form Investment Assets.  In exchange for the DIP Lender agreeing to make the DIP Lender Investment, the DIP Lender shall receive (i) repayment of the DIP Loan Balance in Cash following confirmation of the Plan, (ii) non-voting preferred equity interests in Investment Assets ("Preferred Interests") having a cumulative preferred dividend of 8% on the amount of the DIP Lender Investment (the "Investment Preferred Interest"), and (iii) 51% of the equity interests of Investment Assets. Former Tarragon shall own the remaining equity interests of Investment Assets and shall contribute to Investment Assets all of the Downstreamed Equity Interests of the Downstreamed Entities owning the Investment Portfolio.  Following confirmation of the Plan, the DIP Lender shall purchase, at such time or times as required by the Affiliated Debt Holders, additional Investment Preferred Interests in an amount up to $2,500,000 (the "Additional Investment Preferred Interests").  The proceeds of such sale shall be used to enable Investment Assets to pay, when required, its future operating costs and expenses.

Investment Assets and the manager entity of Investment Assets shall each have a Board of Managers (the "Investment Assets Board" and the "Investment Assets Manager Board",

respectively) consisting of five Managers: three appointed by the DIP Lender, one appointed by the Affiliated Debt Holders and one appointed by HFZ.  The Investment Assets Board will agree upon a monthly operating budget following the Effective Date.  At such times when Investment Assets' cash on hand is insufficient to satisfy, when required, the overall budget, the DIP Lender shall purchase Additional Investment Preferred Interests.

In the event that the DIP Lender shall fail to purchase any of the Additional Investment Preferred Interests when required, then: (i) the Investment Assets Board shall have the right to arrange for a replacement investor to purchase Class B Preferred Interests of Investment Assets ("Class B Interests"), which shall be the same as the Investment Preferred Interests, except that the Class B Interests shall be repaid prior to the Investment Preferred Interests, (ii) the DIP Lender shall be entitled to have one Manager on each of the Investment Assets Board and the Investment Assets Manager Board and the purchaser of the Class B Interests shall have the right to have one Manager on each of the Investment Assets Board and the Investment Assets Manager Board, and (iii) Reorganized Tarragon shall have the right to repurchase for an aggregate of $1,000, a percentage of the common equity interests of Investment Assets owned by the DIP Lender equal to 1% for each $100,000 of the Class B Interests to be purchased by the replacement investor and transfer such common equity interests to the replacement investor.

## 7.   **Homebuilding Assets**

On or promptly following the Effective Date, Former Tarragon shall form Homebuilding Assets.  Former Tarragon shall contribute to Homebuilding Assets all of the Downstreamed Equity Interests of the entities owning the Homebuilding Portfolio.

## 8.   **Post Confirmation Officers.**

On or promptly following the Effective Date, the post-confirmation senior executive officers of Reorganized Tarragon and Investment Assets will include the following individuals:

<u>Reorganized Tarragon</u>:

Udi Toledano - Chief Executive Officer

Robert Rothenberg – Chief Operating Officer

Eyal Nuchamovitz – Chief Financial Officer

William S. Friedman – Chief Acquisition Officer

<u>Investment Assets:</u>

Arie Kotler – Chief Executive Officer

Robert Rothenberg – Chief Operating Officer

Eyal Nuchamovitz – Chief Financial Officer

In addition to the above referenced senior executive officers, junior executive officers who will be responsible for the day-to-day business affairs of Reorganized Tarragon and its Affiliates will be appointed from time to time.

**B.      <u>Flow of proceeds from Assets contained in the Liquidation Portfolio.</u>**

The Net Proceeds from the liquidation of the Assets contained in the Liquidation Portfolio ("Liquidation Portfolio Proceeds") shall be distributed as follows:

1.      All loans and applicable carrying costs, selling costs and post-Confirmation expenses attributable to the real estate assets held by each subsidiary of Liquidation Assets shall be paid in full (or reimbursed to Reorganized Tarragon or any Affiliate which advanced such expenses) from the Net Proceeds of such subsidiary; next

2.      All remaining Net Proceeds shall be distributed to Former Tarragon, the sole member of Liquidation Assets.

**C.      Flow of proceeds from Assets contained in the Investment Portfolio.**

The Net Proceeds from the sale, refinancing or other capital event of or related to the Assets contained in the Investment Portfolio ("Investment Portfolio Proceeds") shall be distributed as follows:

1.      Any amounts received by Investment Assets from Former Tarragon as DIP Lender Expense Contributions (as hereinafter defined) shall be applied solely to the payment of the Priority Return and the redemption of Investment Preferred Interests  (or Class B Interests, if applicable); next

2.      All Net Proceeds of Investment Assets shall be distributed (i) first, to the DIP Lender in proportion to the aggregate accrued but unpaid Priority Return and for the redemption of the Investment Preferred Interests, and (ii) then, to Former Tarragon in proportion to the aggregate outstanding accrued preferred dividends and redemption value of the Tarragon Preferred Stock (Investment).  All amounts distributed to the DIP Lender pursuant to this provision shall be applied first to accrued but previously unpaid Priority Returns, then to the redemption of the Investment Preferred Interests (in full or in part); next

3.      After the Investment Preferred Interests and Tarragon Preferred Stock (Investment) have been redeemed, until the Creditor Note has been paid in full, 62.77% of the Net Proceeds shall be paid to Former Tarragon and 37.23% of the Net Proceeds shall be paid to the DIP Lender; next

4.      After the Investment Preferred Interests and Tarragon Preferred Stock (Investment) have been redeemed, and after the Creditor Note has been paid in full, to the

members of Investment Assets (Former Tarragon and the DIP Lender) in proportion to their

membership interests in Investment Assets.

**D.     Flow of proceeds from Assets contained in the Homebuilding Portfolio.**

All of the Net Proceeds from the liquidation of the Assets contained in the Homebuilding

Portfolio ("Homebuilding Portfolio Proceeds") shall be distributed to Former Tarragon, the sole

member of Homebuilding Assets.

**E.     Flow of Funds from Former Tarragon.**

Any funds received by Former Tarragon ("Former Tarragon Proceeds") shall be

distributed as follows:

1.      Creditor Note Non-Recourse Payments.  Former Tarragon shall issue the

Creditor Note as a payment in kind for non-priority claims of unsecured creditors of Tarragon

Corp., Tarragon Dev. Corp., Tarragon South, Tarragon Dev., LLC and TMI.  Former Tarragon

shall apply the designated funds received from the Portfolio Entities and, for a period of five

years after the Effective Date, the Special Tax Receipts (designated as such by HFZ M/F

Company) in satisfaction of the Creditor Note.  Payments on the Creditor Note shall be made on

a quarterly basis.  Net Proceeds received from the Portfolio Entities shall be paid toward the

Creditor Note as follows:

a.  0% from Liquidation Assets, until the satisfaction of all Funded Confirmation Expenses (as hereinafter defined) or other Administrative Expense Claims; thereafter, 90% of Net Proceeds received from Liquidation Assets.

b.  0% from Investment Assets, until all Tarragon Preferred Stock (Investment) and all Investment Preferred Interests have been redeemed; thereafter 43% (27% of the 62.77% distribution) of Net Proceeds received from Investment Assets.

c.  0% from Homebuilding Assets until all Tarragon Preferred Stock has been redeemed; thereafter 15% of Net Proceeds received from Homebuilding Assets.

2.  For a period of five years after the Effective Date, Former Tarragon shall apply all of the Special Tax Receipts (contributed by HFZ M/F Company) to the payment of the Creditor Note.

**F.  Recovery of Funded Confirmation Expenses from Liquidation Assets Distributions.**

Former Tarragon shall apply the Net Proceeds received from Liquidation Assets to the extent of the Funded Confirmation Expenses, as follows:

1.  A cumulative amount equal to the DIP Lender Confirmation Expenses, *less* previously contributed amounts hereunder, shall be contributed to Investment Assets, to be used by Investment Assets to redeem the Investment Preferred Interests (the "DIP Lender Expense Contribution").

2.  A cumulative amount equal to the HFZ Confirmation Expenses, *less* previously distributed amounts hereunder, shall be distributed to HFZ M/F Company, to be further distributed to Reorganized Tarragon to be applied by the Reorganized Tarragon Board to redeem the Tarragon Preferred Stock (the "HFZ Expense Distribution").

3.  The DIP Lender Expense Contribution and the HFZ Expense Distribution shall be made pari passu by Former Tarragon in proportion to the outstanding balance of the DIP

Lender Confirmation Expenses and the HFZ Confirmation Expenses, reduced by prior payments

pursuant to subsections 1 and 2 immediately above.

       4.     The remaining Net Proceeds shall be distributed to HFZ M/F Company,

the sole member of Former Tarragon.

## G.    <u>Flow of Funds from HFZ M/F Company.</u>

Any funds received by HFZ M/F Company ("HFZ M/F Company Proceeds") shall be

distributed as follows (after allowance for legal fees and reasonable reserves):

       1.     So long as any Preferred Stock of Reorganized Tarragon remains

outstanding, all Net Proceeds of HFZ M/F Company shall be distributed to Reorganized

Tarragon; and

       2.     After all of the Preferred Stock of Reorganized Tarragon have been

redeemed, all Net Proceeds of HFZ M/F Company shall be distributed to the members of HFZ

M/F Company (HFZ and Reorganized Tarragon) in proportion to their membership interests in

HFZ M/F Company at such times as the Managing Members of HFZ M/F Company shall

determine.

## H.    <u>Classification of Claims and Interests and Their Treatment Under the Plan</u>

### 1.    Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Interest in a

particular Class only if such Claim or Interest is substantially similar to the other Claims or

Interests in such Class.  The Plan creates separate Classes to deal respectively with Secured

Claims, Unsecured Claims and Interests.  The Debtors believe that the Plan's classifications

place substantially similar Claims or Interests in the same Class and thus, meet the requirements

of Section 1122 of the Bankruptcy Code.  As described more fully below, the Plan provides,

separately for each Class, that Holders of Claims will receive various types of or no distributions

under the Plan.

### 2.     Unclassified Claims

Certain types of Claims are not placed into voting Classes; instead they are unclassified.

Such Claims are not considered impaired and they do not vote on the Plan because they are

automatically entitled to specific treatment provided under the Bankruptcy Code.  As such, the

Debtors have not placed such Claims in a Class.  The treatment of these Claims is provided

below:

### a.     Administrative Expense Claims

(i)     Administrative Expense Claims are Claims against the Debtors

constituting a cost or expense of administration of the Chapter 11 Cases allowed under Sections

503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and

expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or

assumed by the Debtors in connection with the conduct of its business, any allowance of

compensation or reimbursement of expenses for Professionals to the extent allowed by the

Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code, and fees or charges

assessed against the Debtors' Estate under section 1930, chapter 12, title 28, United States Code

("Statutory Fees"), which are treated separately below.

(ii)     Subject to the allowance procedures and the deadlines provided in

the Plan, and except to the extent that any entity entitled to payment of any Allowed

Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed

Administrative Expense Claim, including Allowed Section 503(b)(9) Administrative Claims,

shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the

later of the Effective Date and seven Business Days after the entry of a Final Order Allowing

such Administrative Expense Claim, or as soon thereafter as is practicable; provided, however,

that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary

course of business by the Debtors or liabilities arising under loans or advances to or other

obligations incurred by the Debtors, to the extent approved by the Bankruptcy Court if such

approval was required under the Bankruptcy Code, shall be paid in full and performed by

Reorganized Tarragon in the ordinary course of business in accordance with the terms and

subject to the conditions of any agreements or Bankruptcy Court Orders governing, instruments

evidencing or other documents relating to, such transactions.

### b.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such

Allowed Priority Tax Claim, at the election of the Debtors, in their sole discretion, either (i)

Cash equal to the amount of such Claim on the later of (a) the Effective Date and (b) seven

Business Days after entry of a Final Order Allowing such Priority Tax Claim, or as soon

thereafter as is practicable, but in no event later than thirty days after entry of the Final Order,

unless such Holder shall have agreed to different treatment of such Allowed Claim, (ii) in

accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash payments in equal

quarterly installments commencing on the first Business Day of the succeeding quarter in

which the Effective Date occurs and continuing on the first Business Day of each quarter

thereafter, until the quarter which is five years after the Commencement Date totaling the

principal amount of such Claim plus interest on any outstanding balance from the Effective Date

calculated at the interest rate equal to the applicable federal rate as determined in accordance

with section 1274(d) of the Internal Revenue Code of 1986, as amended and the regulations

promulgated thereunder, or (iii) such other treatment as to which the Holder of such Allowed

Priority Tax Claim shall have agreed in writing; provided, however, that any Claim or demand

for payment of a penalty (other than a penalty of the type specified in section 507(a)(8)(G) of the

Bankruptcy Code) shall be disallowed pursuant to the Plan and the Holder of an Allowed Priority

Tax Claim shall not assess or attempt to collect such penalty from the Debtors, their Estates,

Reorganized Tarragon, or any property of such Entities.

### c.    DIP Facility Claims against Tarragon Corp. and certain of its subsidiaries

On the Effective Date, in exchange for the DIP Lender making the DIP Lender

Investment and committing to purchase the Additional Investment Preferred Interests, the DIP

Lender shall receive (i) the repayment of the DIP Loan Balance, (ii) an amount of non-voting

preferred equity interests described herein, and (iii) 51% of the equity interests of Investment

Assets.

### 3.    Classified Claims and Interests

Except for the Administrative Expense Claims, Professional Compensation and

Reimbursement Claims, Statutory Fees, Priority Tax Claims and DIP Facility Claims discussed

above, all Claims against, and Equity Interests in, the Debtors and with respect to all property of

the Debtors and their Estates, are defined and hereinafter designated in respective Classes.  A

Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or

Equity Interest qualifies within the description of that Class, and is classified in another Class or

Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the

description of such other Class or Classes.  A Claim or Equity Interest is classified in a particular

Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity

Interest in that Class and has not been paid, released or otherwise satisfied or waived before the

Effective Date.  Notwithstanding anything to the contrary contained in the Plan, no distribution

shall be made on account of any Claim that is not an Allowed Claim.

The Plan is intended to deal with all Claims against and Equity Interests in the Debtors,

of whatever character, whether known or unknown, whether or not with recourse, whether or not

contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court

pursuant to section 502 of the Bankruptcy Code.  However, only Holders of Allowed Claims will

receive any distribution under the Plan.  For purposes of determining Pro Rata distributions

under the Plan and in accordance with the Plan, Disputed Claims shall be included in the Class in

which such Claims would be included if Allowed, until such Claims are finally disallowed.

### 4.      Treatment of Claims and Interests

Except for Administrative Claims and Priority Tax Claims, the Plan divides all Claims

against the Debtors into various classes.  The table set forth below summarizes the Classes of

Claims and Interests under the Plan and the treatment of such Claims and Interests.

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| Not Applicable | None | Administrative Claims | Payment in full in Cash. |
| Not Applicable | None | Priority Tax Claims | Payment in full in Cash. |
| Not Applicable | Class 1 | DIP Facility Claims | In exchange for the DIP Lender making the DIP Lender Investment and committing to purchase the Additional Investment Preferred Interests, the DIP Lender shall receive (i) the repayment of the DIP Loan Balance, (ii) an amount of non-voting preferred equity interests described herein, and (iii) 51% of the equity interests of Investment Assets. |
| Tarragon Corp. | Class 2A | Secured Claims | There are no Class 2A Claims |
| | Class 2B(i) | Unsecured Priority Claims | Payment in full in Cash |
| | Class 2B(ii) | Unsecured Non-Priority Claims | Holders shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust. |
| | Class 2B(iii) | Taberna Claims | Subject to the terms of the Subordinated Indentures, Holders of Class 2B(iii) Claims, in full, final, and complete satisfaction of such Claims, shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust after the Senior Debt (as defined in each Subordinated Indentures) has been paid in full. |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | Class 2B(iv) | General Electric Credit Corporation Claims | The Guaranty given to GECC by Tarragon Corp. will be reaffirmed by Reorganized Tarragon. |
| | Class 2B(v) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 2B(vi) | Unsecured Affiliated Debt Holder Claims | Holders will receive 60% of the equity in Reorganized Tarragon in exchange for the waiver of approximately $40 million of affiliated unsecured claims held by the Affiliated Debt Holders. In addition, William S. Friedman and Arie Kotler shall each agree to guarantee certain existing obligations of Tarragon Corp. to GECC on terms acceptable to them in their sole discretion. Furthermore, William S. Friedman and Robert Rothenberg shall agree to amend their existing employment contracts to reduce compensation. Finally, the members of Ansonia, LLC shall agree to waive any veto rights they control, conditioned on arrangements for Robert Rothenberg's continued participation in portfolio management and so long as there is no materially adverse tax consequences relating to any proposed transaction which is not otherwise covered from the proceeds of such transaction. In addition, any Class 2B(vi) Claim against Tarragon Corp. shall be released by the Holders of such Claims as of the Effective Date. |
| | Class 2C | Equity Interests | There shall be no Distributions to Holders and all such equity interests shall be cancelled. |
| | Class 2D | Unsecured Convenience Class Claims | Each Holder shall receive Cash equal to 20% of such Allowed Unsecured Convenience Class Claim. |
| Tarragon Dev. Corp. | Class 3A | Secured Claims | There are no Class 3A Claims |
| | Class 3B(i) | Unsecured Priority Claims | Payment in full in Cash |
| | Class 3B(ii) | Unsecured Non-Priority Claims | Holders shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust. |
| | Class 3B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 3C | Equity Interests | Holders shall retain their Equity Interests. |
| Tarragon South | Class 4A | Secured Claims | There are no Class 4A Claims |
| | Class 4B(i) | Unsecured Priority Claims | Payment in full in Cash |
| | Class 4B(ii) | Unsecured Non-Priority Claims | Holders shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust. |
| | Class 4B(iii) | Intercompany Claims | There shall be no Distributions to Holders and |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | such Claims shall be cancelled. |
| | Class 4C | Equity Interests | Holders shall retain their Equity Interests. |
| Tarragon Dev. LLC | Class 5A | Secured Claims | There are no Class 5A Claims |
| | Class 5B(i) | Unsecured Priority Claims | Payment in full in Cash |
| | Class 5B(ii) | Unsecured Non-Priority Claims | Holders shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust. |
| | Class 5B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 5C | Equity Interests | Holders shall retain their Equity Interests. |
| TMI | Class 6A | Secured Claims | There are no Class 6A Claims |
| | Class 6B(i) | Unsecured Priority Claims | Payment in full in Cash. |
| | Class 6B(ii) | Unsecured Non-Priority Claims | Holders shall receive their Pro Rata share of the proceeds of the Creditor Note as determined by the Liquidation Trust. |
| | Class 6B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 6C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Investment Assets. |
| Bermuda Island | Class 7A | Secured Claims | Subject to a separately presented and approved the Settlement Agreement with Bank of America, each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Bermuda Island otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 7B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Bermuda Island otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 7B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Bermuda Island otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 7B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 7C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| Orion | Class 8A | Secured Claims | Subject to a separately presented and approved the Settlement Agreement with Bank of America, each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Orion otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 8B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Orion otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 8B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Orion otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 8B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 8C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Homebuilding Assets. |
| Orlando Central | Class 9A | Secured Claims | There are no Class 9A Claims. |
| | Class 9B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Orlando Central otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 9B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Orlando Central otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 9B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 9C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Fenwick | Class 10A | Secured Claims | There are no Class 10A Claims. |
| | Class 10B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Fenwick otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 10B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Fenwick otherwise distributable to a |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 10B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 10C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Las Olas | Class 11A(i) | Secured Claims (Bank Atlantic) | The Holder shall receive title to the Assets owned by Las Olas which secure such Class 11A(i) Claims. |
| | Class 11A(ii) | Secured Claims (Regions Bank) | Holders shall receive an unsecured promissory note of Las Olas in the amount of the deficiency that exists with respect to the outstanding obligations owed by Las Olas to Holders of Class 11A(ii) Claims after applying the value of the Assets received from Central Square in partial satisfaction of such Class 11A(ii) Claims (the "Regions Bank Note"). The Regions Bank Note shall be repaid from the proceeds from the liquidation of the Assets of Las Olas and provide for interest payments only over a term of three years based on a ten year amortization at an interest rate equal to the One Month Libor Rate plus 350 basis points with a balloon payment at the end of such term; provided, however, that the payments to Regions Bank under the Regions Bank Note are contingent upon the mortgage held by Regions Bank on certain penthouses owned by Las Olas surviving any fraudulent conveyance claims that may be asserted. |
| | Class 11B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Las Olas otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 11B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Las Olas otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 11B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 11C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |
| Trio West | Class 12A | Secured Claims | There are no Class 12A Claims |
| | Class 12B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Trio West otherwise distributable to a subsidiary of Former Tarragon, in |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | accordance with Section 507 of the Bankruptcy Code. |
| | Class 12B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Trio West otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 12B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 12C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| 800 Madison | Class 13A | Secured Claims | Subject to a separately presented and approved the Settlement Agreement with Bank of America, in exchange for Bank of America agreeing to (i) forbear from exercising any rights under the loan documents against 800 Madison, (ii) extend the maturity dates of the loan to 800 Madison, and (iii) provide post-petition financing to 800 Madison to complete construction of its property and funding of an interest reserve, Tarragon Corp. and Tarragon Dev. Corp. will, in turn, deliver a guaranty of the Bank of America Financing Loans, which guaranty shall be secured solely by a first priority lien on 60% of the net proceeds payable to Tarragon Corp. and Tarragon Dev. Corp. from a sale of real property owned by 800 Madison. |
| | Class 13B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of 800 Madison otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 13B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of 800 Madison otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 13B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 13C | Equity Interests | Holders shall retain their Equity Interests. |
| 900 Monroe | Class 14A | Secured Claims | Subject to a separately presented and approved the Settlement Agreement with Bank of America, each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of 900 Monroe otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | the Bankruptcy Code. |
| | Class 14B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of 900 Monroe otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 14B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of 900 Monroe otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 14B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 14C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Homebuilding Assets. |
| Block 88 | Class 15A | Secured Claims | There are no Class 15A Claims |
| | Class 15B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Block 88 otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 15B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Block 88 otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 15B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 15C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests owned by a Debtor shall be ultimately assigned to Liquidation Assets. |
| Central Square | Class 16A | Secured Claims | The Holder shall receive title to the Assets owned by Central Square which secure such Class 16A Claims. |
| | Class 16B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Central Square otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 16B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Central Square otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | Class 16B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 16C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |
| Charleston | Class 17A | Secured Claims | There are no Class 17A Claims |
| | Class 17B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Charleston otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 17B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Charleston otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 17B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 17C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Omni | Class 18A | Secured Claims | There are no Class 18A Claims. |
| | Class 18B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Omni otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 18B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Omni otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 18B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 18C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |
| Tarragon Edgewater | Class 19A | Secured Claims | There are no Class 19A Claims |
| | Class 19B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Tarragon Edgewater otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 19B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Tarragon Edgewater otherwise distributable to a subsidiary of Former |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 19B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 19C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |
| Trio East | Class 20A | Secured Claims | Subject to a separately presented and approved the Settlement Agreement with Bank of America, each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Trio East otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 20B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Trio East otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 20B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Trio East otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 20B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 20C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be ultimately assigned to Liquidation Assets. |
| Vista | Class 21A | Secured Claims | There are no Class 21A Claims |
| | Class 21B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Vista otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 21B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Vista otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 21B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 21C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Murfreesboro | Class 22A | Secured Claims | There are no Class 22A Claims. |
| | Class 22B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Murfreesboro otherwise |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | | distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 22B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Murfreesboro otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 22B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 22C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Stonecrest | Class 23A | Secured Claims | There are no Class 23A Claims. |
| | Class 23B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Stonecrest otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 23B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Stonecrest otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 23B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 23C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled. |
| Stratford | Class 24A | Secured Claims | There are no Class 24A Claims |
| | Class 24B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Stratford otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 24B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Stratford otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 24B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 24C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled on the Effective Date. |
| MSCP | Class 25A | Secured Claims | There are no Class 25A Claims |
| | Class 25B(i) | Unsecured Priority | Each Holder shall receive their Pro Rata share |

| Debtor | Class | Description | Treatment Under the Plan |
|---|---|---|---|
| | | Claims | of the proceeds from the liquidation of the Assets of MSCP otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 25B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of MSCP otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 25B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 25C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled on the Effective Date. |
| Hanover | Class 26A | Secured Claims | There are no Class 26A Claims |
| | Class 26B(i) | Unsecured Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Hanover otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 26B(ii) | Unsecured Non-Priority Claims | Each Holder shall receive their Pro Rata share of the proceeds from the liquidation of the Assets of Hanover otherwise distributable to a subsidiary of Former Tarragon, in accordance with Section 507 of the Bankruptcy Code. |
| | Class 26B(iii) | Intercompany Claims | There shall be no Distributions to Holders and such Claims shall be cancelled. |
| | Class 26C | Equity Interests | Holders shall not receive any Distributions and all such Equity Interests shall be cancelled on the Effective Date. |

## I.   Distributions under the Plan and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests

### 1.   Method of Distributions Under the Plan

#### a.   In General

The Liquidation Trustee shall be the holder of the Creditor Note for the benefit of the

Beneficiaries of the Liquidation Trust.  The form of the Liquidation Trust is attached hereto as

Exhibit H.  On the Effective Date, any cash distributions that are required to be made pursuant to

the Plan shall be made by Reorganized Tarragon.  In addition, any distributions that are required

to be made in connection  with the proceeds of sale or refinance of any of the Assets shall be

made by Reorganized Tarragon.  Distributions to Creditors under the Creditor Note shall be governed by the Liquidation Trust Agreement and the Bankruptcy Code's priority scheme.

### b.      The Liquidation Trust

#### (i)      Overview

Immediately prior to the Effective Date, the Debtors shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust in accordance with the Liquidation Trust Agreement.  The Liquidation Trust Agreement shall incorporate the terms of the Plan (as applicable) and otherwise contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust Estate as a grantor trust.  To the extent that there may be any inconsistency or conflict between the terms and conditions of the Plan and the terms and conditions of the Liquidation Trust Agreement, the terms and conditions of the Plan shall control. All parties shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Liquidation Trust Estate.

On the Effective Date, and in accordance with and pursuant to the terms of the Plan, Former Tarragon shall issue the Creditor Note to the Liquidation Trust in satisfaction of certain Unsecured Claims of Tarragon and such other Claims as provided in the Plan.

#### (ii)      Termination of the Liquidation Trust Estate

The Liquidation Trust Estate will terminate on the later of  (i) the stated maturity date set forth in the Creditor Note (the "Maturity Date") or (ii) as provided in the Liquidation Trust Agreement

#### (iii)      The Liquidation Trust

##### (a)      Purpose of the Liquidation Trust.

The purpose of the Liquidation Trust is to hold the Creditor Note and disburse the proceeds thereon to the Holders of Allowed Claims pursuant to the terms of the Plan.

(b)    <u>Management of the Liquidation Trust.</u>

The affairs of the Liquidation Trust and all assets held or controlled by the Liquidation Trusts shall be managed under the direction of the Liquidation Trustee in accordance with the terms of the Liquidation Trust Agreement.  The Liquidation Trustee shall be the representative of the Liquidation Trust Estate pursuant to section 1123 of the Bankruptcy Code and shall have the rights, powers and standing of a debtor in possession under section 1107 of the Bankruptcy Code, and such other rights, powers and duties incident to causing performance of the Debtors' obligations under the Plan or otherwise as may be reasonably necessary.  Notwithstanding the foregoing, the affairs of the Liquidation Trust and all assets held or controlled by the Liquidation Trust shall be managed in accordance with the terms of the Liquidation Trust Agreement.

**(iv)    Powers and Authority of the Liquidation Trustee**

The powers of the Liquidation Trustee are set forth in full in the Liquidation Trust Agreement and shall include, among other things: (i) the power to litigate, collect and distribute the proceeds of all assets of the Liquidation Trust subject to the terms of the Plan, including the Creditor Note and Avoidance Actions; (ii) the power to effect distributions under the Plan to the Holders of Allowed Claims; (iii) the authority to pay all costs and expenses of administering the Liquidation Trust Estate after the Effective Date, including the power to employ and compensate Persons to assist the Liquidation Trustee in carrying out the duties hereunder and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (iv) the power to implement the Plan including any other powers necessary or incidental thereto; (v) the authority to participate in any post-Effective Date motions to amend or modify the Plan or the Liquidation Trust Agreement, or appeals from the Confirmation Order; and (vi) the authority to

participate in actions to enforce or interpret the Plan.  Notwithstanding any of the foregoing, the

Liquidation Trustee may not amend or alter the terms and provisions of the Plan.

### (v)    Disbursing Agent

With respect to distributions (i) made on the earlier of (a) the Effective Date or (b) the

Allowed Date to Holders of Priority and Administrative Claims asserted against the Debtors'

Estates, and (ii) of the net operating proceeds or the proceeds of the sale or refinance of any of

the Assets, Reorganized Tarragon shall serve as the Disbursing Agent (the "Priority and Admin

Disbursing Agent").  With respect to all other Claims including the Liquidation Trust, the

Liquidation Trustee shall either serve as the Disbursing Agent under the Plan, or, subject to prior

Bankruptcy Court approval, shall appoint a Disbursing Agent under the Plan.

### (vi)    Establishment of Accounts and Reserves

As provided in the Plan and the Liquidation Trust Agreement, the Liquidation Trustee

will establish the following accounts for the Liquidation Trust:

Expense Reserve Account.  The Liquidation Trustee will establish an expense reserve

account (the "Expense Reserve Account") to pay all costs and expenses related to the care and

maintenance of the Liquidation Trust Estate, including, but not limited to, the expenses of the

Liquidation Trust (including the fees and expenses of the Liquidation Trustee and any

professionals retained by the Liquidation Trustee (the "Liquidation Trustee Professionals")) and

the expenses related to all matters handled by the Liquidation Trustee and the Liquidation

Trustee Professionals, including Causes of Action and Disputed Claims which are prosecuted

and/or resolved by the Liquidation Trustee

General Trust Account.  The Liquidation Trustee will establish a general trust account

from which the Liquidation Trustee will make Distributions to Holders of Allowed Claims, to

the extent the Liquidation Trustee is authorized to make such Distributions under the Plan (the "General Trust Account").

Disputed Claims Reserve Account.   The Liquidation Trustee will establish appropriate reserves for Disputed Claims from which the Liquidation Trustee will make Distributions to each Holder of a Disputed Claim whose Claim is or becomes an Allowed Claim. If any amount is remaining in any account other than the General Trust Account at a time when the Liquidation Trustee believes in good faith that the need for such account has ended, the Liquidation Trustee will eliminate the account and the amount thereof will be deposited into the General Trust Account and made available for Distribution to Holders of Allowed claims.

### (vii)    Employment and Compensation

The Liquidation Trustee shall serve without bond and shall receive such compensation for serving as Trustee and Disbursing Agent as is provided for in the Liquidation Trust Agreement.  At any time after the Effective Date and without further order of the Bankruptcy Court, the Liquidation Trustee may employ such Persons or Entities, including Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Cases), reasonably necessary to assist the Liquidation Trustee in performing its duties under the Liquidation Trust Agreement and the Plan.  Such Persons or Entities shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis in arrears by the Liquidation Trustee.

All fees and expenses of administration of the Liquidation Trust Estate and representation of the Liquidation Trustee shall be paid from the Expense Reserve Account.

### (viii)    Limitation on Liability of the Liquidation Trustee

Subject to applicable law, the Liquidation Trustee will not be liable for any act he may do or omit to do as Liquidation Trustee while acting in good faith and in the exercise of his

reasonable business judgment; nor will the Liquidation Trustee be liable in any event except for his own gross negligence or willful fraud or willful misconduct.  The foregoing limitation on liability also will apply to any Person (including any Professional) employed by the Liquidation Trustee and acting on behalf of the Liquidation Trustee in the fulfillment of the Liquidation Trustee's duties under the Plan and the Liquidation Trust Agreement.  The Liquidation Trustee and all Liquidation Trustee Professionals also will be entitled to indemnification out of the Assets of the Liquidation Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims that the Liquidation Trustee may incur or sustain by reason of being or having been a Liquidation Trustee of the Liquidation Trust, or for performing any functions incidental to such service; provided, however, that the Liquidation Trustee and the Liquidation Trustee Professionals will not be relieved of liability for bad faith, willful misfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing or breach of fiduciary duty.

### (ix)    No Right in Assets

The assets contributed to the Liquidation Trust ("Trust Assets") will be held by the Liquidation Trustee in trust for the benefit of the Creditors that are beneficiaries of the Liquidation Trust and that are paid from the Liquidation Trust under the Plan.  Consequently, other than Liens of Secured Creditors as provided under the Plan, the Plan does not create or give to any Creditor any direct interest or property right to any of the Trust Assets.

### c.    Timing of Distributions

Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

### d.    Minimum Distributions

No payment of Cash less than One Hundred Dollars ($100.00) shall be made by the Liquidation Trustee or Reorganized Tarragon to any Holder of a Claim unless a request therefor is made in writing to the Reorganized Tarragon or the Liquidation Trustee, as applicable.

### e.       Fractional Dollars

Any other provisions of the Plan to the contrary notwithstanding, no payments of fractions of dollars will be made.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down).

### f.       Unclaimed Distributions

Any Distributions under the Plan that are unclaimed for a period of one year after distribution thereof shall be revested in the Debtors and any entitlement of any Holder of any Claim to such Distributions shall be extinguished and forever barred.

### g.       Distributions to Holders as of the Record Date

As of the close of business on the Record Date (as hereinafter defined), the claims register shall be closed, and there shall be no further changes in the record Holders of any Claims.  The Debtors and Reorganized Tarragon shall have no obligation to recognize any transfer of any Claims occurring after the Record Date.  The Debtors and Reorganized Tarragon shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those record Holders stated on the Claims register as of the close of business on the Record Date.

### h.       Setoffs and Recoupment

Either of the Debtors or Reorganized Tarragon, as the case may be, may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant to

the Plan in respect of such Claim, any Claims of any nature whatsoever that such Debtor or

Reorganized Tarragon, as the case may be, may have against the claimant, but neither the failure

to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the

Debtors or Reorganized Tarragon of any such Claim or right it may have against such Claimant.

### i.    Objections to and Resolution of Claims

Except to the extent provided by the Plan, Reorganized Tarragon shall have the exclusive

right to make and file objections to Administrative Expense Claims (including Fee Applications).

The Liquidation Trustee shall have the exclusive right to make and file objections to any and all

other Claims involving the Liquidation Trust.   All objections shall be litigated to entry of a Final

Order; provided, however, that the Liquidation Trustee and /or Reorganized Tarragon shall have

the authority to compromise, settle, otherwise resolve or withdraw any objections, without

approval of the Bankruptcy Court

### J.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumption and Assignment of Executory Contracts and Unexpired Leases

(i)    Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy

Code, all Executory Contracts and unexpired leases that exist between the applicable Debtor and

any Person as of the Confirmation Date and which are set forth in Schedule 5(J)(i)(1) (Executory

Contracts) or Schedule 5(J)(i)(2) (unexpired leases) of the Disclosure Statement, shall be deemed

assumed by the applicable Debtor and assigned to Reorganized Tarragon as of the Effective

Date, except for any Executory Contract or unexpired lease (i) which has been assumed pursuant

to an Order of the Bankruptcy Court entered before the Confirmation Date, (ii) which has been

rejected pursuant to an Order of the Bankruptcy Court entered before the Confirmation Date, or

(iii) as to which a motion for approval of the rejection of such Executory Contract or unexpired

lease has been filed and served before the Confirmation Date; provided, however, that each of

the Debtors reserve the right, on or before the Effective Date, to amend such Schedules to delete

any Executory Contract or unexpired lease therefrom or to add any Executory Contract or

unexpired lease thereto, in which event such Executory Contract(s) or unexpired lease(s) shall be

deemed to be, respectively, assumed or rejected.  All Executory Contracts, other contracts and

agreements and any unexpired leases that exist between any of the Debtors and any Person shall

be rejected by the Debtors as of the Confirmation Date unless expressly assumed on Schedule

5(J)(i)(1) or 5(J)(i)(2).  The applicable Debtor shall provide notice of any amendments to

Schedule 5(J)(i)(1) or 5(J)(i)(2) to the parties to the Executory Contracts and unexpired leases

affected thereby.  The listing of a document on Schedule 5(J)(i)(1) or 5(J)(i)(2) shall not

constitute an admission by the applicable Debtor that such document is an Executory Contract or

an unexpired lease or that the applicable Debtor has any liability thereunder.

(ii)     Bar Date for Filing Proofs of Claim Relating to Executory

Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the

rejection of an Executory Contract or unexpired lease, after the Bar Date, pursuant to the Plan

must be filed with the Bankruptcy Court and served upon the Clerk and the Debtors' counsel or

as otherwise may be provided in the Confirmation Order, by no later than thirty days after notice

of entry of the Confirmation Order and/or notice of an amendment to Schedule 5(J)(i)(1) or

5(J)(i)(2).  Any Claims not filed within such time will be forever barred from assertion against

the Debtors and their Estates and Reorganized Tarragon and its property.  Any Claim arising out

of the rejection, prior to the Bar Date, of an Executory Contract or unexpired lease, shall have

been filed with the Bankruptcy Court and served upon the Debtors prior the Bar Date or is

forever barred from assertion against the Debtors and their Estates and Reorganized Tarragon

and its property.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the

rejection of Executory Contracts and unexpired leases shall be treated as General Unsecured

Claims under the Plan.

(iii)     <u>Indemnification Obligations</u>.  For purposes of the Plan, the

obligations of each of the Debtors to defend, indemnify, reimburse or limit the liability of any

present member, manager, director, officer or employee who is or was a member, manager,

director, officer or employee, respectively, on or after the Commencement Date against any

Claims or obligations pursuant to any operating agreement, certificates of formation or similar

corporate governance documents, applicable state law, or specific agreement, or any combination

of the foregoing, shall: (i) be assumed by Reorganized Tarragon; (ii) survive confirmation of the

Plan; (iii) remain unaffected thereby; and (iv) not be discharged, irrespective of whether

indemnification, defense, reimbursement or limitation is owed in connection with an event

occurring before, on or after the Commencement Date.

**K.**     <u>**Releases and Related Provisions**</u>

**1.**     **Releases**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically

provided in the Plan, for good and valuable consideration, on and after the Effective Date, the

Debtors, the Creditors Committee, the members of the Creditors Committee and all Holders of

Claims and/or Interests and each of their respective affiliates, principals, officers, directors,

attorneys, accountants, financial advisors, advisory affiliates, employees and agents (each a

"Released Party") shall each conclusively, absolutely, unconditionally, irrevocably, and forever

release and discharge each other Released Party from any and all Claims, obligations, rights,

suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or

unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise,

that such Released Party would have been legally entitled to assert in his, her or its own right

(whether individually or collectively), based on or relating to, or in any manner arising from, in

whole or in part, the Debtors, the Creditors' Committee, the members of the Creditors'

Committee, the Chapter 11 Cases, the Plan, the purchase, sale, or rescission of the purchase or

sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise

to, any Claim that is treated in the Plan, the business or contractual arrangements between any

Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the

Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and this Disclosure

Statement, or any related agreements, instruments, or other documents, upon any other act or

omission, transaction, agreement, event, or other occurrence taking place on or before the

Effective Date, other than any Claims, direct actions, causes of action, demands, rights,

judgments, debts, obligations, assessments, compensations, costs, deficiencies or other expenses

of any nature whatsoever (including without limitation, attorneys' fees) (i) arising under or based

on the Plan or any other documents, instrument or agreement to be executed or delivered

therewith, or (ii) in the case of fraud.

## 2.      Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of

the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in

full force and effect until the Effective Date. Except as otherwise expressly provided in the Plan

or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation

Order or a separate Order of the Bankruptcy Court, all entities who have held, hold, or may hold

Claims against or Equity Interest in the Debtors, are permanently enjoined, on and after the

Confirmation Date, from (i) commencing or continuing in any manner any action or other

proceeding of any kind with respect to any such Claim or Equity Interest, (ii) the enforcement,

attachment, collection or recovery by any manner or means of any judgment, award, decree or

Order against the Debtors on account of any such Claim or Equity Interest, (iii) creating,

perfecting or enforcing any encumbrance of any kind against the Debtors or against the property

or interests in property of the Debtors on account of any such Claim or Equity Interest, and (iv)

asserting any right of setoff, subrogation or recoupment of any kind against any obligation due

from the Debtors or against the property or interests in property of the Debtors on account of any

such Claim or Equity Interest.  Such injunction shall extend to successors of the Debtors

(including, without limitation, Reorganized Tarragon ) and its respective properties and interests

in property.

> **3.     Exculpation**

The Debtors, Reorganized Tarragon, the Creditors' Committee, each of the members of

the Creditors' Committee, and their respective members, partners, officers, directors, employees

and agents (including any attorneys, financial advisors, investment bankers and other

professionals retained by such Persons) shall have no liability to any Holder of any Claim or

Equity Interest for any act or omission in connection with, or arising out of the Chapter 11 Cases,

the Disclosure Statement, the Plan, the Plan Documents, the solicitation of votes for and the

pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this

Plan or the property to be distributed under this Plan, except for willful misconduct or gross

negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be

entitled to rely on the advice of counsel with respect to their duties and responsibilities under this

Plan.

**L.**    **Miscellaneous Provisions**

    **1.**    **Effectuating Documents and Further Transactions**

The Debtors or Reorganized Tarragon are authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

    **2.**    **Post-Confirmation Date Fees and Expenses**

From and after the Confirmation Date, the Debtors and Reorganized Tarragon shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, but only to the extent funds are available, pay the reasonable fees and expenses of Professionals thereafter incurred by the Debtors and/or Reorganized Tarragon until its termination in accordance with the provisions of the Plan, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

With respect to Professionals whose services are rendered in connection with Claims asserted against the Liquidation Trust and whose fees and expenses are incurred from and after the Confirmation Date, the Liquidation Trustee shall pay, but only to the extent funds are available, and from the proceeds of the Liquidation Trust, the reasonable fees and expenses of such Professionals in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court.  Reorganized Tarragon shall not have any responsibility for the payment of such Professional's fees and expenses.

    **3.**    **Amendment or Modification of the Plan**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors, at any time before the Confirmation Date, provided that the Plan, as altered, amended or

modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the

Debtors shall have complied with section 1125 of the Bankruptcy Code.

### 4.     Severability

In the event that the Bankruptcy Court determines, before the Confirmation Date, that

any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void

or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to

which the provision is determined to be invalid, void or unenforceable.  The invalidity,

voidability or unenforceability of any such provision shall in no way limit or affect the

enforceability and operative effect of any other provision of the Plan.

### 5.     Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of

Claims, and Equity Interests, and their respective successors and assigns, including, without

limitation, Reorganized Tarragon.

### 6.     Notices

All notices, requests and demands to or upon the Debtors or Reorganized Tarragon to be

effective shall be in writing and, unless otherwise expressly provided herein or in the Plan, shall

be deemed to have been duly given or made when actually delivered or, in the case of notice by

facsimile transmission, when received and telephonically confirmed, addressed as follows:

| If to the Debtors or Reorganized Tarragon : | Tarragon Corp.<br>423 West 55th Street, 12th Floor<br>New York, New York 10019<br>Attention: William S. Friedman, CEO |

with copies to:                   Cole, Schotz, Meisel,
                                  Forman & Leonard, P.A.
                                  25 Main Street
                                  P.O. Box 800
                                  Hackensack, NJ 07602-0800
                                  Attn:   Michael D. Sirota, Esq.
                                          Warren A. Usatine, Esq.
                                  Telephone:  (201) 489-3000
                                  Facsimile:  (201) 489-1536

### 7.      Governing Law

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is

applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations

arising under the Plan shall be governed by, and construed and enforced in accordance with, the

laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such

jurisdiction.

### 8.      Withholding and Reporting Requirements

In connection with the consummation of the Plan, the Debtors or Reorganized Tarragon,

as the case may be, shall comply with all withholding and reporting requirements imposed by

any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject

to any such withholding and reporting requirements.

### 9.      Plan Supplement

Forms of all material agreements or documents related to any the Plan, including but not

limited to those identified in this Plan, shall be contained in the Plan Supplement.  The Plan

Supplement shall be filed with the Clerk of the Bankruptcy Court no later than five days before

the Voting Deadline.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be

inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders

of Claims, or Equity Interest may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel.

### 10.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 11.    Headings

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

### 12.    Exhibits/Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full therein.

### 13.    Filing of Additional Documents

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Entity with respect to any matter set forth therein.

### 15.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

16. **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the

Bankruptcy Court shall enter the Confirmation Order.  Neither the filing of the Plan, any

statement or provision contained in the Plan, or the taking of any action by the Debtors with

respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the

Debtors with respect to the Holders of Claims or Equity Interests before the Effective Date.

17. **Section 1145 Exemption**

Pursuant to section 1145(a) of the Bankruptcy Code, the offer, issuance, transfer or

exchange of any security under the Plan, or the making or delivery of an offering memorandum

or other instrument of offer or transfer under the Plan, shall be exempt from Section 5 of the

Securities Act of 1933 or any similar state or local law requiring the registration for offer or sale

of a security or registration or licensing of an issuer or a security.

18. **Implementation**

The Debtors shall take all steps, and execute all documents, including appropriate

releases, necessary to effectuate the provisions contained in the Plan.

19. **Inconsistency**

In the event of any inconsistency among the Plan, the  Disclosure Statement, the Plan

Documents, the Plan Supplement, or any other instrument or document created or executed

pursuant to the Plan, the provisions of the Plan shall govern.

20. **Compromise of Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution

and other benefits provided under the Plan, the provisions of the Plan shall constitute a good

faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of

the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, Reorganized Tarragon, the Estates, and all Holders of Claims and Equity Interests against the Debtors.

## VI.    VOTING AND CONFIRMATION PROCEDURES

The following is a brief summary regarding the acceptance and confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys. Additional information regarding voting procedures is set forth in the notice accompanying this Disclosure Statement.

### A.    Voting Instructions

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. Your Claims may be classified in multiple classes. When you vote and return your Ballot, please indicate the Class or Classes in which your Claims and/or Interests are classified by marking the appropriate space provided on your Ballot for such purpose.

**The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with Kurtzman no later than the Voting Deadline**. Ballots not received by the Voting Deadline may not be counted. A Ballot that partially rejects and partially accepts the Plan or a Ballot that improperly indicates or fails to indicate acceptance or rejection of the Plan will be counted as an acceptance.

If you have any questions regarding the procedure for voting, please contact:

Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Cole, Schotz, Meisel,
Forman & Leonard, P.A.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602-0800
tel #:  (201) 489-3000
fax #:  (201) 489-1536

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan.  Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

*For all Holders:*

By signing and returning a Ballot, each Holder of a Claim in each Class also will be certifying to the Debtors and to the Bankruptcy Court that, among other things:

• such Holder has received and reviewed (or has had the opportunity to do so on the website) a copy of this Disclosure Statement and related Ballot and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth in the Plan;

• such Holder has cast the same vote on every Ballot completed by such Holder with respect to holdings of such Class of Claims;

• no other Ballots with respect to such Class of Claims have been cast or, if any other Ballots have been cast with respect to such Class of Claims, such earlier Ballots are thereby revoked;

• the Debtors have made available to such Holder or its agents all documents and information relating to the Plan and related matters reasonably requested by or on behalf of such Holder; and

• except for information the Debtors, or their own agents, have provided in writing, such

Holder has not relied on any statements made or other information received from any person

with respect to the Plan.

**B.**    **Parties in Interest Entitled to Vote**

Any Holder of a Claim against the Debtors whose Claim has not been disallowed

previously by the Bankruptcy Court is entitled to vote to accept or reject the Plan, if such Claim

is impaired under the Plan and either (i) such Holder's Claim has been scheduled by the Debtors

and is not scheduled as disputed, contingent or unliquidated; or (ii) such Holder has filed a proof

of Claim before the Bar Date.  Any Claim to which an objection has been filed is not entitled to

vote, unless the Bankruptcy Court, upon application of the Holder to whose Claim an objection

has been made, temporarily allows such Claim in an amount that it deems proper for the purpose

of accepting or rejecting the Plan.  Any such application must be heard and determined by the

Bankruptcy Court on or before _____, 2009.  A vote may be disregarded if the

Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or

procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**1.**    **Definition of Impairment**

Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Interests is

impaired under a the Plan unless, with respect to each Claim or Interest of such Class, the Plan:

- leaves unaltered the legal, equitable, and contractual rights of the Holder of such

    Claim or equity Interest; or

- notwithstanding any contractual provision or applicable law that entitles the

    Holder of a Claim or Interest to demand or receive accelerated payment of such

    Claim or Interest after the occurrence of a default:

- cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured;

- reinstates the maturity of such Claim or Interest as it existed before such default;

- compensates the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

- if such Claim or such Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the Holder of such Claim or such Interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and

- does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

## C.  **Voting Tabulation**

In tabulating votes, the following rules shall be used to determine the Claim amount associated with a Creditor's vote:

• If the applicable Debtor or any other party in interest does not object to a Claim prior to the Voting Deadline, the Claim amount for voting purposes shall be the Claim amount contained on a timely filed proof of Claim or, if no proof of Claim was filed, the non-contingent, liquidated and undisputed Claim amount listed in its Schedules.

• If the applicable Debtor or any other party in interest objects to a Claim prior to the Voting Deadline, such Creditor's Ballot shall not be counted in accordance with Bankruptcy Rule 3018(a), unless temporarily Allowed by the Bankruptcy Court for voting purposes, after notice and a hearing.

• If a Creditor believes that it should be entitled to vote on the Plan, then such Creditor must serve on the Debtors, the Creditors' Committee and the UST and file with the Bankruptcy Court a motion for an Order pursuant to Bankruptcy Rule 3018(a) (a "Rule 3018(a) Motion") seeking temporary allowance for voting purposes. Such Rule 3018(a) Motion, with evidence in support thereof, must be filed by the Plan Objection Deadline (as hereinafter defined).

• The Claim amount established through the above process controls for voting purposes only and does not constitute the Allowed amount of any Claim for distribution purposes.

• To ensure that its vote is counted, each Holder of a Claim must (i) complete a Ballot; (ii) indicate the Holder's decision either to accept or reject the Plan in the boxes provided on the respective Ballot; and (iii) sign and return the Ballot to the address set forth above.

• The Ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion or admission of a Claim.

• If a Holder holds Claims in more than one Class under the Plan, the Holder may receive one Ballot coded for each Class of Claims held by such Holder.

• A Ballot that partially rejects and partially accepts the Plan or a Ballot that improperly indicates or fails to indicate acceptance or rejection of the Plan will be counted as an acceptance.

• The Debtors may not accept or count Ballots received after the Voting Deadline in connection with its request for confirmation of the Plan. **The method of delivery of Ballots to be sent to Kurtzman is at the election and risk of each Holder of a Claim**, provided that, except as otherwise provided in the Plan, such delivery will be deemed made only when the original executed Ballot is actually received by Kurtzman. In all cases, sufficient time should be allowed to assure timely delivery. **Original executed Ballots are required. Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. No Ballot**

**should be sent to the Debtors, Debtor's counsel, the Creditors' Committee, or the Debtors' financial advisors.**  The Debtors expressly reserve the right to amend, at any time and from time to time, the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the Plan).  If the Debtors make material changes in the terms of the Plan or if the Debtors waive a material condition, the Debtors will disseminate additional solicitation materials and will extend the solicitation, in each case, to the extent directed by the Bankruptcy Court.

• If multiple Ballots are received from or on behalf of an individual Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot.

• If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person shall be required to (i) indicate such capacity when signing and (ii) unless the Debtors otherwise determine, submit proper evidence satisfactory to the Debtors to so act on behalf of a beneficial interest Holder.

• The Debtors, in their  reasonable discretion, subject to contrary Order of the Bankruptcy Court, and consistent with the Plan, may waive any defect in any Ballot at any time, either before or after the close of voting, upon notice to the Creditors' Committee.  Except as otherwise provided herein, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors may, in their sole discretion, reject such Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan.

• In the event a designation is requested under section 1126(e) of the Bankruptcy Code, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for

purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy

Court orders otherwise.

• Any Holder of impaired Claims who has delivered a valid Ballot voting on the Plan

may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a).

• The Debtors' interpretation of the terms and conditions of the Plan shall be final and

binding, on all parties, unless otherwise directed by the Bankruptcy Court.

• Subject to any contrary Order of the Bankruptcy Court, the Debtors reserve the absolute

right upon notice to the Creditors' Committee, to reject any and all Ballots not proper in form,

the acceptance of which would, in the Debtor's or its counsel's opinion, not be in accordance

with the provisions of the Bankruptcy Code.  Subject to any contrary Order of the Bankruptcy

Court, the Debtors further reserve the right, upon notice to the Creditors' Committee, to waive

any defects or irregularities or conditions of delivery as to any particular Ballot unless otherwise

directed by the Bankruptcy Court.  Neither the Debtors, nor any other person or entity, will be

under any duty to provide notification of defects or irregularities with respect to deliveries of

Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless

otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have

been made until such irregularities have been cured or waived.  Ballots previously furnished (as

to which any irregularities have not theretofore been cured or waived) will not be counted.

**D.**    **Voting Record Date**

The record date for purposes of determining which Holders of Claims are entitled to vote

on the Plan is _____, 2009 ("Record Date").  As of the close of business on the Record

Date, the claims register shall be closed, and there shall be no further changes in the record

Holders of any Claims.  The Debtors shall have no obligation to recognize any transfer of any

Claims occurring after the Record Date.  The Debtors shall instead be entitled to recognize and

deal for all purposes under the Plan with only those record Holders stated on the claims register

as of the close of business on the Record Date.

**E.**    **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-

in-interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2009, at

10:00 a.m. (prevailing Eastern Time) before the Honorable Donald H. Steckroth, United States

Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin

Luther King, Jr. Federal Building, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102.  The

Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

further notice except for an announcement of the adjourned date made at the Confirmation

Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on or before _____,

2009, at 5:00 p.m. (prevailing Eastern Time) (the "Plan Objection Deadline") in accordance with

the Confirmation Hearing notice served on you.  UNLESS OBJECTIONS TO

CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE

PROCEDURES SET FORTH IN THE CONFIRMATION HEARING NOTICE, THEY WILL

NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**F.**    **Procedure for Objections**

Any objection to confirmation of the Plan must be made in writing and specify in detail

the name and address of the objector, all grounds for the objection and the amount of the Claim

or Interest held by the objector.  Any such objection must be filed with the Bankruptcy Court and

served on the Debtor's counsel and all parties who have filed a notice of appearance by 5:00 p.m.

prevailing Eastern Time on _____, 2009.  Unless an objection is timely filed and served, it may

not be considered by the Bankruptcy Court.

**G.**    **Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the

requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy

Court shall enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will

satisfy the applicable requirements, as follows:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtors, as Plan proponent, will have complied with the applicable provisions of

the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in,

or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the

Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made

before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the

confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as

reasonable.

• With respect to each Class of impaired Claims, either each Holder of a Claim of such

Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim,

property of a value, as of the Effective Date of the Plan, that is not less than the amount that such

Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the

Bankruptcy Code.

• Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

• Except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

• At least one Class of impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

• All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied or will have complied with all of the requirements of Chapter 11, and (iii) the Plan has been proposed in good faith.

## H.    Best Interest of Creditors and Liquidation Analysis

Pursuant to section 1129(a)(7) of the Bankruptcy Code, for the plan to be confirmed, it must provide that Holders of Claims or Interests will receive at least as much under a plan as they would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired class requires that each Holder of an Allowed Claim or Interest of such Class either: (i) accepts the Plan; or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under

the Plan by the Holders of Allowed Claims in each Class or Equity Interests equals or exceeds

the value that would be allocated to such Holders in a liquidation under Chapter 7 of the

Bankruptcy Code.

The Debtors believe that the Plan meets the Best Interest Test and provides value which

is greater than that which would be recovered by each such Holder in a Chapter 7 bankruptcy

proceeding.  Attached as Exhibit E is the Emergence Plan Analysis, which reflects the Debtors'

forecast of unsecured Creditor recoveries in the Tarragon Corp. Chapter 11 Case.  Recoveries of

Creditors in the remainder of the Chapter 11 Cases are based on the results of the liquidation of

Assets and necessarily are not less than which would be recovered by each Holder in a Chapter 7

bankruptcy proceeding.

Generally, to determine what Holders of Allowed Claims and Equity Interests in each

impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must

determine what funds would be generated from the liquidation of Debtor's Assets and properties

in the context of a Chapter 7 liquidation case, which for unsecured creditors would consist of the

proceeds resulting from the disposition of the Assets of Debtor, augmented by the unencumbered

Cash held by Debtor at the time of the commencement of the liquidation case.  Such Cash

amounts would be reduced by the costs and expenses of the liquidation and by such additional

Administrative Claims and Priority Claims as may result from the termination of Debtor's

business and the use of Chapter 7 for the purpose of liquidation.

In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

on the liquidation of the assets of Debtors.  Such assets would include the same assets being

collected and liquidated under the Plan – the interest of Debtors in the Cash, the Assets, and the

Causes of Action.  However, the net proceeds from the collection of property of the Estates

available for distribution to Creditors would be reduced by any commission payable to the

Chapter 7 trustee and the trustee's attorney's and accounting fees, as well as the unpaid

administrative costs of the Chapter 11 estate (such as the compensation for Professionals).  In a

Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding scale commission based

upon the funds distributed by such trustee to creditors, even though the Debtors will have already

accumulated much of the funds and the Estates will have already incurred many of the expenses

associated with generating those funds.  Accordingly, there is a reasonable likelihood that

creditors would "pay again" for the funds accumulated by the Debtors because the Chapter 7

trustee would be entitled to receive a commission in some amount for all funds distributed from

the Estates.

It is further anticipated that a Chapter 7 liquidation would result in delay in the payment

to creditors.  Among other things, a Chapter 7 case could trigger a new bar date for filing Claims

that would be more than ninety days following conversion of the Chapter 11 Cases to Chapter 7.

Fed. R. Bankr. P. 3002(c).  Hence, a Chapter 7 liquidation would not only delay distribution but

raise the prospect of additional claims that were not asserted in the Chapter 11 Cases.

Moreover, Claims that may arise in the Chapter 7 case or result from the Chapter 11

Cases would be paid in full from the Assets before the balance of the Assets would be made

available to pay pre-Chapter 11 Allowed Priority Claims, Allowed General Unsecured Claims,

and Equity Interests.  The distributions from the Assets would be paid Pro Rata according to the

amount of the aggregate Claims held by each creditor.  The Debtors believe that the most likely

outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that

rule, no junior creditor may receive any distribution until all senior creditors are paid in full, with

interest, and no equity security holder would be entitled to receive any distribution until all

creditors are paid in full.  The Debtors have determined that confirmation of the Plan will

provide each Holder of a Claim or Equity Interest with no less of a recovery than it would

receive if Debtor were liquidated under a Chapter 7.  This determination is based upon the effect

that a Chapter 7 liquidation would have on the Assets available for distribution to Holders of

Claims and Equity Interests, including: (i) the increased costs and expenses of a liquidation

under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to

such trustee; and (ii) the amount of existing Claims and the potential increases in Claims that

would have to be satisfied on a priority basis or on a parity basis with Holders of Claims in the

Chapter 11 Cases.  The Debtors also believe that the value of any distributions from the Assets to

Allowed Claims in a Chapter 7 case would be less than the value of distributions under the Plan

because such distributions in the Chapter 7 case would not occur for a substantial period of time.

In the likely event litigation were necessary to resolve Claims asserted in the Chapter 7 case, the

delay could be prolonged for several years.  As described in the Debtors' Liquidation Analysis

attached hereto as <u>Exhibit F</u>, when the cost of liquidation is considered, as well as the time delay

in receiving distributions, the Debtors believe that certain Holders of Claims will receive

substantially smaller distributions pursuant to a Chapter 7 liquidation than under the Plan.

**I.**      <u>**Financial Feasibility**</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a Chapter 11 plan may be

confirmed only if the Bankruptcy Court finds that such plan is feasible.  A feasible plan is one

which will not lead to a need for further reorganization or liquidation of the debtor, unless

reorganization or liquidation is proposed in the Plan.  The Plan proposed by the Debtors provides

for a liquidation of the Debtors' Assets and a distribution of Cash and other consideration to

Creditors in accordance with the terms of the Plan.  The Debtors' cash flow projections are

attached as <u>Exhibit D</u>.  In addition, the Debtors will be able to satisfy the conditions precedent to

the Effective Date and will otherwise have sufficient funds to meet its post-Effective Date

expenses, including payment for the costs of administering and fully consummating the Plan and

closing the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan satisfies the

financial feasibility requirement imposed by the Bankruptcy Code.

**J.**     **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that each Class of Claims

or Equity Interests that is impaired under a plan to accept the Plan, with the exception described

in the following section.  A Class that is not impaired under the Plan is deemed to have accepted

the Plan and, therefore, solicitation of acceptances with respect to such Class is not required.

**K.**     **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan,

even if such plan has not been accepted by all impaired classes entitled to vote on such plan,

provided that such plan has been accepted by at least one impaired class (without considering the

vote of an "insider" class).  The Debtors will seek to confirm the Plan notwithstanding the

nonacceptance or deemed nonacceptance of the Plan by any impaired Class of Claims.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an

impaired class to accept a plan, the plan shall be confirmed, on request of the proponent of the

plan, in a procedure commonly known as "cram-down," so long as the plan does not

"discriminate unfairly," and is "fair and equitable" with respect to each class of claims or equity

interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the Class that

is substantially equivalent to the treatment that is provided to other Classes that have equal rank.

In determining whether a plan discriminates unfairly, courts will take into account a number of

factors, including the effect of applicable subordination agreements between parties.

Accordingly, two Classes of unsecured creditors could be treated differently without unfairly discriminating against either Class.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of secured claims includes the requirements that (i) the Holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by debtor or transferred to another entity under the plan and (ii) each Holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (i) the plan provides that each Holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the Holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

**L.**     <u>**Acceptance**</u>

The Claims in Classes 1, 2B(i), 3B(i), 3C, 4B(i), 4C, 5B(i), 5C, 6B(i) and 13C are not

impaired under the Plan and as a result the Holders of such Claims are deemed to have accepted

the Plan.

Claims in all other applicable Classes are impaired and will receive certain distributions

under the Plan, and as a result, the Holders of such Claims and Equity Interests are entitled to

vote thereon.  Pursuant to section 1129 of the Bankruptcy Code, the Claims in such Classes must

accept the Plan in order for it to be confirmed without application of the "fair and equitable test,"

described above, to such Classes.  As stated above, Classes of Claims will have accepted the

Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of

the Claims of each such Class (other than any Claims of Creditors designated under section

1126(e) of the Bankruptcy Code that have voted to accept or reject the Plan.)

**VII.**     <u>**PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING
AND CONSUMMATING THE PLAN**</u>

**ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER**

**THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION**

**SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT,**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

The alternative to the Plan is the Debtors' liquidation under Chapter 7 of the Bankruptcy

Code.  As set forth above, after evaluating this alternative, the Debtors have concluded that the

Plan is the best alternative and will maximize recoveries to claimants assuming confirmation of

the Plan.  Nonetheless, there are a number of risk factors that Holders of Claims should consider.

Moreover, Holders should also consider the impact of a Chapter 7 alternative.  Included above is

a summary of the Debtors' analysis supporting its conclusion that such a Chapter 7 liquidation would not provide the highest value to claimants.

## A.     <u>Certain Bankruptcy Considerations</u>

### 1.     **Parties in Interest May Object to The Debtors' Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.     **The Debtors May Not Be Able to Secure Confirmation of the Plan**

The Debtors cannot assure you that the Debtors will receive the requisite acceptances to confirm the Plan.  Even if the Debtors receive the requisite acceptances, the Debtors cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting Creditor might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (i) a finding by the Bankruptcy Court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to

non-accepting Holders of claims and equity interests within a particular class under the plan will

not be less than the value of distributions such Holders would receive if the Debtors were

liquidated under Chapter 7 of the Bankruptcy Code.  Although there can be no assurance that

these requirements will be met, the Debtors believe that the Plan will not be followed by a need

for further financial reorganization and that non-accepting Holders within each Class under the

Plan will receive distributions at least as great as would be received following a liquidation under

Chapter 7 of the Bankruptcy Code when taking into consideration the higher value of assets

under the Plan and all administrative expense claims and costs associated with any such Chapter

7 case.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity

Interests ultimately would receive with respect to their Claims or Equity Interests.  If an

alternative reorganization could not be agreed to, it is possible that the Debtors would have to

liquidate their assets under Chapter 7, in which case it is likely that Holders of Claims and Equity

Interests would receive substantially less favorable treatment than they would receive under the

Plan.

### 3.      The Debtors May Object to the Amount or Classification of a Claim

The Debtors each reserve the right to object to the amount or classification of any Claim

or Equity Interest.  The estimates set forth in this Disclosure Statement cannot be relied on by

any Holder of a Claim or Equity Interest whose Claim or Equity Interest is subject to an

objection.  Any such Holder of a Claim or Equity Interest may not receive its specified share of

the estimated distributions described in this Disclosure Statement.

**B.** **Factors Affecting Distributions to Holders of Allowed Claims after the Effective Date**

    **1.** **Financial Information; Disclaimer.**

Although the Debtors have used their best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, all financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and Disclosure Statement. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

    **2.** **The Amount of Liabilities Projected Under the Plan Could Increase.**

The Debtors' management has assumed a certain dollar value of the Debtors' liabilities for purposes of allocating distribution to Holders of the several Classes of Claims under the Plan. Although these are good faith estimates as of the date of the Plan, there can be no certainty that either unknown liabilities may arise or the aggregate value of liabilities may increase. If the projected value of liabilities assumed by management underestimates actual liabilities or contingent liabilities or disputed claims arise that result in an increase in the dollar value of the Debtors' aggregate liabilities, the level of recovery for Holders of Claims and Equity Interests under the Plan could be negatively impacted.

    **3.** **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Various Factual Determinations.**

Some of the material consequences of the Plan regarding United States federal income taxes are summarized in Article VII. hereof. Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, that raise additional uncertainties. The Debtors cannot assure you that the IRS will not take a contrary view, and no

ruling from the IRS has been or will be sought.  The Debtors cannot assure you that the IRS will

not challenge any position the Debtors have taken, or intend to take, with respect to any tax

treatment, or that a court would not sustain such a challenge.  FOR A MORE DETAILED

DISCUSSION OF RISKS RELATING TO THE SPECIFIC POSITIONS THE DEBTORS

INTEND TO TAKE WITH RESPECT TO VARIOUS TAX ISSUES, PLEASE REVIEW

ARTICLE VII(c). HEREOF.

### 4.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Case may be converted to Case under

Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate

the Debtors' assets for distribution to the Holders of Claims in accordance with the priorities

established by the Bankruptcy Code.  A further description of the effect of the conversion of the

Chapter 11 Case to a liquidation under Chapter 7 is set forth above.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE

"FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE

SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE

SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY

OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE

IMPLEMENTATION OF THE PLAN, EXISTING AND FUTURE GOVERNMENTAL

REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL

DISASTERS, ACTS OF TERRORISM OR WAR, AND OTHER MARKET AND

COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE

CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE

DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL

RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE

EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING

STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY

SUCH STATEMENTS.

**C.**     **Certain Federal Income Tax Consequences of the Plan**

**1.**     **General**

The following discussion addresses certain United States federal income tax

consequences of the consummation of the Plan.  This discussion is based upon the Internal

Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations

thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof,

all of which are subject to change, possibly retroactively.  No rulings or determinations by the

Internal Revenue Service have been obtained or sought by the Debtors with respect to the Plan.

An opinion of counsel has not been obtained with respect to the tax aspects of the Plan.

This discussion does not purport to address the federal income tax consequences of the Plan to

particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small

business investment companies, regulated investment companies, broker-dealers, insurance

companies, tax-exempt organizations and financial institutions) or the state, local or foreign

income and other tax consequences of the Plan.

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX**

**CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY**

**INTEREST.  SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX**

**ISSUES DISCUSSED BELOW.  EACH HOLDER OF A CLAIM OR EQUITY**

**INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING**

**THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE**

**TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

2.      **Federal Income Tax Consequences to Holders of Claims and Equity Interests**

A Holder of an Allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim or Equity Interest.  A Holder of an Allowed Claim or Equity Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest.  The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).  The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim or Equity Interest.  If the Claim or Equity Interest in the Creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the Holder of the Claim is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim or Equity Interest for less than one year.

A Holder of an Allowed Claim or Equity Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Equity Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or

business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the

Holder's trade or business. A Holder that has previously recognized a loss or deduction in

respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary

income) any amounts received under the Plan to the extent such amounts exceed the Holder's

adjusted basis in such Claim or Equity Interest.  Holders of Claims or Equity Interests who were

not previously required to include any accrued but unpaid interest with respect to in their gross

income on a Claim or Equity Interest may be treated as receiving taxable interest income to the

extent any consideration they receive under the Plan is allocable to such interest.  Holders

previously required to include in their gross income any accrued but unpaid interest on a Claim

may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the

Plan.

        Holders of a Claim constituting any installment obligation for tax purposes may be

required to currently recognize any gain remaining with respect to such obligation if, pursuant to

the Plan, the obligation is considered to be satisfied at other than its face value, distributed,

transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

General Unsecured Claims may receive only a partial distribution of their Allowed Claims

depending upon the aggregate dollar amount of Allowed Claims in each Class.  Whether the

Holder of such Claims or Equity Interests will recognize a loss, a deduction for worthless

securities or any other tax treatment will depend upon facts and circumstances that are specific to

the nature of the Holder and its Claims or Equity Interests. Accordingly, the Holders of Claims

and Equity Interests should consult their own tax advisors.  Under backup withholding rules, a

Holder of an Allowed Claim may be subject to backup withholding at the rate of 31 percent with

respect to payments made pursuant to the Plan unless such Holder (a) is a corporation or is

otherwise exempt from backup withholding and, when required, demonstrates this fact or (b) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of failure to report all dividend and interest income.  Any amount withheld under these rules will be credited against the Holder's federal income tax liability.  Holders of Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment thereof.

**3.     Federal Income Tax Consequences to the Debtor**

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Court or is pursuant to a plan approved by the Court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's NOLs, certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers.  Attribute reduction is calculated only after the tax for the year of the discharge has been determined.  Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, it is possible that Holders of Claims will receive less than full payment on their Claims.  The Debtors' liability to the Holders of Claims in excess of the amount satisfied

by distributions under the Plan will be canceled and therefore, will result in COD income to the Debtors.   The Debtors should not realize any COD income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the Tax Code described in the immediately preceding paragraph.

### 4.        Importance of Obtaining Professional Tax Assistance

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  Holders of Claims or Equity Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and if so, when such deduction or loss would be available.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF THE CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY**

**AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY**

**CHANGE IN APPLICABLE TAX LAWS.**

## VIII.    <u>RECOMMENDATION</u>

In the Debtors' opinion, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims and Equity Interests.  Accordingly, the Debtors recommend that Holders of Claims  and Equity Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.


Dated: August 3,  2009

*[Signature pages of the Disclosure Statement follow.]*

**TARRAGON CORPORATION**


By: ___/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer


**TARRAGON DEVELOPMENT
CORPORATION**


By: ___/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer


**TARRAGON  SOUTH DEVELOPMENT
CORP.**


By: ___/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer


**TARRAGON DEVELOPMENT
COMPANY LLC**


By: ___/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Corporation, its Managing
Member


**TARRAGON MANAGEMENT INC.**


By: ___/s/ William S. Friedman_____
Name:   William S. Friedman
Title:   Chief Executive Officer

**BERMUDA ISLAND TARRAGON LLC**


By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Corporation, its Managing
Member


**ORION TOWERS TARRAGON LLP**


By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of Orion
Tarragon GP, Inc., its General Partner


**ORLANDO CENTRAL PARK
TARRAGON LLC**


By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Corporation, its Managing
Member


**FENWICK PLANTATION TARRAGON
LLC**


By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Development Corporation, the
Manager of Charleston Tarragon Manager,
LLC, its Manager

**CHARLESTON TARRAGON
MANAGER, LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Development Corporation, its
Manager


**800 MADISON STREET URBAN
RENEWAL, LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Development Corporation, the
Manager of Block 88 Development, LLC, its
Managing Member


**BLOCK 88 DEVELOPMENT LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Development Corporation, its
Manager


**900 MONROE DEVELOPMENT, LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Corporation, its Manager

**THE PARK DEVELOPMENT EAST,
LLC**


By: ____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Development Corporation, the
Managing Member of Palisades Park East
Tarragon, LLC, its Managing Member


**ONE LAS OLAS, LTD.**


By: ____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of Omni
Equitiies Corporation, its General Partner


**OMNI EQUITIES CORPORATION**


By: ____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer


**CENTRAL SQUARE TARRAGON LLC**


By: ____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Corporation, its Managing
Member

**THE PARK DEVELOPMENT WEST, LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Development Corporation, the
Managing Member of Palisades Park West
Tarragon, LLC, its Managing Member


**VISTA LAKES TARRAGON, LLC**


By: \_\_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Corporation, its Manager


**TARRAGON EDGEWATER ASSOCIATES, LLC**


By: \_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Tarragon Development Corporation, its
Manager


**MURFREESBORO GATEWAY PROPERTIES, LLC**


By: \_\_\_/s/ William S. Friedman_____
Name:   William S. Friedman
Title:     Chief Executive Officer of
Morningside National, Inc., its Manager

**TARRAGON STONECREST LLC**

By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Morningside National, Inc., its Manager


**TARRAGON STRATFORD, INC.**

By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer


**MSCP, INC.**

By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer


**TDC HANOVER HOLDINGS, LLC**

By: _____/s/ William S. Friedman_____
Name:   William S. Friedman
Title:    Chief Executive Officer of
Tarragon Development Corporation, its
Managing Member