**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Telecopier
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Attorneys for Tarragon Corporation, *et al.,*
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE DONALD H. STECKROTH
CASE NO. 09-10555(DHS)

In re:

TARRAGON CORPORATION, *et al.,*

      Debtors-in-Possession.

Chapter 11
(Jointly Administered)

**VERIFIED APPLICATION IN SUPPORT
OF DEBTORS' MOTION PURSUANT
TO 11 U.S.C. §§ 362, 363 AND 364 FOR
INTERIM AND FINAL ORDERS (1)
APPROVING POST-PETITION
FINANCING WITH UTA CAPITAL
LLC, (2) GRANTING LIENS AND
PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS,
(3) MODIFYING THE AUTOMATIC
STAY, (4) SCHEDULING FINAL
HEARING PURSUANT TO FED. R.
BANKR. P. 4001, AND (5) GRANTING
OTHER RELATED RELIEF**

**HEARING DATE AND TIME:**
March \_\_\_\_, 2010, at \_\_:\_\_ \_\_.m.

**ORAL ARGUMENT REQUESTED**

TO:   HONORABLE DONALD H. STECKROTH
      United States Bankruptcy Judge

Tarragon Corporation, *et al.*, the within debtors and debtors-in-possession (collectively, the "Debtors"),[1] by and through their counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., respectfully represent:

## I.    INTRODUCTION AND JURISDICTION

1.    This Verified Application is submitted in support of the Debtors' motion pursuant to 11 U.S.C. §§ 362, 363 and 364 for interim and final Orders (the "DIP Financing Orders"):  (1) approving post-petition financing with UTA Capital LLC ("UTA"); (2) granting liens and providing superpriority administrative expense status; (3) modifying the automatic stay; (4) scheduling a final hearing pursuant to Fed. R. Bankr. P. 4001; and (5) granting other related relief (the "Motion").  The proposed form of interim Order granting the Motion (the "Interim Order") is filed simultaneously herewith.

2.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (G), (M), and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.    BACKGROUND

3.    On January 12, 2009, January 13, 2009 and February 5, 2009 (as applicable to each Debtor, the "Filing Date"), the Debtors each filed a voluntary petition for relief under

---

[1] The Debtors are Tarragon Corporation ("Tarragon Corp."), Tarragon Development Corporation ("Tarragon Dev. Corp."), Tarragon South Development Corp., Tarragon Development Company LLC, Tarragon Management, Inc., Bermuda Island Tarragon LLC, Orion Towers Tarragon, LLP, Orlando Central Park Tarragon L.L.C., Fenwick Plantation Tarragon LLC, One Las Olas, Ltd., The Park Development West LLC, 800 Madison Street Urban Renewal, LLC, 900 Monroe Development LLC, Block 88 Development, LLC, Central Square Tarragon LLC, Charleston Tarragon Manager, LLC, Omni Equities Corporation, Tarragon Edgewater Associates, LLC, The Park Development East LLC, Vista Lakes Tarragon, LLC.   Debtors Murfreesboro Gateway Properties LLC and Tarragon Stonecrest, LLC are not parties to the DIP Credit Agreement (defined herein) and, therefore, are not movants herein.

Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"). Since the Filing Date, the Debtors have remained in possession of their assets and continued management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      On February 4, 2009, the Office of the United States Trustee for the District of New Jersey appointed an Official Committee of Unsecured Creditors (the "Committee").

5.      A detailed description of the Debtors' businesses and facts precipitating the filing of the Debtors' Chapter 11 proceedings is set forth in the Affidavit of William S. Friedman and Supplemental Affidavit of William S. Friedman (collectively, the "Friedman Affidavit") submitted in support of the Debtors' various "First Day Motions" (Docket Nos. 23 and 33). Those facts are incorporated herein by reference.

6.      As set forth in the Friedman Affidavit, Tarragon Corp. and its direct and indirect, debtor and non-debtor affiliates (collectively, "Tarragon") are real estate developers, owners and managers. Tarragon operates two (2) business divisions, a real estate development division (the "Development Division") and an investment division (the "Investment Division"). The Development Division focuses on developing, renovating, building and marketing homes in high-density, urban locations and in master-planned communities. The Investment Division owns and operates a portfolio of stabilized rental apartment communities.

A.      **Tarragon's Pre-Petition Indebtedness**

7.      As set forth in the Friedman Affidavit, as of the Filing Date, Tarragon Corp. had unsecured debt totaling approximately $170 million, exclusive of contingent guaranty obligations, as follows: (a) $125 million of subordinated unsecured debt to Taberna Capital Management LLC and certain of its affiliates pursuant to the terms of Subordinated Indentures dated June 15, 2005, September 12, 2005 and March 1, 2006, as amended; (b) approximately $40

million of unsecured debt to Beachwold Partners, L.P. ("Beachwold") and Robert P. Rothenberg ("Rothenberg" and, together with Beachwold, the "Beachwold Parties"), affiliates of the Debtors, pursuant to the terms of promissory notes dated January 7, 2008; and (c) other unsecured debt.  William S. Friedman ("Friedman") the Chief Executive Officer of Tarragon Corp., is the general partner of Beachwold.  Rothenberg is Tarragon Corp's President.

8.      In addition, as set forth in detail in the Friedman Affidavit, before the Filing Date, numerous debtor and non-debtor affiliates of Tarragon Corp. incurred secured debt to finance the costs of construction, renovations and/or acquisitions of land.  Those entities granted their respective lenders mortgages on their real property and improvements, easements, fixtures, and personal property thereon, as well as a security interest in rent, revenues and profits generated from the mortgaged property.  As of the Filing Date, the total amount of outstanding secured debt of the Tarragon debtor and non-debtor projects was approximately $165 million and $595 million, respectively.

9.      In connection with Tarragon's various development projects, Tarragon Corp. and/or Tarragon Dev. Corp. typically guaranteed repayment of the loan or granted a completion guarantee with respect to the project.  As of the Filing Date, Tarragon Corp.'s guaranteed obligations totaled approximately $769 million.

**B.      The Debtors' Prior DIP Financings**

10.      As of the Filing Date, the Debtors had sufficient liquidity to operate their business without the need for an immediate debtor-in-possession financing facility.  Given the continuing downward trend in the real estate industry and correlating adverse effect on the Debtors' cash flow and liquidity, the Debtors believed that having the ability to access a post-petition financing facility would ensure the seamless continuation of the Debtors' business while they explored

4

restructuring alternatives.  Accordingly, the Debtors negotiated a Secured Super-Priority Debtor-in-Possession Credit Agreement dated January 12, 2009 with ARKOMD (the "ARKOMD DIP Credit Agreement") pursuant to which ARKOMD agreed to provide them with a $6.25 million credit facility.  The ARKOMD DIP Credit Agreement was approved on a final basis by an Order entered on March 5, 2009 (Docket No. 302) (the "ARKOMD DIP Order").  Under the terms and conditions of the ARKOMD DIP Credit Agreement and ARKOMD DIP Order, the stated maturity date of the financing provided by ARKOMD (the "ARKOMD DIP Loan") was July 12, 2009, subject to being extended to September 10, 2009, assuming (a) no Material Budget Deviations (as defined in the ARKOMD DIP Credit Agreement) occurred within 180 days after the Filing Date or (b) ARKOMD's consent.

11.     On or about July 12, 2009, the Debtors drew on the ARKOMD DIP Loan in the approximate amount of $3 million to provide them with sufficient liquidity through the anticipated confirmation of the plan of reorganization they were negotiating with ARKOMD as sponsor.  In connection therewith, ARKOMD agreed to extend the maturity date of the ARKOMD DIP Loan to November 9, 2009, on the terms set forth in a First Amendment to the ARKOMD DIP Credit Agreement.

12.     The ARKOMD DIP Loan matured on November 9, 2009, at which time the Debtors repaid the outstanding indebtedness to ARKOMD.  When they were unable to complete an agreement with ARKOMD to sponsor a plan of reorganization, however, the Debtors required replacement financing to provide them with sufficient liquidity while they pursued alternative plan structures.  Accordingly, certain of the Debtors entered into a term sheet (the "Westminster Term Sheet") with Westminster Residential Acquisition LLC ("Westminster Residential"), an affiliate of the Kushner Companies, pursuant to which Westminster Residential agreed to act as

the sponsor of the Debtors' plan of reorganization.  Pursuant to the Westminster Term Sheet and

pending the parties' anticipated execution of definitive documents, Westminster DIP Funding,

LLC ("Westminster Funding"), also an affiliate of the Kushner Companies, entered into a post-

petition financing agreement with certain of the Debtors, pursuant to which Westminster

Funding provided to them a $4,510,000 credit facility (the "Westminster DIP Facility").

13.     The Court entered an Order approving the Westminster DIP Facility on a final

basis on December 10, 2009.  Unfortunately, the Debtors and the Committee were unable to

reach agreement with Westminster Residential on definitive documents that were to form the

basis of a plan of reorganization.

14.     The maturity date of the Westminster DIP Facility was January 22, 2010.  On

March 8, 2010, Westminster Funding filed a motion for an Order (i) enforcing a prior Order of

the Court pursuant to section 105 of the Bankruptcy Code, and (ii) directing the Debtors to repay

the matured Westminster DIP Facility (the "Westminster Motion").  The hearing on the

Westminster Motion is scheduled for March 31, 2010.

15.     If the UTA DIP Loan (as defined below) is approved, and subject to the Debtors'

agreement with Westminster Funding on a payoff amount, the Debtors intend to utilize the first

draw under the UTA DIP Loan to satisfy their obligations under the Westminster DIP Facility

(or to escrow the funds pending the Court's adjudication of the amount due to Westminster

Funding under the Westminster DIP Facility).  The Debtors reasonably anticipate that their

indebtedness to Westminster Funding as of March 31, 2010 will be approximately $4,100,000.

**B.      The Debtors' Need For and General Description of the UTA DIP Loan**

16.     The Debtors and other major stakeholders in these cases negotiated and ultimately

executed on March 5, 2010, a binding term sheet for a plan of reorganization with UTA (the

"UTA Term Sheet"), an entity whose principal was introduced to the Debtors during the early

6

stages of these cases.  A copy of the UTA Term Sheet is attached as **Exhibit A**.  The UTA Term

Sheet was modified pursuant to Amendment No. 1, dated as of March 24, 2010 (the "UTA Term

Sheet Amendment").  The UTA Term Sheet Amendment is attached as **Exhibit B**.

17.    During the negotiations with UTA regarding the funding of a plan of

reorganization, it became evident that the Debtors needed a replacement post-petition loan in

order satisfy the Westminster DIP Facility and to have sufficient liquidity to operate the business

through confirmation and to pay expenses that must be paid at or around confirmation in order to

emerge from Chapter 11.  UTA agreed to provide the Debtors with the necessary replacement

DIP loan to satisfy their obligations under the matured Westminster DIP Facility, subject to

satisfactory documentation and execution of the UTA Term Sheet by all parties thereto.

18.    Accordingly, the Debtors, the Committee and their respective professionals

immediately engaged in good faith and extensive arms'-length negotiations with UTA and its

professionals regarding the terms of the new DIP loan.  Those negotiations culminated in the

Secured, Super-Priority Debtor-in-Possession and Exit Financing Credit and Security Agreement

dated as of March 24, 2010 (the "UTA Credit Agreement"), a copy of which is attached as

**Exhibit C**.

19.    Pursuant to the UTA Credit Agreement, UTA will make an initial advance of

funds to certain of the Debtors (the "UTA DIP Loan")[2] to enable them to satisfy their obligations

under the Westminster DIP Facility and to pay certain ordinary and necessary operating expenses

in the sum of $4,200,000.00.  The Debtors will seek authority at the final hearing on the Motion

(the "Final Hearing") to draw the $620,000 balance of the UTA DIP Loan.  The use of the UTA

---

[2] Rothenberg and two individual retirement plans having Friedman and Lucy Friedman
(Friedman's wife) as their respective plan beneficiaries will be participants in the UTA Credit
Agreement to the extent of $620,000.00.

38590/0031-6370010v4

DIP Loan proceeds will be consistent with the disbursement schedule attached as exhibit B to the

UTA Credit Agreement (the "Disbursement Schedule").  Subject to the terms and conditions set

forth in the UTA Credit Agreement, the UTA DIP Loan shall convert into an exit facility upon

the effective date of the Debtors' amended plan of reorganization.

20.     The following is a concise summary of the significant terms of the UTA DIP

Loan:[3]

| (a) | **Amount of Loan:** | Loan is in the amount of $4,820,000.00. |
| --- | --- | --- |
| (b) | **Maturity Date/Termination Date:** | The Maturity Date is the earliest of (a) if the Confirmation Order has been entered on or before June 15, 2010, the date which is eighteen months after the Loan Advance Date, (b) the date of termination of UTA's obligations to permit the Loan to remain outstanding pursuant to Section 8.2(b) of the UTA Credit Agreement, (c) the Termination Date, (d) September 15, 2010, if the Confirmation Order has not been entered by the Bankruptcy Court on or before June 15, 2010, (e) the date of the filing of a Plan of Reorganization or plan of liquidation that has not been consented to by UTA in writing or fails to provide for the payment in full in cash of all Obligations under the UTA Credit Agreement and the other Loan Documents on or before the effective date of such plan, or (f) without the prior written consent of UTA, the date of the closing of a sale of all or substantially all of Borrowers' assets.  In turn, Termination Date means the date on which (a) all principal of and interest on the Loan has been indefeasibly repaid in full in cash, (b) all other Obligations under the UTA Credit Agreement and the other Loan Documents have been completely discharged, including the Obligation to pay |

_____

[3] This section is intended to provide a summary of the UTA Credit Agreement.  The reader is directed to the UTA Credit Agreement for a more complete recitation of its terms.  To the extent of any inconsistency, the terms of the UTA Credit Agreement shall control.  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the UTA Credit Agreement.

38590/0031-6370010v4

Additional Interest and all Fees, and (c) Borrowers shall have no further right to borrow any monies under the UTA Credit Agreement.

(c) **Use of Proceeds:** Proceeds of the UTA DIP Loan (net of amounts used to pay UTA's costs pursuant to Section 11.3(b)(iv) of the UTA Credit Agreement) shall be used to pay the Westminster DIP Facility (or the funds necessary to repay the Westminster DIP Facility shall be escrowed), and for working capital and general business purposes as specified in the Disbursement Schedule.[4] Borrowers shall not be permitted to use the proceeds of the UTA DIP Loan (i) to finance in any way any investigation (including, without limitation, discovery proceedings), adversary proceeding, claim, action, suit, offset, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests or claims of UTA (or any of UTA's Affiliates, directors, officers, employees, insiders, agents or representatives) or its rights and remedies under the UTA Credit Agreement, the other Loan Documents, or any Order and (ii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of UTA, except as required by law.

---

[4] In accordance with the January 16, 2009 Administrative Order establishing procedures for interim compensation and reimbursement of expenses to professionals, (a) each professional retained in these cases was authorized to file monthly fee statements for interim approval and allowance of compensation for services rendered and reimbursement of expenses incurred during the immediately preceding month, and (b) in the absence of objection, the Debtors were authorized to pay each professional 80% of the fees and 100% of the expenses requested in the monthly fee statement. Given the Debtors' liquidity problems, they ceased paying the 80% of the fees and 100% of the expenses requested in the professionals' monthly statements for December 2009 through the present. In addition, the Debtors did not pay the 20% holdbacks for the months of June 2009 through September 2009 that were awarded by the Court in connection with the professionals' second interim fee applications. From the UTA DIP Loan proceeds, professionals will be paid at plan confirmation only a portion of the fees and expenses incurred and accrued through confirmation of the Debtors' proposed plan of reorganization. Professionals will not be paid 100% of those fees and expenses at confirmation, as ordinarily required. Rather, the UTA Credit Agreement contemplates a deferral of a material portion of professional fees pending the repayment in full of the UTA DIP Loan post-confirmation.

38590/0031-6370010v4

(d)  **Collateral Security
and Priority:**

First priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interest in and lien, senior and superior in priority to the liens, security interests and claims of all other secured and unsecured creditors of the Borrowers' estate, except as to the Carve-Out Expenses, upon the following collateral: (a) Tarragon's Equity Interests, as set forth more fully on Exhibit E to the UTA Credit Agreement and (b) any otherwise unencumbered assets and property of the Debtors (including, but not limited to, (x) assets and properties that would otherwise become unencumbered and (y) after-acquired assets and properties) of the Borrower (other than (i) stock, limited partnership equity, general partnership equity or limited liability company interests not constituting Tarragon's Equity Interests or (ii) any asset or property of a non-debtor Borrower Party, other than Tarragon's Equity Interests, if the grant of a security interest constitutes or results in a breach or an event of default (following the passage of all applicable cure periods) under any applicable loan or security agreement) and all other assets of the Borrowers (the "Collateral"). The Obligations also shall be granted a superpriority administrative expense claim, subject to the Carve-Out Expenses. The Collateral shall not include a security interest in and lien on the Borrowers' avoidance power actions under chapter 5 of the Bankruptcy Code; *provided*, *however*, that any proceeds of any such avoidance actions (net of costs and expenses, including legal fees, incurred in obtaining such proceeds) shall, within one (1) Business Day of receipt, be deposited into a blocked account at a bank designated by Borrowers and reasonably approved by UTA, which account shall be subject to an account control agreement sufficient to give UTA a first priority perfected interest in such account and such proceeds. Such proceeds shall be retained undisbursed until the earlier of (i) an Event of Default, at which time UTA may exercise all remedies against such proceeds as are provided in Section 8.2 of the UTA Credit Agreement or otherwise; or (ii) the payment in full of all interest (other than Additional Interest)

|     |     |     |
|-----|-----|-----|
|     |     | on and principal of, and the Exit Fee with respect to, the UTA DIP Loan, at which time such proceeds shall be released from the blocked account and UTA's lien and shall be paid to the Tarragon Creditor Entity for its own use and purposes. |
| (e) | **Interest Rates:** | 15% *per annum* paid monthly in arrears from available funds. Unpaid interest shall accrue and compound monthly. Any unpaid interest shall be due at maturity. Additional interest payable under "Distribution Waterfall," as described in the UTA Term Sheet. |
| (f) | **Fees, Indemnification and Expenses** | Exit fee of 5% of the loan, payable under the "Distribution Waterfall," as described in the UTA Term Sheet. Borrowers will hold UTA harmless from any and all damages or liabilities arising in connection with the UTA Credit Agreement other than as a result of UTA's fraud, gross negligence or willful misconduct. The Borrowers also shall pay to UTA all of UTA's reasonable legal and other fees relating to due diligence for and negotiation, documentation and closing of the Loan, not to exceed $100,000 in the aggregate and subject to Bankruptcy Court approval of the Interim Order (and the expenses may be netted out of the proceeds of the Loan). Any additional UTA reasonable legal expenses in excess of $100,000 will be reimbursed to UTA as and when described under the "Distribution Waterfall" in the UTA Term Sheet. |
| (g) | **Remedies** | UTA is entitled to all remedies customarily available to post-petition lenders in Chapter 11 cases, including the right to realize on all Collateral and exercise any remedy available under the UTA Credit Agreement, without the need for further stay relief, provided however, the enforcement of remedies shall require 6 calendar days' notice to the Debtors. |

21.    In accordance with the guidelines for financing requests in this District, the

Debtors make the following disclosures as to certain "extraordinary provisions" in the UTA

Credit Agreement and/or the DIP Financing Orders:

38590/0031-6370010v4

(a)      **Carve-Out Expenses**      The Carve-Out Expenses shall include: (A) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)), (B) the fees due to the Clerk of the Court, and (C) the actual fees and expenses incurred by professionals (less the unused portion of retainers held by such professionals), retained by an order of the Bankruptcy Court entered pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals"), but only to the extent that they are within the amounts set forth in the Disbursement Schedule and are subsequently allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code.  Additionally, UTA's Liens on the Collateral shall be subject to a claim (the "50/50 Claim") for allowed fees and expenses of the Professionals retained by the Debtors in an aggregate amount not to exceed $150,000 and allowed fees and expenses of the Professionals retained by the Committee in an aggregate amount not to exceed $150,000; *provided*, *however*, that unless and until UTA has foreclosed upon one or more items of the Collateral, all unpaid fees and expenses of Professionals not treated as Carve-Out Expenses shall be treated for all purposes as Deferred Confirmation Expenses and payable (prior to the Termination Date) only as provided in Section 1.6 of the UTA Credit Agreement.  At such time or times, if any, as UTA shall foreclose upon one or more items of Collateral, proceeds of such foreclosure(s) shall be shared one-half to UTA and one-half to the holder(s) of the 50/50 Claim (and ratably among such holders) until such time, if any, as $300,000 shall have been paid to such holder(s), at which time the 50/50 Claim shall be fully satisfied and extinguished.  The holder(s) of the 50/50 Claim shall not demand, sue for or commence any action to recover or collect from Borrowers any fees or expenses encompassed by the 50/50 Claim (except to the extent such fees or expenses are payable in accordance with Section 1.6 of the UTA Credit Agreement) or to enforce the 50/50 Claim until the Termination Date has occurred.  No portion of the Carve-Out Expenses or any other proceeds of the UTA DIP Loan or any

38590/0031-6370010v4

fees or expenses secured by the Equal Priority Lien may be used to investigate, litigate, object, contest or challenge in any manner or raise any defenses to the debt, claims, offsets or collateral position of UTA under the DIP Credit Agreement or any other claims against any of the entities owned or controlled by UTA or its Affiliates.  In addition, the Carve-Out Expenses and any other proceeds of the UTA DIP Loan shall not be used, nor shall any fees or expenses secured by the Equal Priority Lien be incurred or expended, in connection with (i) preventing, hindering or delaying UTA' s enforcement or realization upon the Collateral once an Event of Default has occurred, (ii) selling or otherwise disposing of the Collateral without the consent of UTA, (iii) using or seeking to use any insurance proceeds related to the Collateral without the consent of UTA, or (iv) incurring indebtedness senior to UTA's liens.  UTA shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Debtors' cases.

(b) **Section 506(c) Waiver**    No costs or expenses of administration which have been incurred or may be incurred in the cases at any time shall be charged against UTA, its claims or the Collateral.

(c) **Events of Default:**    Events of Default include, but are not limited to: (a) Borrowers (i) fail to make any payment of principal of, or interest (including Additional Interest) on, or Fees owing in respect of, the Loan or any of the other Obligations when due and payable, or (ii) fail to pay or reimburse UTA for any expense reimbursable under the UTA Credit Agreement or under any other Loan Document within five (5) days following UTA's demand for such reimbursement or payment of expenses; (b) the filing of any Plan of Reorganization or liquidation by the Borrowers, or entry of an order confirming such plan, that does not provide for the termination of the Commitment and repayment in full in cash of all Obligations under the UTA Credit Agreement, including without limitation the Obligation to pay Additional Interest and the Exit Fee as provided in the UTA Credit Agreement, and

13

any Order then in effect on or before the effective date of such plan, (c) the filing of a motion, or the execution of a written agreement, or the filing of any plan of liquidation or reorganization or disclosure statement attendant thereto by Borrowers: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the UTA Credit Agreement, unless such financing pays in full all Obligations (including the Obligation to pay Additional Interest and the Exit Fee) due under the UTA Credit Agreement; (B) to grant any Lien upon any Collateral (or the proceeds of any Collateral), including any cash or cash proceeds of property of the Borrowers not encumbered by any Lien as of or after the Petition Date; (C) except as provided in any Order, as the case may be, to use cash collateral of UTA under Section 363(c) of the Bankruptcy Code without the prior written consent of UTA; or (D) any other action or actions materially adverse to UTA or its rights and remedies under the UTA Credit Agreement or its interest in the Collateral, and (d) the other items identified in Section 8.1 of the UTA Credit Agreement.

22.    Although these and other listed provisions may be considered "extraordinary" under the Financing Guidelines, they are typical of DIP financing terms, and the Debtors believe that any other DIP lender would insist on similar, if not identical, provisions. In fact, these terms were substantially similar to the terms of the ARKOMD and Westminster DIP Loans and are supported by the Committee.

### III.    RELIEF REQUESTED AND BASIS THEREFOR

**A.    To the Extent Authority is Needed, the Debtors Should be Authorized to Enter Into the UTA Term Sheet and UTA Term Sheet Amendment *Nunc Pro Tunc***

23.    Section 363(b) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." In general, a debtor may enter into a proposed transaction outside the

ordinary course of business where the transaction represents an exercise of the debtor's sound

business judgment.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing

Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 517 (7th Cir. 1991)); Committee

of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983);

Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Titusville Country Club v. Pennbank (In re Titusville

Country Club), 128 B.R. 396, 398 (Bankr. W.D. Pa. 1991).

  24.  A debtor has the burden of establishing that a valid business purpose exists for the

use of estate property in a manner outside the ordinary course of business.  See Lionel Corp., 722

F.2d at 1071.  Once the debtor articulates a valid business justification for the proposed action, it

is presumed that the decision was made "on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company."  In re Integrated Resources, Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.

1985)).  In other words, the business judgment rule essentially shields a debtor's management

from judicial second-guessing and mandates that a court approve a debtor's business decision

unless the decision is a product of bad faith or gross abuse of discretion.  See In re Global

Crossing, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); see also In re Johns-Manville Corp., 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct").

  25.  Although it is arguable that the Debtors were free to enter into a term sheet, which

is subject to definitive documentation, without court approval, to avoid any uncertainty and to

give UTA comfort as to the validity of the Debtors' actions, the Debtors submit that it was a

sound exercise of their business judgment to enter into the UTA Term Sheet and the UTA Term

Sheet Amendment.  The UTA Term Sheet forms the basis for the Debtors' to-be filed amended

plan of reorganization, which ultimately will be subject to voting by creditors and approval by

this Court.

26.     The UTA Term Sheet is the product of rigorous negotiations among the Debtors,

the Committee and UTA and, as such, reflects the best possible terms for the Debtors' successful

emergence from Chapter 11.  Implementation of the UTA Term Sheet will provide the Debtors

with the influx of capital they desperately require to stay in Chapter 11 pending confirmation of

an amended plan of reorganization and, ultimately, confirmation of a plan supported by all major

stakeholders.  Accordingly, the UTA Term Sheet and UTA Term Sheet Amendment (to the

extent not superseded by the UTA Credit Agreement) should be approved under Section 363 of

the Bankruptcy Code, to the extent applicable.

**B**.      **The UTA DIP Loan Should Be Approved Under Section 364 of the Bankruptcy Code**

27.     Section 364 of the Bankruptcy Code governs a debtor's ability to obtain post-

petition credit and provides, in pertinent part, as follows:

> (c)     If the trustee [debtor-in-possession] is unable to obtain
> unsecured credit allowable under section 503(b)(1) of this title as
> an administrative expense, the court, after notice and a hearing,
> may authorize the obtaining of credit or the incurring of debt --
>
> (1)     with priority over any or all administrative expenses
> of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate
> that is subject to a lien.

11 U.S.C. § 364(c).

38590/0031-6370010v4

28.     Courts have observed that in satisfying the standards of section 364 of the

Bankruptcy Code, a debtor need only make a reasonable effort to seek sources of credit of the

type set forth in section 364(a) and (b) of the Bankruptcy Code.  See In re Snowshoe Co., 789

F.2d 1085, 1088 (4th Cir. 1986) (trustee has demonstrated by good faith that credit was not

available without senior lien by unsuccessfully contacting other financial institutions in the

immediate geographic area); 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-32 (Bankr. S.D.N.Y.

1992) ("[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every

possible lender"); In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (finding that

the debtor demonstrated the unavailability of unsecured financing where several lending

institutions were approached).  When there are few lenders likely, able or willing to extend the

necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D.

Ga. 1989).

29.     The standards of section 364(c) are satisfied here.  The current state of the capital

and credit markets, especially for the severely impacted real estate industry, coupled with the

Debtors' levered assets and execution of the UTA Term Sheet which will enable the Debtors to

confirm a plan of reorganization supported by all major stakeholders, leads to the inescapable

conclusion that the Debtors could not have obtained financing from another lender on the same

or more favorable terms and conditions than those proposed in the UTA Credit Agreement.

Moreover, given the Debtors' exhaustive search for a DIP lender at the outset and throughout the

pendency of these cases, the Debtors are certain that no other lender would be willing to provide

post-petition financing at this juncture in the Debtors' Chapter 11 cases in the amount needed to

satisfy their obligations to Westminster Funding and operate their business pending confirmation.

30.     Based on the foregoing, the Debtors decided to pursue post-petition financing from UTA, who also will serve as the exit lender for the Debtors' plan of reorganization.  Based on the facts and circumstances of these cases, as summarized above, the Debtors' management reasonably concluded that UTA is the best, if not the only, alternative available at the present time for post-petition financing of the nature contemplated in the UTA Credit Agreement.  Consequently, the Debtors' efforts to obtain post-petition financing satisfy the statutory requirement of section 364(c) of the Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee has demonstrated by good faith that credit was not available without senior lien by unsuccessfully contacting other financial institutions in the immediate geographic area); 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-32 (Bankr. S.D.N.Y. 1992) ("[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every possible lender"); In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (finding that the debtor demonstrated the unavailability of unsecured financing where they approached several lending institutions).

**C.     The Terms of the UTA DIP Loan are Fair, Reasonable and Appropriate and, Therefore, Should be Approved**

31.     The Debtors are unable to obtain unsecured credit in the ordinary course of business or as an administrative expense.  In the Debtors' business judgment, the UTA DIP Loan was the best financing option available under the circumstances of these cases, including the possibility that the Debtors could not satisfy their obligations to Westminster Funding under the Westminster DIP Facility.  If the Debtors are unable to satisfy their obligations to Westminster Funding, Westminster Funding could take all action authorized under its loan documents to

enforce its rights and remedies, including to liquidate the significant collateral pledged by the

Debtors, to the detriment of the Debtors and their creditors and estate.  To avoid such disastrous

result, the Debtors' management moved swiftly to negotiate the UTA Credit Agreement.

32.     The proposed terms of the UTA DIP Loan were negotiated extensively, in good

faith and at arms'-length among the Debtors, the Committee and UTA and their respective

professionals.  The terms are fair, reasonable and appropriate under the circumstances of these

cases and in light of the current economic climate.  As contemplated by the policies underlying

the Bankruptcy Code, the purpose of the UTA DIP Loan is to enable the Debtors to maintain the

value of their assets and business while pursuing confirmation of a plan of reorganization

consistent with the UTA Term Sheet.  See generally, In re First South Sav. Ass'n , 820 F.2d 700,

710-15 (5th Cir. 1987).

**D.     The Debtors Have Exercised Sound Business Judgment in Entering Into the UTA
        Credit Agreement**

33.     After appropriate investigation and analysis, the Debtors' management has

concluded that the UTA DIP Loan provides the best alternative available for satisfying their

obligations under the Westminster DIP Facility and accessing additional liquidity pending (and

in contemplation of) confirmation of their amended Chapter 11 plan.  This conclusion is

supported wholeheartedly by the Committee.  Bankruptcy courts routinely defer to a debtor's

business judgment on most business decisions, including the decision to borrow money.  See In

re Simasko Prods. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be

left to the board room and not this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr.

S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the debtor's

estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of

38590/0031-6370010v4

administration of the estate, and threaten the court's ability to control a case impartially."

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

34.     In general, a bankruptcy court should defer to a debtor-in-possession's business

judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious.  In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981).

Courts generally will not second guess a debtor-in-possession's business decisions when those

decisions involve "a business judgment made in good faith, upon a reasonable basis, and within

the scope of his authority under the Code." Id. at 513-14.

35.     Here, the Debtors exercised their sound business judgment in determining that a

replacement post-petition credit facility is appropriate and necessary, and have satisfied the legal

prerequisites to borrow under the UTA DIP Loan.  Accordingly, the Debtors should be granted

authority to enter into the UTA Credit Agreement and to borrow funds from UTA on the terms

and conditions contained therein pursuant to Section 364(c) of the Bankruptcy Code.

**E.     Immediate Relief Is Necessary**

36.     Fed. R. Bankr. P. 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier

than fifteen (15) days after the service of such motion.  Upon request, however, the Court is

empowered to conduct an interim hearing on the motion and authorize the obtaining of credit to

the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

37.     Pursuant to Fed. R. Bankr. P. 4001(b) and 4001(c), the Debtors request that the

Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors to

obtain post-petition financing from UTA on an interim basis.  As discussed above, the hearing on

the Westminster Motion has been scheduled for March 31, 2010.  To avoid the potentially

damaging and disruptive consequences caused by the Debtors' inability to satisfy their

obligations to Westminster Funding from cash on hand (or at least escrow sufficient funds

pending adjudication of the extent of their obligations), the Debtors must obtain authority to

draw on the UTA DIP Loan before the Final Hearing.  Absent interim relief, the Debtors and

their estates will suffer immediate and irreparable harm.  Accordingly, it is appropriate and,

indeed, critical for the Court to approve the Motion on an interim basis to allow an initial draw in

the amount of $4,200,000.

38.     During the interim period and before the Final Hearing pursuant to Fed. R. Bankr.

P. 4001(b)(2) and 4001(c)(2), the post-petition financing arrangement will be governed by the

terms of the DIP Credit Agreement.  A proposed final order will be submitted before the Final

Hearing incorporating substantially the same terms.

### IV.   CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and

Final Orders granting the Motion and such other relief as the Court deems just and appropriate

under the circumstances.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Tarragon Corporation, *et al.*,
Debtors-in-Possession


By:   */s/ Warren A. Usatine*
            Michael D. Sirota
            Warren A. Usatine

DATED:  March 25, 2010

38590/0031-6370010v4

## <u>VERIFICATION</u>

WILLIAM S. FRIEDMAN, of full age, certifies as follows:

1.      I am the Chief Executive Officer of Tarragon Corporation, one of the within

debtors and debtors-in-possession (the "Debtors").  As such, I have full knowledge of the facts

set forth herein, and am authorized to make this Application on the Debtors' behalf.

2.      I have read the foregoing Verified Application and certify that the factual

statements contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified

Application are willfully false, I am subject to punishment.


        */s/ William S. Friedman*
        WILLIAM S. FRIEDMAN

DATED:  March 24, 2010

38590/0031-6370010v4