# EXHIBIT A

Execution Version

*UTA Capital LLC*
*100 Executive Drive, Suite 330*
*West Orange, NJ 07052*

**Proposed Terms for Senior Secured Exit Loan as Part of
Borrowers' Plan of Reorganization**

*This Term Sheet is intended to be a binding obligation of the parties hereto and constitutes a commitment of Lender to fund and of the other parties hereto to exclusively support, and vote in favor of, a plan of reorganization jointly proposed by Lender, the Debtors and the official committee of unsecured creditors of Tarragon Corporation and its affiliates (the "Creditor Committee"), subject to the terms and conditions provided herein.*

---

**$4,820,000 Senior Secured Exit Loan**

---

| | |
|---|---|
| **Borrower:** | The Borrowers will be Tarragon Corporation, a Nevada corporation, debtor and debtor-in-possession ("Tarragon"), and certain affiliates of Tarragon that are currently borrowers under an existing debtor-in-possession loan (collectively, "Borrowers") in the original principal amount of $4,510,000 (the "Existing DIP Loan") from Westminster DIP Funding, LLC ("Westminster"). Tarragon will file and seek confirmation of a plan of reorganization (the "Plan") consistent with the terms and conditions of this Term Sheet. The parties to this Term Sheet will enter into a Plan Support Agreement in a form reasonably satisfactory to them by no later than March 15, 2010. |
| **Lender:** | UTA Capital LLC or a wholly owned subsidiary ("UTA" or "Lender"), a Delaware limited liability company. |
| **Loan Amount:** | $4,820,000 |
| **Loan Structure:** | A loan of $4,820,000 (the "Loan"). Lender may syndicate a portion of the Loan to other parties, but will retain all decision-making authority with respect to all matters relating to the Loan and the Collateral (as hereinafter defined). The Beachwold Parties (as defined below) will be a participant in the Loan to the extent of $620,000. |
| **Maturity:** | If the Plan is not confirmed by June 1, 2010, the Loan shall mature on September 1, 2010. Otherwise, the Loan shall mature eighteen months from the date of funding, which funding date shall be two (2) days following the entry of the Approval Order (as hereinafter defined), subject to satisfaction of the conditions |

| | |
|---|---|
| | described below under "Conditions" and "Closing Date." |
| **Closing Date:** | The Closing Date of the Loan shall be two (2) business days after approval by the Bankruptcy Court. The Order of the Bankruptcy Court approving the Loan and its terms shall be in a form reasonably satisfactory to Lender (the "Approval Order"). All parties shall use reasonable best efforts to obtain such Approval Order by March 15, 2010. |
| **Interest Rate:** | Fifteen percent (15%) *per annum* paid monthly in arrears from available funds. Unpaid interest shall accrue and compound monthly. Any unpaid interest shall be due at Maturity. All interest shall be calculated on the basis of the actual number of days elapsed over an assumed year consisting of three hundred sixty-five (365) days. |
| **Exit Fees:** | Five percent (5%) of the Loan to the Lender ("Exit Fee"), payable as described below under "Distribution Waterfall." |
| **Additional Interest:** | Payable as described below under "Distribution Waterfall." |
| **New Ansonia** | A new company will be formed by Beachwold Partners LP and Robert Rothenberg (collectively, the "Beachwold Parties") as a Delaware limited liability company ("New Ansonia") and will acquire all of Tarragon Development Company LLC's ("TDC") interest in Ansonia Apartments, LP ("Ansonia LP"). |
| | For their respective contributions, the Beachwold Parties shall collectively receive 50% of the equity of New Ansonia and an entity established by the existing creditors of Borrowers (the "Tarragon Creditor Entity") shall receive 50% of the equity of New Ansonia. The terms and conditions of an Operating Agreement of New Ansonia shall be agreed by and between the Beachwold Parties and the Tarragon Creditor Entity and shall include protections against related party transactions, restrictions on equity grants, provisions governing the transfer or sale of equity interests, a delineation of management decisions, board decisions and member decisions, and restrictions on the issuance of debt or equity. |
| **New Ansonia Option:** | In the event that the existing loan made by General Electric Credit Corporation ("GECC") to Ansonia LP or subsidiaries of Ansonia LP (the "GECC Loan") is satisfied in full or with the prior written consent of GECC, Lender shall have the right to convert the Loan into 11% of the equity of New Ansonia (the "New Ansonia Option"). Upon such conversion, the interest of |

2

|  |  |
|---|---|
|  | the Tarragon Creditor Entity in New Ansonia shall be increased to 60% and the interest of the Beachwold Parties in New Ansonia shall be reduced to 29%. |
|  | Notwithstanding the foregoing, the Lender shall not directly or indirectly contact or have any communications with GECC with respect to the GECC Loan. |
| **Collateral:** | Except for TDC's interest in Ansonia LP which shall be transferred to New Ansonia as described above, the collateral for the Loan shall be the same as the collateral that was pledged by Borrowers in connection with the Existing DIP Loan, which shall include all assets of Borrowers which can now or in the future be pledged to Lender ("Collateral"). |
|  | The partnership interests of New Ansonia in Ansonia LP shall be held subject to a negative pledge that precludes New Ansonia from pledging or otherwise encumbering such interests until the Loan has been satisfied in full. In addition, prior to the repayment in full of the Loan and the Exit Fee, all distributions otherwise payable to the members of New Ansonia shall be distributed to Lender and applied, *first*, to any outstanding interest due on the Loan, *second*, to reduce the principal amount of the Loan, and *third*, to pay the Exit Fee. |
| **Liquidation:** | Prior to confirmation of the Plan, Borrowers shall proceed diligently to liquidate the Collateral and distribute the net proceeds of liquidation as described below under "Distribution Waterfall." Following confirmation of the Plan, Borrowers and the Tarragon Creditor Entity shall proceed diligently to liquidate the Collateral in accordance with the terms and conditions of the Plan. |
|  | Borrowers, consistent with the terms of the Plan, shall have all decision making rights with respect to the proposed sale or other disposition of any assets of the Borrowers or any of their affiliates, including the Collateral. Notwithstanding the forgoing, with regard to certain specific assets listed on Schedule A (the "Material Liquidation Assets"), the parties to this Term Sheet shall agree to a schedule of estimated minimum net liquidation proceeds (the "Minimum Liquidation Proceeds") to be realized from the sale or other disposition of such Material Liquidation Assets. The Lender shall have approval rights (such approval not to be unreasonably withheld, conditioned or delayed) only with regard to a proposed sale or other disposition of a Material Liquidation Asset that, if consummated, would result in net liquidation proceeds below the Minimum |

3

|  |  |
|---|---|
|  | Liquidation Proceeds amount associated to such Material Liquidation Asset. |
| **Distribution Waterfall:** | All Surplus Cash, and, upon the sale or other disposition of any item of the Collateral, net proceeds of sale, after (i) payment of all senior liens on the asset being sold that exist as of the date of such sale or disposition, (ii) payment of all other creditor claims against the owner of the asset being sold that exist as of the date of such sale or disposition, and (iii) payment of all reasonable and customary expenses of sale, shall be distributed by the Borrowers as follows: |

(i) First, 100% to Lender until (a) all reimbursement obligations to Lender provided for in the loan documents with respect to reimbursement of any expenses incurred by Lender after the Loan funding in enforcing its rights or maintaining the Collateral have been satisfied in full, and (b) all interest on the Loan that is then due and payable has been paid in full; *then*

(ii) Second, 100% to Lender until all principal of the Loan has been paid in full; *then*

(iii) Third, 100% to Lender until the Exit Fee has been paid in full; *then*

(iv) Fourth, 100% to payment of Deferred Confirmation Expenses (as defined below) according to the Plan until such Deferred Confirmation Expenses are paid in full, and then to the Tarragon Creditor Entity to be distributed pursuant to the terms of the Plan until a collective total of $8 million has been paid or distributed to all parties pursuant to clauses (i)-(iii), this clause (iv) or as Permitted Overhead Expenses (as defined below); *then*

(v) Fifth, 11% to Lender as additional interest, and 89% to payment of Deferred Confirmation Expenses according to the Plan until such Deferred Confirmation Expenses are paid in full, and then to the Tarragon Creditor Entity, until a total of $2 million has been paid or distributed pursuant to this clause (v); provided, however, that if the Order has not been obtained by March 31, 2010 or has been stayed or challenged after issuance, or Lender has previously waived its right to terminate this Term Sheet for failure to enter into definitive loan documents by March 22, 2010, Lender shall first be reimbursed for all of its reasonable unreimbursed expenses related to the Loan transaction and related Bankruptcy Court matters in excess of the $100,000 cap after a total of $1 million has been paid or distributed, and before any further payments or distributions are

4

made pursuant to this clause (v); *then*

(vi) Sixth, 22% to Lender as additional interest and the remaining 78% as follows: first, the entire 78% shall be distributed to payment of Deferred Confirmation Expenses according to the Plan until such Deferred Confirmation Expenses are paid in full, and then after such Deferred Confirmation Expenses are paid in full, 13% to the Beachwold Parties, and 65% to the Tarragon Creditor Entity.

"Deferred Confirmation Expenses" shall mean, to the extent not already paid on or before the Effective Date of the Plan, (i) all allowed administrative and priority claims in the Chapter 11 cases of Tarragon Corporation, Tarragon Development Corporation, Tarragon Development Company, LLC and Tarragon South Development, LLC, and (ii) all pre-confirmation and post-confirmation fees due to the Office of the United States Trustee.

Notwithstanding the foregoing, for any month in which the Borrowers do not have Surplus Cash (as defined below) up to $90,000 per month of cash flow or net liquidation proceeds may be utilized for payment of Borrowers' overhead expenses and operating costs, including without limitation, taxes and priority claims ("Permitted Overhead Expenses") prior to any payment or distribution described above pursuant to the Distribution Waterfall.

"Surplus Cash" means all cash on hand of Borrowers in excess of $500,000 other than proceeds of the Loan. For avoidance of doubt, Borrowers and their affiliates shall be permitted to utilize any cash on hand that is less than $500,000 (excluding net proceeds from the sale of Collateral) for payment of Borrowers' Permitted Overhead Expenses prior to any payment or distribution described above pursuant to the Distribution Waterfall. Any remaining cash on hand of Borrowers following the sale or other distribution of the last remaining asset of Borrowers shall be distributed pursuant to the Distribution Waterfall described above.

| | |
|---|---|
| **Representations and Warranties:** | Usual and customary for transactions of this type shall be included in the loan documents evidencing the Loan. |
| **Covenants:** | Usual and customary restrictive and financial covenants for transactions of this type. |
| **Beachwold Parties Waiver:** | For consideration of the benefits they are receiving under this |

5

|              |                                                                                                                                                                                                                                                               |
|--------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | Term Sheet, the Beachwold Parties shall agree to waive approximately $40,000,000 in claims against Tarragon.                                                                                                                                                   |
| **Conditions:** | As reasonably established by Borrowers and Lender, (a) all necessary bankruptcy court approvals, (b) mutual agreement on the specific details of the Loan and the loan documents evidencing the Loan, and (c) the terms and conditions of the Operating Agreement of New Ansonia shall be agreed by and between the Beachwold Parties and the Tarragon Creditor Entity. |

As an inducement to Lender to not require customary satisfactory due diligence as a condition to entry into the loan documents evidencing the Loan and funding of the Loan, Tarragon:

(a) agree that Lender's representatives shall, during normal business hours upon advance notice, have reasonable access to the books and records and representatives and officers of Tarragon, the other Borrowers and their affiliates; and

(b) hereby represents and warrants to Lender as to the Material Liquidation Assets that, assuming consummation of the Loan, and except as otherwise previously disclosed in writing to Lender:

(1) <u>Schedule B</u> sets forth Tarragon or its affiliates equity interest in the Material Liquidation Assets, which equity interest, except as set forth on <u>Schedule B</u>, is not subject to any security interest, lien or pledge;

(2) the Material Liquidation Assets are subject only to such mortgages, liens or security interests (other than immaterial liens or security interests created in the ordinary course and not for money borrowed) as are reflected on balance sheets, operating statements or schedules previously provided to Lender;

(3) all commercial tenant space leases with respect to the Material Liquidation Assets are in full force and effect and there are no commercial tenant defaults thereunder that materially and adversely affect the value of the Material Liquidation Assets;

(4) the most recent balance sheet and operating statement with respect to each Material Liquidation Asset or its direct equity owner is true and correct in all material respects as of its date; and

6

|  |  |
|---|---|
|  | (5) except as set forth on Schedule C, there are no material liabilities, contingent or otherwise, or pending or threatened (in writing) material litigation or governmental proceedings, affecting the Material Liquidation Assets or their equity owner that are not reflected on the balance sheet or operating statement with respect to such Material Liquidation Assets or equity owners. |
|  | A breach of any of these representations and warranties that has a material adverse effect on the aggregate Minimum Liquidation Proceeds of the Material Liquidation Assets, shall not give rise to a claim by Lender for damages (other than reimbursement for its actual and reasonable legal and diligence expenses), but shall entitle Lender to elect not to enter into the loan documents evidencing the Loan or to fund the Loan, and to seek reimbursement of such expenses. |
| **Existing DIP Loan:** | Upon entry of an order of the Bankruptcy Court approving the Loan, the Existing DIP Loan shall be repaid from the proceeds of the Loan or the funds necessary to repay the Existing DIP Loan shall be escrowed pursuant to an Order of the Bankruptcy Court. |
| **Ansonia Waiver and Tax Neutrality:** | (a) At the time that a person not currently a member of New Ansonia ("Funding Member") makes funds available to New Ansonia and is admitted to New Ansonia as a member and such partner requires that Ansonia LLC ("Ansonia") waive its right to approve and consent to transactions, Ansonia agrees to do so on the terms and conditions set forth below. In the event that the Tax Neutrality Loans (as defined below) provided for herein are not made as required, the waiver would no longer be effective and Ansonia's consent will be required. |
|  | (b) On a transaction which results in a taxable gain being allocated to Ansonia, a loan will be made by Funding Member to cover the estimated taxes of the members of Ansonia based on the estimated gain to be allocated to Ansonia. If the loan is not made at the time of the transaction, there shall be assurances satisfactory to Ansonia that the loan will be made and that it shall be made to permit taxes (including estimated taxes) to be paid on a timely basis. If a member has no taxes to pay in any year for which a loan is made, such member receiving a loan shall repay such loan or if the taxes payable by such member in any such year are less than the loan amount made in such year, the member receiving a loan shall repay the portion of the loan which exceeds such members taxes. Each member receiving a |

7

loan for any year shall provide to New Tarragon reasonably promptly during the calendar year immediately following the transaction a certificate from an independent certified public accountant that the amount of the federal, state and local taxes payable by such member exceeds the amount of all loans made for the year in which such transactions occurred. If a member shall fail to provide such a certificate, then if he or she does not cure such failure within 10 business days of receiving a notice from New Ansonia that such member has not provided such certification, the loan(s) made to such member in such year shall be due and payable.

(c) The maximum amount of all such loans will be $5 million, subject to reduction to the extent that New Ansonia makes distributions to Robert Rothenberg and/or Ansonia (other than to cover taxes) prior to making such loans. Such loans are referred to herein as the "Tax Neutrality Loans".

(d) Loans will be non-interest bearing for 5 years and thereafter such loans will bear interest at 1.2% per annum. Each of the loans will be due eight years after the loan was made. Each borrower will be personally liable for 50% of an amount equal to (i) any unpaid portion of the principal of the loans made to him less (ii) such member's share of Ansonia's equity in Ansonia LP as pledged to secure the Tax Neutrality Loans.

(e) The Tax Neutrality Loans will be secured by each of the Ansonia's member's interest in Ansonia. In addition, Robert Rothenberg's loan(s) will be secured by his interest in New Ansonia. Any distributions to Ansonia will be used to repay each of the member's loan obligations pro rata and other distributions to Robert Rothenberg will be used to pay his obligations on the loans. To the extent that Robert Rothenberg's obligations are fully satisfied before the other members, his share of future distributions shall be paid to him.

**Property Management:**  New Ansonia will enter into a five year property management agreement ("the Beachwold Property Management Agreement") with the Beachwold Parties or their designee (the "Beachwold Manager"). The Beachwold Property Management Agreement shall provide for, among other things, the Beachwold Parties to manage the properties directly or indirectly owned by New Ansonia, for a fee of 5% ("Beachwold Management Fee") of the gross revenues generated from such properties. The Beachwold Management Fee shall cover all overhead and administrative costs associated with managing such properties, including,

8

38590/0031-6325459v11

without limitation, all overhead and administrative costs associated with any subcontract.

The Beachwold Manager shall enter into a three-year subcontract for property management services (the "Jupiter Management Agreement") with Jupiter Communities LLC or its designee ("Jupiter"). The Jupiter Management Agreement shall provide for, among other things, Jupiter to manage the properties owned by the Borrowers/New Ansonia in Texas, Alabama and Tennessee and any other properties that are mutually agreed upon by the parties thereto for a fee of 3% of the gross revenues generated from the properties located in Texas, a fee of 2.5% of the gross revenues generated from the properties located in Alabama and Tennessee, and a fee as may agreed by the parties thereto with respect to any other properties. Such management fees shall cover all overhead and administrative costs associated with managing such properties other than those overhead and administrative costs that are sufficiently discrete so as to enable Jupiter to determine the specific amount that is directly related to the applicable property and other than any operating costs or expenses related to the applicable property. In addition, the Beachwold Manager shall engage Jupiter to provide risk management services pursuant to agreements to be negotiated among the parties.

**Use of Proceeds:** To repay the Existing DIP Loan, make partial payment to professionals, make payment to Lender's counsel and furnish working capital to Borrowers.

**Indemnifications:** Borrowers will hold Lender harmless from any and all damages or liabilities arising in connection with this financing other than as a result of Lender's fraud, gross negligence or willful misconduct.

**Documents:** To be satisfactory to Lender, Lender's counsel, Borrowers, and Borrowers' counsel. The documents are to be prepared by Lender's counsel and reviewed by Borrowers' and the Creditor Committee's counsel.

**Legal Fees/Expenses:** The Borrowers shall pay to Lender all of Lender's reasonable legal and other fees relating to due diligence for and negotiation, documentation and closing of the Loan, not to exceed $100,000 in the aggregate and subject to Bankruptcy Court approval. The Borrowers shall seek approval of the payment of such expenses in connection with approval of the Loan, and such payment shall be made out of the closing proceeds.

9

| | |
|---|---|
| **Plan and Disclosure Statement:** | Upon the parties' execution of this Term Sheet, reasonable efforts will be made to prepare the Plan, disclosure statement, order confirming the Plan, and all other required documents, and seek and obtain final bankruptcy court approval and confirmation of the Plan, following all applicable notice and hearing requirements, by sixty (60) days from the date of this Term Sheet. By no later than March 11, 2010, the Borrowers shall provide to Lender a draft of the Plan and accompanying Disclosure Statement, which shall incorporate the terms of this Term Sheet. |
| **Expiration Date:** | This Term Sheet shall expire if not accepted and agreed by the Borrowers on or before March 4, 2010. Either party shall have the right to terminate this Term Sheet if the parties have not entered into definitive documents by March 22, 2010. |
| **Exclusivity:** | Following the execution of this Term Sheet by all parties, Borrowers shall not enter into any negotiations or agreements with any other party with respect to exit financing for a liquidating plan of reorganization or other plan of reorganization, or replacement DIP financing, unless the parties have not entered into definitive documents by March 12, 2010. |
| **Expense Reimbursement upon Alternative Transaction:** | Following the execution of this Term Sheet by all parties, in the event that a financing transaction similar to the transaction described herein is consummated with a party other than Lender (the "Alternative Transaction"), then Borrowers will support a motion by Lender for reimbursement of its reasonable expenses actually incurred by Lender in connection with the Loan to the extent permissible and allowable under section 503(b) of the Bankruptcy Code (such expenses not to exceed 3% of the amount of the Loan), all payable at the closing of the Alternative Transaction. |
| **Governing Law and Venue:** | This Term Sheet and the definitive transaction documents will be governed by the laws of the State of New York, without regard to the principles of conflict of laws thereof. The United States Bankruptcy Court for the District of New Jersey where the Borrowers' Chapter 11 cases are pending shall be the exclusive venue for the adjudication of all disputes. |

The parties hereto agree to negotiate in good faith, using commercially reasonable efforts, definitive terms for the financing transaction described herein. Please indicate your acknowledgment of the foregoing by returning to us a signed copy of this Term Sheet.

[Signature Page Follows]

10

Agreed and accepted March 5, 2010

        OFFICIAL COMMITTEE OF UNSECURED
        CREDITORS OF TARRAGON CORPORATION,
        et al.

By: _____
    Name: Raphael Licht
    Title: Secretary,
        Taberna Capital Management, LLC

UTA CAPITAL LLC

By: YZT MANAGEMENT LLC, its Managing
    Member

By: _____
    Name: Udi Toledano
    Title   Managing Member

TABERNA CAPITAL MANAGEMENT, LLC

By: _____
    Name: Raphael Licht
    Title: Secretary

BEACHWOLD PARTNERS, L.P.

By: _____
    Name:
    Title:

TARRAGON CORPORATION
(on behalf of itself and all other Debtors)

By: _____
    Name:
    Title:

10

38590/0031-6325459v9

Agreed and accepted March 5, 2010

    OFFICIAL COMMITTEE OF UNSECURED
    CREDITORS OF TARRAGON CORPORATION,
    et al.

    By:_____
       Name:
       Title:

    UTA CAPITAL LLC

    By: YZT MANAGEMENT LLC, its Managing
        Member

    By: */s/ Udi Toledano*
       Name: Udi Toledano
       Title  Managing Member

    TABERNA CAPITAL MANAGEMENT, LLC

    By:_____
       Name:
       Title:

    BEACHWOLD PARTNERS, L.P.

    By:_____
       Name:
       Title:

    TARRAGON CORPORATION
    (on behalf of itself and all other Debtors)

    By:_____
       Name:
       Title:

11

Agreed and accepted March 5, 2010

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TARRAGON CORPORATION,
et al.

By:_____
   Name:
   Title:

UTA CAPITAL LLC

By: YZT MANAGEMENT LLC, its Managing Member

   By:_____
     Name: Udi Toledano
     Title: Managing Member

TABERNA CAPITAL MANAGEMENT, LLC

By:_____
   Name:
   Title:

BEACHWOLD PARTNERS, L.P.

By: /s/ William S. Friedman
   Name: William S. Friedman
   Title: General Partner

TARRAGON CORPORATION
(on behalf of itself and all other Debtors)

By: /s/ William S. Friedman
   Name: William S. Friedman
   Title: CEO

11

38590/0031-6325459v11

ANSONIA, LLC

By: _____
Name: Robert Rothenberg
Title: Managing Member

_____
Robert Rothenberg

_____
William Friedman

## Schedule A

### Material Liquidation Assets

1. 800 Madison Street Urban Renewal, LLC
2. 900 Monroe Development, LLC
3. Block 106 Development, LLC
4. Promissory Note in the original principal amount of $1,500,000 from URSA Development Group, LLC to Block 112 Development, LLC
5. Hoboken Cinema, LLC
6. Orion Towers Tarragon, LLP
7. Mustang Creek National, LP
8. Summit on the Lake Associates, Ltd.
9. Keane Stud, LLC
10. Uptown Village A, LLC
    Uptown Village B, LLC

Schedule B

Equity Interests

|  | Entity | Equity Holders |
|---|---|---|
| 1. | 800 Madison Street Urban Renewal, LLC | Block 88 Development, LLC (100%)<br><br>Tarragon Corporation (40%) **<br>**Frank Raia (15%)**<br>Tarragon Development Corporation (30%) **<br>**Mia M. Macri Irrevocable Living Trust (15%)** |
| 2. | 900 Monroe Development, LLC | Tarragon Corporation (87.5%)<br>Tarragon Development Corporation (12.5%) |
| 3. | Block 106 Development, LLC | Tarragon Development Corporation (62.5%)<br>**URSA Development Group, LLC (37.5%)** |
|  | Block 144 Development, LLC | Tarragon Development Corporation (62.5%)<br>**URSA Development Group, LLC (37.5%)** |
| 4. | Promissory Note in the original principal amount of $1,500,000 from URSA Development Group, LLC to Block 112 Development, LLC | Not Applicable |
| 5. | Hoboken Cinema, LLC | Tarragon Corporation (47.5%)<br>**URSA Development Group, LLC (22.5%)**<br>**Mia M. Macri Irrevocable Living trust (15%)**<br>**Frank Raia (15%)** |
| 6. | Orion Towers Tarragon, LLP | General Partner<br><br>Orion Tarragon GP, Inc. (0.1%)<br><br>    Tarragon South Development Corp. (100%)<br><br>Limited Partner<br><br>Orion Tarragon LP, Inc. (99.9%)<br><br>    Tarragon South Development Corp. (100%) |

14

38590/0031-6325459v11

| 7. | Mustang Creek National, LP | General Partner<br><br>Mustang National, Inc. (1%)<br><br>    Tarragon Corporation (100%)<br><br>Limited Partner<br><br>Tarragon Limited, Inc. (99%)<br><br>    Tarragon Corporation (100%) |
|---|---|---|
| 8. | Summit on the Lake Associates, Ltd. | General Partner<br><br>National Income Realty Investors, Inc. (1%)<br><br>    Tarragon Corporation (100%)<br><br>Limited Partner<br><br>Tarragon Corporation (99%) |
| 9. | Keane Stud, LLC | Tarragon Corporation (50%)<br>**Depot Hill Road, LLC (50%)** |
| 10. | Uptown Village A, LLC | Tarragon South Development Corp. (100%) |
|  | Uptown Village B, LLC | Tarragon South Development Corp. (100%) |

Note: Companies listed in bold are not affiliates of Tarragon Corporation.

** Tarragon Corporation's and Tarragon Development Corporation's interest in Block 88 Development, LLC is subject to a pledge in favor of Bank of America.

15

Schedule C

Block 144 Development, LLC

The holder, by assignment, of a mortgage note (the "Block 144 Lender") relative to undeveloped real estate in Hoboken, New Jersey (the "Block 144 Property") commenced a foreclosure action against the owner of the Block 144 Property, Block 144 Development, LLC ("Block 144 Development"), claiming Block 144 Development owed it in excess of $1.15 million. The foreclosure action is venued in the Superior Court of New Jersey, Hudson County, and is entitled Block 144, Mtge, LLC v. Block 144 Development, LLC et als, Docket No. F-2322-09, (the "Block 144 Foreclosure Action"). Block 144 Development has contested the amounts allegedly due under the mortgage note.

The Block 144 Lender also commenced a separate action asserting that Block 144 Development breached the terms of the mortgage note. This action is venued in the Superior Court of New Jersey, Hudson County, and is entitled Block 144, Mtge, LLC v. Block 144 Development, LLC et als., Docket No.: L-2154-09. Block 144 Development has contested the claims in this action.

On December 23, 2009, the New Jersey Transit Corporation filed an eminent document action in the Superior Court of New Jersey, Hudson County, against virtually all the Block 144 Property subject to the Block 144 Foreclosure Action, entitled New Jersey Transit Corporation v. Block 144 Development, LLC,, Docket No.: L-6539-09 (the "Block 144 Eminent Domain Action"). The filing of the Block 144 Eminent Domain Action terminated the Block 144 Foreclosure Action and transmuted Plaintiff's mortgage interest in the Block 144 Property into a claim against the fund placed into Court by the public authority.

Block 106 Development, LLC

The holder, by assignment, of a mortgage note (the "Block 106 Lender") relative to undeveloped real estate in Hoboken, New Jersey (the "Block 106 Property") commenced a foreclosure action against the owner of the Block 106 Property, Block 106 Development, LLC ("Block 106 Development"), claiming Block 106 Development owed it in excess of $6.3 million. The foreclosure action is venued in the Superior Court of New Jersey, Hudson County, and is entitled Block 106, Mtge, LLC v. Block 106 Development, LLC et als, Docket No. F-3002-09, (the "Block 106 Foreclosure Action"). Block 106 Development contested the amounts allegedly due under the mortgage note.

The Block 106 Lender also commenced a separate action asserting that Block 106 Development breached the terms of the mortgage note. This action is venued in the Superior Court of New Jersey, Hudson County, and is entitled Block 106 Mtge, LLC v. Block 106 Development, LLC et

als., Docket No.: L-802-09. Block 106 Development has contested the claims in this action. There is a April 6, 2010 trial date scheduled in this action. In addition, the Block 106 Lender filed a motion for summary judgment, returnable on April 1, 2010, which Block 106 Development is contesting as procedurally and substantively defective.

17